# 23-0197-cv

# United States Court of Appeals
*for the*
# Second Circuit

RUTHETTA L. ALFORD,

*Plaintiff-Appellant,*

— v. —

NFTA-METRO, ROBERT W. GUISE,

*Defendants-Appellees.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NEW YORK

## BRIEF AND SUPPLEMENTAL APPENDIX FOR DEFENDANTS-APPELLEES

WAYNE R. GRADL
NIAGARA FRONTIER
TRANSPORTATION AUTHORITY
*Attorneys for Defendants-Appellees*
181 Ellicott Street
Buffalo, New York 14203
(716) 855-6590

COUNSEL PRESS    (800) 4-APPEAL • (512753)

# <u>CORPORATE DISCLOSURE STATEMENT</u>

Pursuant to Federal Rule of Appellate Procedure 26.1, Appellee Niagara Frontier Transit Metro System, Inc. ["Appellee NFTA Metro"] certifies and states:

Appellee NFTA Metro is a wholly owned subsidiary of the Niagara Frontier Transportation Authority which is a New York State public authority created under the New York Public Authorities §§1299 *et seq.*

i

# **TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES ......................................................................... iii

STATEMENT OF THE ISSUES .....................................................................1

STATEMENT OF THE CASE .........................................................................2

    A.    FACTUAL BACKGROUND ................................................. 2

    B.    PROCEDURAL BACKGROUND ........................................7

SUMMARY OF APPELLEES' LEGAL ARGUMENTS .......................................9

ARGUMENT ................................................................................................10

    A.    THE CLAIM AGAINST APPELLEE GUISE WAS PROPERLY DISMISSED ..............................................................10

    B.    APPELLANT HAS NO ACTIONABLE HOSTILE ENVIRONMENT CLAIM.................................................................10

    C.    APPELLANT WAS NOT CONSTRUCTIVELY DISCHARGED .......................................................................16

    D.    APPELLEE NFTA METRO IS NOT PROPERLY CHARGED OR HELD LIABLE FOR APPELLEE GUISE'S REMARKS .......................................................17

    E.    APPELLANT HAS NO ARGUABLE RETALIATION CLAIM ...........................................................................19

    F.    APPELLANT'S NY STATE LAW CLAIMS WERE PROPERLY DISMISSED ..................................................23

CONCLUSION..........................................................................................24

CERTIFICATE OF COMPLIANCE ...........................................................25

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases:**

*Arungaw v. Brennan*,
No. 1: 17-cv-9586-GHW (S.D.N.Y. Jan. 14, 2019)..............................................15

*Barton v. Unity Health System*,
No. 14-CV-6658-FPG-JWF (W.D.N.Y. Mar. 19, 2018) .....................................19

*Barton v. Unity Health Sys.*,
768 F. App'x 83 (2d Cir 2019)..........................................................................19

*Burns v. City of Utica*,
590 F. App'x 44 (2d Cir. 2014) .........................................................................19

*Carter v. New Venture Gear, Inc.*,
310 F. App'x 454 (2d Cir. 2009)........................................................................19

*Chukwuka v. City of New York*,
513 Fed. App'x 34 (2d Cir. 2013) .....................................................................11

*Draper v. New York State Office Of Parks*,
*Recreation, And Historic Preservation*,
No. 10-CV-6414 (W.D.N.Y. Aug. 29, 2013) .....................................................12

*Duch v. Jakubek*,
588 F.3d 757 (2d Cir. 2009) .............................................................................17

*Feingold v. New York*,
366 F.3d 138 (2d Cir. 2004) .............................................................................18

*Fincher v. Depository Trust and Clearing Corp.*,
604 F.3d 712 (2d Cir. 2010) .............................................................................16

*Guerra v. Jones*,
421 F. App'x 15 (2d Cir. 2011)..........................................................................10

*Haggood v. Rubin & Rothman, LLC*,
No. 14-cv-341 (SJF)(AKT) (N.D.N.Y. Nov. 17, 2014)......................................12

*Lunts v Rochester City Sch. Dist.*,
515 F. App'x 11 (2d Cir 2013)...........................................................................14

*Matter of Figueroa v. New York State Div. of Human Rights*,
142 A.D.3d 1316, 38 N.Y.S.3d 857 (App. Div. 2016)........................................23

*Matter of Kirsch v.*
*Board of Education of Williamsville Central School District*,
No. 15-CV-721 (W.D.N.Y 2019). ........................................................14

*Matter of State Div. of Human Rights v. St. Elizabeth's Hosp.*,
66 N.Y.2d 684, 496 N.Y.S.2d 411, 487 N.E.2d 268 (1985) ...............................23

*Moore v. City of New York*,
08 Civ. 8879 (PGG) (S.D.N.Y. Mar. 1, 2010) ....................................................10

*Reichman v. City of New York*,
179 A.D.3d 1115, 117 N.Y.S.3d 280 (App. Div. 2020).......................................23

*Reyes v. Westchester Cnty. Health Care Corp.*,
19-CV-08916 (PMH) (S.D.N.Y. Jan. 29, 2021); ...................................................12

*Rivera v. Rochester Genesee Regional Transp.*,
702 F.3d 685 (2d Cir. 2012) ..................................................................................11

*Smith v. Niagara Frontier Transportation Authority*,
03-CV-0548E(Sr) (W.D.N.Y. Apr. 11, 2007)...........................................10, 12, 19

*Williams v. N.Y.C. Dep't of Educ.*,
21-CV-0520 (LTS) (S.D.N.Y. Jun. 7, 2021).......................................................10

*Zheng-Smith v. Nassau Health Care Corp.*,
486 F. Supp. 3d 611, 623 – 24 (E.D.N.Y. 2020)..................................................12

## Statutes & Other Authorities:

FRCP Rule 12(b)(6)................................................................................................8

FRCP Rule 56 ...................................................................................................1, 8

FRCP Rule 56(d)...........................................................................................14, 15

## **STATEMENT OF THE ISSUES**

The District Court's granting of summary judgment dismissing Appellant's complaint pursuant to FRCP 56 required resolving the following issues:

1.      Did Appellant's Title VII claim against individual Appellee Guise fail to state a claim for relief against him personally as a matter of law?

2.      Were Appellee Guise's argument about a rag place setting and disparaging remarks about George Floyd to Appellant sufficient to create a racially hostile work environment on its own or in conjunction with the decision of the management of Appellee Niagara Frontier Transit Metro System, Inc. ["Appellee NFTA-Metro"] to decline to discharge Appellee Guise for said argument and remarks?

3.      Did Appellee NFTA-Metro's failure to discharge Appellee Guise after Appellant made an internal complaint about his disparaging remarks concerning George Floyd constitute a constructive discharge that justified Appellant quitting her employment by opting to retire?

4.      Was the response of Appellee NFTA-Metro to Appellant's internal complaint about Appellee Guise's disparaging remarks about George Floyd reasonable and sufficient insulate Appellee NFTA-Metro from incurring any liability for said remarks?

1

5.    Could Appellant's submissions to the District Court be construed to constitute a viable retaliation claim?

6.    Were Appellant's claims under the New York State Human Rights Law properly dismissed along with the Federal Title VII claim?

## STATEMENT OF THE CASE

### A.    FACTUAL BACKGROUND

The facts of this case are rather straightforward and essentially undisputed. Consistently, Appellees' counsel in this matter planned to conduct absolutely no discovery. Appellees were either entitled to the summary judgment granted by the District Court or Appellant was entitled to a trial on the alleged emotional distress damages she claimed to have suffered.

To be noted preliminarily is that Appellant is an African American and began her employment with Appellee NFTA Metro as an Office Clerk A in September 2001. *See* Appendix ["App."] at pp. 25 & 35 (N.B., page citations are to the Court's numbering of "Document 69"). The final position that Appellant held with Appellee NFTA Metro before her retirement effective August 1, 2021, was Senior Clerk A. *Id*. at p. 37. Throughout her tenure with Appellee NFTA Metro she was employed in positions that were part of the bargaining unit of employees represented by Amalgamated Transit Union Local Union 1342. *Id*. at pp. 25 -26.

2

On June 11, 2020, Appellant had a verbal exchange with her immediate supervisor Appellee Robert W. Guise ["Appellee Guise"] about her putting a cloth or rag on a table at the Allen Street Light Rail Station as a sort of table setting. During this exchange Appellee Guise mentioned the name George Floyd and made disparaging remarks about him, including that he was not a saint and had pointed a gun at a pregnant woman, as well as speculated Floyd was not really dead. *See* App. at pp. 32 & 42 - 43 and Report and Recommendation ["R & R"], pp. 3 – 4, App. at 160 - 61. Although not mentioned in her EEOC charge, Appellant likewise claimed further upset at the end of that day when she was leaving work and observed Appellee Guise with "a huge grin on his face as he sat at his desk." R & R at p. 4, App. at p. 161.

After speaking with co-workers about this conversation with Appellee Guise, Appellant opted to complain to Facility Manager Darren Haag who in turn advised her to make a formal complaint about the incident. *See* App. at 32. Appellant did file a formal harassment complaint against Appellee Guise with Defendant NFTA Metro's EEO/Diversity Development on or about August 3, 2020. *See id*. at pp. 40 – 47. Appellee Guise did admit to mentioning George Floyd in conversation with the Appellant in the context of directing her that she was to not leave cloth or rag table settings at the Allen Street Light Rail Station so as not to encourage loitering at the station and minimize the possibility of confrontations

3

that could lead to incidents like the fatal one involving George Floyd. *See* App. at p. 48. For purposes of the summary judgment motion, taken as true were Appellant's allegations that during their June 11, 2020 conversations Appellee Guise also made the disparaging remarks concerning George Floyd claimed by Appellant and cited in the District Court's Report and Recommendation. *See* App. at pp. 32 – 33, 39 – 46 & 160 - 61.

Appellee NFTA Metro's EEO/Diversity Development Department completed its investigation of Appellant's harassment complaint against Appellee Guise on or about August 17, 2020. On that day, Department Manager DeJuan Hardy sent Appellant a letter explaining, among other things, that Appellee Guise was "re-instructed regarding acceptable behavior in the workplace" and that the status of her complaint was now closed. *See* App. at p. 50. Appellant Guise received a letter from EEO/Diversity Development Department Manager Hardy which directed him to contact his office to schedule Sensitivity Training. *See id*. at p. 52. Appellee Guise had originally begun his employment with Appellee NFTA Metro in February of 1983 and had served as NFTA Metro's Rail Maintenance Manager since November of 2014. *See id*. at pp. 27, 54 & 56. There was no record of Appellee Guise ever being subject to a prior harassment complaint from another employee for racial or any other reason. *See id*. at p. 27. Appellant herself stated in her papers filed with the District Court that prior to June 11, 2020, "Defendant

4

Guise and I, Plaintiff Alford had a great networking relationship while he supervised as Rail Car Vehicle Maintenance Superintendent." *See* App. at pp. 125 & 152. Appellant immediately continued thereafter that "Defendant Guise and I, Plaintiff also had an awesome networking relationship when he became Rail Maintenance Manager {Dept. #50}." *Id.*

Nevertheless, inasmuch as Appellant was interested in seeing Appellee Guise fired as a result of her complaint about his June 11, 2020 remarks about George Floyd (s*ee* App. at pp. 32 - 33), the matter did not end with the decision issued by the EEO/Diversity Development Department. Appellant approached EEO/Diversity Development Department Manager Hardy to inquire on why Appellee Guise was still employed and reported in her EEOC charge that she was told the June 11, 2020 conversations with Appellee Guise were "his first offense." *See* App. at p. 33. Thereafter, on September 13, 2020, Appellant opted to file an employee injury report and seek Workers' Compensation benefits for alleged emotional injuries attributable to her June 11, 2020 conversations with Defendant Guise. *See id*. at p. 58. Shortly thereafter, Appellant opted to begin a medical leave of absence on or about September 27, 2020. *See id*. at p. 33.

On or about February 8, 2021, the New York State Workers' Compensation Board issued an administrative decision closing Appellant's claim for failure to submit required medical documentation pertaining to her claimed

5

injury. *See* App. at p. 62. In lieu of pursuing her Workers' Compensation benefits claim, Appellant instead filed the charge with the EEOC that underlies the present action on or about February 24, 2021. *See id*. at pp. 32 – 33. On or about March 3, 2021, the EEOC opted to discontinue processing of Appellant's discrimination complaint and issued a Dismissal and Notice of Rights, because "[b]ased on the information provided, the Commission is unable to conclude that the evidence obtained established a violation of Title VII." *See id*. at pp. 65 – 66.

On July 1, 2021, Karen Novo, the Director of Human Resources for Appellee NFTA Metro, sent Appellant a letter advising her that in view of the Workers' Compensation Board's decision closing her claim she would no longer be considered on a Workers' Compensation leave, but instead have the disability leave rights set forth in Section 8-3.2 of the collective bargaining agreement governing her employment and in that regard, provided Appellant with a disability benefits claim form to complete and return. *See* App. at pp. 68 – 70. Appellant responded with a letter, dated July 8, 2021, which advised that she was taking steps to reopen her claim for Workers' Compensation benefits. *See id*. at p. 72.

Then, on July 14, 2021, and again on July 19, 2021, Appellee NFTA Metro received e-mails from Amalgamated Transit Union Local Union 1342 which advised that Appellant had opted for retirement effective August 1, 2021. *See* App. at pp. 74 – 76. Accordingly, on July 19, 2021, Appellee NFTA Metro sent

Appellant correspondence which outlined her retirement benefits and confirmed that Appellant was considered as having retired effective August 1, 2021. *See id*. at pp. 78 – 81.

From June 11, 2020, through her retirement effective August 1, 2021, no formal adverse personnel action was taken against Appellant by Appellee NFTA Metro or Appellee Guise. *See* App. at p. 29. *See also* Appellant's Brief at pp. 13 - 14. Nor did Appellant's EEOC charge allege that Appellant suffered any formal adverse employment action. *See* App. at pp. 32 – 33. Instead, Appellant opted to voluntarily leave her employment on September 27, 2020, to pursue a Workers' comp claim alleging that Appellee Guise's disparaging remarks about George Floyd coupled with Appellee NFTA Metro's refusal to summarily end Appellee Guise's over 35 years of service on Appellant's complaint caused her emotional distress rendering her incapable of working. *See id*. at pp. 27, 32 – 33, 54 & 56. Appellee NFTA Metro handled Appellant's Workers' comp claim and her leave of absence ending with a voluntary retirement in a normal fashion. *Id*. at pp. 74 – 76.

## B. PROCEDURAL BACKGROUND

Appellant apparently decided that Federal court was the better venue than the New York State Workers' Compensation Board for pursuing her emotional distress claims related to hearing George Floyd spoken about badly. Rather than taking steps to reopen her Workers' comp claim as she had advised Appellee

NFTA Metro's Human Resources Director (*see* App. p. 72), Appellant instead commenced the present action *pro se* June 15, 2021. On or about October 6, 2021, the United States Marshals Service for the Western District of New York mailed out to Appellees the *pro se* Complaint together with Notice and Acknowledgement of Receipt of Summons and Complaint forms.

Appellees accepted service of the *pro se* Complaint. Inasmuch as Appellees discerned no need for any discovery in this matter, on October 28, 2021, Appellees filed a motion to dismiss the *pro se* Complaint pursuant to FRCP Rules 12(b)(6) and Rule 56 which took Appellant's claims at face value and added pertinent records and documents to the record.

On September 6, 2022, the presiding Magistrate Judge issued a Report and Recommendation ["R & R"] for the dismissal of Appellant's complaint. On October 20, 2022, Appellant filed objections to the aforementioned R & R. The presiding District Judge issued a Decision and Order adopting the R & R and directing the case closed on December 12, 2022.

After obtaining an extension to file a Notice of Appeal to this Court Appellant filed her Notice of Appeal on February 13, 2023. Appellant's deadline for submitting an appendix and a brief was subsequently extended and Appellant perfected the present appeal on September 5, 2023.

## SUMMARY OF APPELLEES' LEGAL ARGUMENTS

Summary judgment dismissing the present action was plainly appropriate. This matter presents no material disputes of facts and there was no error in the District Court's judgment that Appellant simply presented no Federal claims upon which relief could be granted. The Title VII claim against Appellee Guise is unquestionably subject to dismissal as a matter of law and a single verbal dispute wherein Appellee Guise made derogatory remarks about George Floyd as opposed to Appellant herself likewise fails to present a legally cognizable claim of a racially hostile work environment. Moreover, and contrary to Appellant's protestations, Appellee NFTA Metro's reaction to her complaint about Appellee Guise's remarks was reasonable and was properly held to insulate Appellee NFTA Metro from any liability for said remarks.

The District Court also considered whether Appellant was the victim of any unlawful retaliation and properly held that no unlawful retaliation had occurred. This exercise was most likely undertaken because Appellant had checked the retaliation box on the EEOC charge form. Nothing in the charge narrative, however, suggested that Appellant had actually suffered any act of retaliation. There is likewise no evidence in the record that Appellant had suffered any adverse personnel action prior to her decision to begin a voluntary leave of absence for her alleged emotional distress and then retire.

Lastly, the District Court properly dismissed Appellant's New York State law claims on the merits.

Nothing in Appellant's brief provides any basis for disturbing any of the District Court's rulings, but to the contrary underscores the correctness of the District Court's decision to grant summary judgment dismissing the complaint in its entirety.

## **ARGUMENT**

### A. THE CLAIM AGAINST APPELLEE GUISE WAS PROPERLY DISMISSED

The dismissal of Title VII claim against Defendant Guise requires no consideration of the undisputed material facts. Well-established is that Title VII does not create liability for individual supervisors or co-workers who are not the actual employer. *See Guerra v. Jones*, 421 F. App'x 15 (2d Cir. 2011); *Williams v. N.Y.C. Dep't of Educ.*, 21-CV-0520 (LTS) (S.D.N.Y. Jun. 7, 2021); *Moore v. City of New York*, 08 Civ. 8879 (PGG) (S.D.N.Y. Mar. 1, 2010); *Smith v. Niagara Frontier Transportation Authority*, 03-CV-0548E(Sr) (W.D.N.Y. Apr. 11, 2007).

### B. APPELLANT HAS NO ACTIONABLE HOSTILE ENVIRONMENT CLAIM

Well-established is that in order establish an actionable claim for harassment or hostile work environment under Title VII a plaintiff must produce sufficient evidence to show that the workplace was "permeated with discriminatory

intimidation, ridicule, and insult that is sufficiently severe and pervasive to alter the conditions of the victim's employment and create an abusive working environment." *See Chukwuka v. City of New York*, 513 Fed. Appx. 34 (2d Cir. 2013); *Rivera v. Rochester Genesee Regional Transp.*, 702 F.3d 685 (2d Cir. 2012). Generally, a single incident is insufficient to create a hostile environment unless "extraordinarily severe." *See supra Chukwuka*, 513 Fed. Appx. at 35 – 36.

The disagreement over whether a rag place setting should be left on a table at a subway station and Appellee Guise's disparaging remarks about George Floyd do not come close to satisfying the "severe and pervasive" standard. Appellant did not incur any formal disciplinary action over the rag disagreement and if an actionable harassment claim could be premised on a judgment or direction of a supervisor that the employee views as wrong, then surely the Federal courts would be flooded by harassment claims. Moreover, whether or not a rag place setting should be placed on a subway station table carried no derogatory racial connotations.

With respect to Appellee Guise's disparaging remarks about George Floyd and the media, they in no way denigrated Appellant herself because of her race. Nor did they convey any negative stereotypes that could be viewed to disparage African Americans in general. Plainly the undisputed speech and comments at issue should be held insufficient to create a triable claim of an intolerable or

11

racially hostile work environment. *Cf. Carter v. New Venture Gear, Inc.*, 310 F. Appx. 454 (2d Cir. 2009); *Reyes v. Westchester Cnty. Health Care Corp.*, 19-CV-08916 (PMH) (S.D.N.Y. Jan. 29, 2021); Zheng-Smith v. Nassau Health Care Corp., 486 F. Supp. 3d 611, 623 – 24 (E.D.N.Y. 2020); *Haggood V. Rubin & Rothman, LLC*, No. 14-cv-341 (SJF)(AKT) (N.D.N.Y. Nov. 17, 2014) and *Smith v. Niagara Frontier Transportation Authority*, 03-CV-0548E(Sr) (W.D.N.Y. Apr. 11, 2007). Moreover, the assertion on p. 4 of Plaintiff's Local Rule Statement that "Defendant Guise and I, Plaintiff Alford had a great networking relationship while he supervised as Rail Car Vehicle Maintenance Superintendent" and "an awesome networking relationship when he became Rail Maintenance Manager." (*see* App. at pp. 125 & 152) provides further support for holding the cloth/rag on the table dispute and the George Floyd comments to be in-actionable as an atypical, isolated incident.

That Appellant alleges that she suffered debilitating emotional distress that required her to leave her employment on account of Appellee Guise's remarks about George Floyd coupled with Appellee NFTA Metro's refusal to fire him for those remarks several months later should not operate to translate an objectively in-actionable incident into a viable Federal claim. *Cf. Draper v. New York State Office Of Parks, Recreation, And Historic Preservation*, No. 10-CV-6414 (W.D.N.Y. Aug. 29, 2013). This is particularly so given that the Record is devoid

of actual evidence that Appellant suffered noteworthy emotional distress. What the Record does contain instead is evidence that Appellant's Workers' Comp claim for debilitating emotional distress allegedly attributable to Appellee Guise's disparaging remarks about George Floyd coupled with Appellee NFTA Metro' s refusal to fire him for those remarks was closed on February 8, 2021, due to her failure to provide required medical documentation. *See* App. at p. 62. Plainly there was no error in the District Court's decision that Appellant failed to present a viable harassment or hostile environment claim.

Appellant herself concedes that the case she presented to the District Court was based on "only one incident." *See* Appellant's Brief at pp. 13 & 22. Perhaps sensing that the case she presented to the District Court is in fact legally insufficient to support an actionable claim for a racially hostile work environment, Appellant argues to this Court that had she "been allowed discovery, she could have obtained such information that the Rail yards had been a very hostile work environment for approximately the past ten years, involving verbal altercations in the open, in the men's room and behind closed doors, from employee to employee, supervisor to supervisor, manger to supervisors and mangers to employees, some leading to violent fights." *See id*. Appellant's argument in this regard appears to fail to appreciate the distinction between a generally unpleasant or hostile work environment and an actionable hostile work environment wherein the employee

13

faces ridicule, intimidation and/or harassment because of some protected trait or characteristic.

More fundamentally, in response to Appellees' motion for summary judgment Appellant did not invoke FRCP 56 (d) or offer the required affidavit showing that summary judgment was properly postponed pending specifically identified necessary discovery. Postponing summary judgment under FRCP 56 (d) requires an affidavit in which the non-moving party specifies the nature of the uncompleted discovery and specifically explains how the facts sought are reasonably expected to create a genuine issue of material fact as well as what efforts the party made to obtain the desired discovery and why those efforts were unsuccessful. *See Lunts v. Rochester City S.D.*, Fed. Appx. 515 (2d Cir. 2013); *Matter of Kirsch v. Board of Education of Williamsville Central School District,* 15 – CV -- 721 (W.D.N.Y. Mar. 15, 2019). Further, the necessary affidavit cannot merely speculate as to what potentially could be discovered or rest on a bare assertion that the evidence supporting the non-moving party's allegations is in the hands of the moving party. *See supra Kirsch*.

Appellant made no effort to advise the District Court of specific discovery she needed to unearth identified facts that would support her case and even the allegation in Appellant's Brief on p. 22 is short on specifics. Moreover, postponing discovery pursuant to FRCP 56 (d) is unwarranted and unnecessary when the facts

the non-moving party seeks to obtain are within the control of the non-moving party. *See Arungaw v. Brennan,* No. 1: 17-cv-9586-GHW (S.D.N.Y. Jan. 14, 2019). Here how Appellant would have allegedly personally suffered in a hostile work environment for the past 10 years are certainly facts within her own control as far as bringing them before the Court. Appellant, however, not only failed to attempt to explain to the District Court what facts she could obtain via discovery that would have supplemented her racially hostile work environment claim beyond the rag/cloth argument and the George Floyd comments, but she likewise did not disclose any such facts to the EEOC or in her internal harassment complaint. *See* App. at pp. 32 – 33 & 39 – 46. Instead, Appellant actually advised the District Court that "Defendant Guise and I, Plaintiff Alford had a great networking relationship while he supervised as Rail Car Vehicle Maintenance Superintendent" and "an awesome networking relationship when he became Rail Maintenance Manager." *See* App. at pp. 125 & 152.

The bottom line is that Appellant's harassment and discrimination claims were considered as she stated them in her own words to the EEOC, in her internal complaint to Appellee NFTA Metro as well as in the papers she filed with the District Court and properly held to not present any actionable legal claims. A demand for discovery under FRCP 56 (d) even if properly made is not intended as a vehicle for replacing old, deficient claims with new concepts that will hopefully

15

fare better than the old deficient claims that served as the actual basis for the action commenced. As such, the alleged hostile work environment and other claims that Appellant did bring to the EEOC and the District Court were properly considered with summary judgment thereafter granted on the merits.

## C.    APPELLANT WAS NOT CONSTRUCTIVELY DISCHARGED

An actionable claim for constructive discharge requires the plaintiff to show that working conditions were so intolerable that a reasonable person would have felt compelled to resign. *See Fincher v. Depository Trust and Clearing Corp.*, 604 F.3d 712 (2d Cir. 2010). This standard is viewed to be higher than the standard for a hostile work environment. *See id.*

Consequently, if the argument about the rag/cloth place setting and Appellee Guise's disparaging remarks about George Floyd and the media are insufficient to create actionable harassment or hostile work environment, then they are insufficient to amount to constructive discharge. Consistently, Appellant did not quit, file her Workers' comp claim or take off work for alleged emotional distress shortly after the June 11, 2020 place setting argument and George Floyd remarks. Instead, she continued working with Appellant Guise without incident until after Appellee NFTA Metro's EEO/Diversity Development completed its investigation into the June 11, 2020 incident on or about August 17, 2020, and

decided that the appropriate action to take vis-à-vis Appellee Guise was not discharge, but sending him to Sensitivity Training. *See* App. at pp. 50 & 52.

Even after the June 11, 2020 matter was closed on or about August 17, 2020, with Appellee Guise being directed to attend Sensitivity Training, Appellant needed another month to decide that the alleged emotional distress she suffered from the George Floyd comments and the failure to discharge Appellee Guise over them required her to file a Workers' Compensation claim and leave her job. *See* App. at pp. 32 – 33 and 58.

Appellee NFTA Metro's decision to respond to Appellant's complaint about her June 11, 2020 conversations with Appellee Guise, as will be explained in the next Section of the Brief, was quite reasonable under the circumstances. Appellant who suffered no personal insult or adverse employment action was plainly not compelled to resign her employment as a result of Appellee Guise's continued employment. Her decision to file her Workers' comp claim, leave her employment and start down the current road was ill-advised, apparently mean-spirited and, most importantly, a purely personal decision.

## D.   APPELLEE NFTA METRO IS NOT PROPERLY CHARGED OR HELD LIABLE FOR APPELLEE GUISE'S REMARKS

Even where a hostile work environment is arguably present an employer is not properly held liable for the objectionable conduct unless there is a specific basis for imputing the conduct to that employer. *See Duch v. Jakubek*, 588 F.3d

17

757 (2d Cir. 2009); *Feingold v. New York*, 366 F.3d 138 (2d Cir. 2004).The District Court correctly ruled there was none.

First to be noted is that Appellee NFTA Metro maintains a policy against harassment and an avenue for employees to complain about and seek relief from harassment. *See* App. at pp. 32 – 33, 39 – 46, 83 – 84 & 87. Perhaps more importantly this matter involves a claim arising from a single, isolated incident as opposed to a series of incidents where constructive notice and failure to act might be argued. *See id*. at pp. 32 - 33. *See also* Appellant's Brief, pp. 13 & 22. In this regard, not only did Appellant not allege a pattern of alleged harassment in her EEOC charge, but she herself stated that prior to the June 11, 2020, conversations at issue "Defendant Guise and I, Plaintiff Alford had a great networking relationship while he supervised as Rail Car Vehicle Maintenance Superintendent" and "an awesome networking relationship when he became Rail Maintenance Manager." *See* App. at pp. 125 & 152. A policy against harassment together with an avenue for employees to seek redress and the fact that the complained of conduct was a single, isolated incident should be sufficient to support the judgment that Appellee NFTA Metro is not properly charged with legal responsibility for Appellee Guise's remarks about George Floyd.

Moreover, Appellee NFTA Metro did not ignore or condone Appellee Guise's remarks about George Floyd, but instead reacted in a reasonable and

18

appropriate manner by admonishing Appellee Guise and sending him to Sensitivity Training. *See* App. at p. 52. Notwithstanding Appellant's mean-spirited wish to see Appellee Guise discharged because of her complaint, the lack of prior complaints against him, the prior "great" or "awesome networking relationship" between him and Appellant, the fact that his remarks did not disparage Appellant personally or African Americans in general, as well as his service to Appellee NFTA Metro dating back to 1983 plainly rendered discharge from employment overly harsh and unwarranted. The Sensitivity Training prescribed and given Appellee Guise was plainly a reasonable and appropriate response. Accordingly, the District Court's properly ruled in line with comparable cases that Appellee Guise's George Floyd remarks were not properly attributed to Appellee NFTA Metro. *Cf. Barton v. Unity Health System*, No. 14-CV-6658-FPG-JWF (W.D.N.Y. Mar. 19, 2018), *aff'd*, 768 Fed. Appx. 83 (2d Cir. 2019); Carter v. New Venture Gear, Inc., 310 F. Appx. 483 (2d Cir. 2019). *Cf. also Smith v. Niagara Frontier Transp. Auth*.

## E.   APPELLANT HAS NO ARGUABLE RETALIATION CLAIM

The District Court correctly concluded that Appellant failed to present any triable retaliation claim inasmuch as she failed to point to any adverse personnel action taken against her. In *Burns v. City of Utica*, 590 F. Appx. 44 (2d Cir. 2014), this Court listed various types of employment actions which might be considered "adverse" for retaliation claim purposes, including termination of employment,

demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits and/or significantly diminished responsibilities.

While the Appellant checked the Retaliation Box on her EEOC charge, the charge narrative she provided contained no allegations of any employment action which may be viewed as adverse. *See* App. at 32 - 33. Nor was there any evidence presented to the District Court that Appellant suffered any disciplinary action or other adverse employment action on or after June 11, 2020, from Appellee Guise or any other individual employed by Appellee NFTA Metro. This is because the Appellant never did suffer any adverse employment action on or after June 11, 2020.

Instead, after management of Appellee NFTA Metro decided on or about August 17, 2020, that sending Appellee Guise to sensitivity training was the appropriate response to his comments about George Floyd (*see* App. at 52), Appellant herself decided on September 13, 2020, to file Workers' comp claim alleging debilitating emotional distress from Appellee Guise's remarks about George Floyd and Appellee NFTA Metro's refusal to fire him for those remarks and then shortly thereafter begin a medical leave of absence for that alleged emotional distress from which she herself opted not to return. Perhaps Appellant should have consulted legal counsel on the mechanics and feasibility of her desired Workers' comp claim before deciding to cease her employment to pursue that

course of action. In any case, an actual adverse personnel action against Appellant is nowhere to be found.

Consistently, before the District Court Appellant explained "Plaintiff's Retaliation Claims" as "I, Plaintiff Alford believe because the Defendant NFT METRO System, Inc. did nothing to protect me and allowed Defendant Guise to remain employed was their first step to retaliate against me because I filed two complaints." *See* App. at p. 126. This does not allege any adverse action against Appellant herself, but instead circles back to the issue of whether Appellant was constructively discharged because Appellee NFTA Metro did not fire Appellee Guise in response to Appellant's complaint. As also discussed, the claim that Appellee NFTA Metro "did nothing" in response to her complaint against Appellee Guise is likewise factually inaccurate. Appellee NFTA Metro verbally reprimanded Appellee Guise and sent him to sensitivity training. *See id*. pp. 33, 50 & 52.

Before this Court Appellant similarly argues for an issue of fact concerning whether she suffered "an adverse employment action" from Appellee Guise's tablecloth criticism and Floyd remarks coupled with Appellee NFTA Metro's decision not to fire Appellee Guise. *See* Appellant's Brief at p. 14. This again just restates the hostile work environment and constructive discharge issues, but the Appellant's brief argument is noteworthy for the disingenuous claim that an

21

"adverse employment action" should be found since as a result of Appellee Guise's remarks and his continued employment "she sought medical help, a medical leave of absence, *only to be forced to resign* after she lost her WCB claim w over technicalities." *See id*. The decision of the Workers' Compensation Board to put Appellant's claim on "No Further Action" status because of Appellant's failure to submit the required medical report is hardly a technicality. *See* App. at p. 62. Nor was Appellant "forced to resign" after the Board discontinued action on her comp claim. After her Comp case was halted Appellant was advised that she was being placed on disability leave status pursuant to the terms of the collective bargaining agreement governing her employment and provided with disability benefits forms to complete. *See id*. at pp. 68 – 70.

Moreover, not only was there no evidence of actual medical care or treatment offered to the Workers' Compensation Board, but none was offered to the District Court either. Even Appellant's assertion that she sought a medical leave of absence can properly be discounted given the fact that Appellant never had her alleged "medical help" provider complete and return the disability benefits form she was given. *See* App. at pp. 68 – 70. Instead, Appellant advised Appellee NFTA Metro's Human Resources Director that she would in fact be continuing her Workers' comp claim, but then, shortly thereafter, opted to retire. *See id*. at pp. 72

& 74 – 76. Opting to retire is, of course, different than simply resigning with no retirement benefits option.

Thus, there was no error in the District Court considering and dismissing a retaliation claim.

## F.   APPELLANT'S NY STATE LAW CLAIMS WERE PROPERLY DISMISSED

The District Court also dismissed the Appellant's claims under the portion of the State Executive Law commonly know as the New York Human Rights Law ["NYSHRL"]. *See* R & R at pp. 17 – 21, App. at pp.174 – 78.

There is likewise no error in this decision. A single incident which did not even include insulting remarks directed to Appellant personally or remarks disparaging of her race likewise do not meet the New York State law standard for a racially hostile work environment. *See Reichman v. City of New York*, 179 A.D.3d 1115, 117 N.Y.S.3d 280 (2d Dept. 2020). As noted, Appellant likewise suffered no adverse employment action. Similar to Federal law Appellee NFTA Metro is also not liable under the NYSHRL for Appellee Guise's remarks absent evidence that Appellee NFTA Metro became party to them by encouraging, ratifying or condoning them. *See Matter of State Div. Of Human Rights v. St. Elizabeth's Hosp.*, 66 N.Y.2d 684, 496 N.Y.S.2d 411, 487 N.E.2d 268 (1985). *Matter of Figueroa v. New York State Div. of Human Rights*, 142 A.D.3d 1316, 38 N.Y.S.3d 857 (4th Dept. 2016).

## **CONCLUSION**

Appellant stated her claims for alleged race discrimination and harassment in her own words to Appellee NFTA Metro's EEO/Diversity Development Department and then to the EEOC. After the EEOC dismissed Appellant's discrimination charge and the present action was commenced Appellees opted to take Appellant at her own words and move for summary judgment on the ground that Appellant's complaints failed to allege any actionable discrimination, harassment or retaliation claims under Federal or New York law. The District Court after carefully reviewing Appellant's submissions agreed and entered summary judgment dismissing the Appellant's complaint in its entirety. There are plainly no errors of law in the District Court's analysis or decision and, accordingly, the judgment dismissing Appellant's complaint is properly affirmed.

Dated:     Buffalo, New York
           November 9, 2023

By: _____
David J. State, Esq. General Counsel
Wayne R. Gradl, Esq., Of Counsel
181 Ellicott Street
Buffalo, New York 14203
Phone: (716) 855-6590
E-mail: Wayne.Gradl@NFTA.com

24

## <u>CERTIFICATE OF COMPLIANCE</u>

1. This Brief complies with the type-volume limit of the Second Circuit Local Rule
   32.1 (a) (4) and Fed. R. App. P. 32 (a) (7) (B) because, excluding the parts of the
   Document exempted by Fed. R. App. P. 32 (f):

         This document contains 5,406 words in total.

2. This Document complies with the typeface requirements of Fed. R. App. P
   32 (a) (5) and the type-style requests of Fed. R. App. P. 32 (a) (6) because:

         This document has been prepared in a proportionally spaced typeface

         using Microsoft Word for Microsoft 365 in Times Roman size 14 type.

Dated: November 9, 2023

                              _David R. State, Esq. General Counsel_
                              Wayne R. Gradl, Esq., Of Counsel
                              181 Ellicott Street
                              Buffalo, New York 14203
                              Phone: (716) 855-6590
                              E-mail: Wayne.Gradl@NFTA.com
                              Attorney for Appellees NFTA Metro and
                              Robert Guise

**ADDENDUM**

 Caution
As of: October 23, 2023 1:43 PM Z

## *Astarita v. Urgo Butts & Co.*

United States District Court for the Southern District of New York

June 10, 1997, Decided ; June 10, 1997, FILED

96 Civ. 6991 (PKL)

### Reporter

1997 U.S. Dist. LEXIS 8112 *; 74 Fair Empl. Prac. Cas. (BNA) 585

LINA ASTARITA, Plaintiff, - against - URGO BUTTS & CO.; MARRIOTT INTERNATIONAL, INC.; WESTCHESTER RESIDENCE INN L.P.; DON URGO, ALLISON BUTTS, PHILIP DANIEL, and RICHARD VILARDO, individually, Defendants.

**Disposition: [*1]** Motion of defendant UBC to dismiss amended complaint for lack of subject matter jurisdiction GRANTED. Motion of defendant UBC to dismiss original complaint deemed moot and DENIED. Action with respect to defendant WRI DISMISSED for lack of subject matter jurisdiction. Motions of defendants Urgo, Butts, Daniel and Vilardo to dismiss action for lack of service of process GRANTED. Plaintiff's motion for sanctions DENIED.

## Core Terms

hotel, individual defendant, amended complaint, employees, original complaint, lack of subject matter jurisdiction, failure to serve, general manager, calendar

## Case Summary

### Procedural Posture

Defendant corporation filed a motion to dismiss an amended complaint filed by plaintiff claimant, who contended that the corporation, with defendant hotel, which the court sua sponte dismissed for lack of subject matter jurisdiction, discriminated against her gender in violation of Title VII of the Civil Rights Act of 1964, *42 U.S.C.S. § 2000e et seq.*, and the New York State Human Rights Law (NYSHRL), *N.Y. Exec. Law § 296 et seq.* (1993).

### Overview

The claimant had worked in various management for a prior hotel, which was sold to the corporation. While allegedly assisting in the closing of the purchase, the claimant informed defendant individuals, officers of the hotel, that she was pregnant but that she would return to work after a brief leave.

A month later, she was informed that she would not be hired after the completion of the purchase. She alleged that she was the only one from the prior hotel who was not hired after the purchase. The court found that the corporation was not an "employer" covered by Title VII because the corporation's staff consisted of, at most, four individuals at the time of the alleged act of discrimination. The prior hotel was not yet an employer, either, because it had no employees prior to the date of the purchase. The court next found that the dismissal of the claimant's NYSHRL claims was appropriate because the federal claims were dismissed at an early stage in the litigation.

### Outcome

The court granted the corporation's motion to dismiss the amended complaint for lack of subject matter jurisdiction. The corporation's motion to dismiss the claimant's original complaint was deemed as being moot and was, thus, denied. The hotel was dismissed, and the individual defendants' motion to dismiss the action for lack of service of process were granted. The claimant's motion for sanctions was denied.

## LexisNexis® Headnotes

Civil Procedure > ... > Subject Matter Jurisdiction > Jurisdiction Over Actions > General Overview

Civil Procedure > ... > Responses > Defenses, Demurrers & Objections > Motions to Dismiss

***HN1***[⬇] **Subject Matter Jurisdiction, Jurisdiction Over Actions**

On a motion under *Fed. R. Civ. P. 12(b)(1)* challenging a district court's subject matter jurisdiction, the court may resolve disputed jurisdictional fact issues by reference to evidence outside the pleadings, such as affidavits. The party

asserting subject matter jurisdiction bears the burden of showing that the case is properly before the court.

Civil Procedure > ... > Summary Judgment > Motions for Summary Judgment > General Overview

Civil Procedure > ... > Subject Matter Jurisdiction > Jurisdiction Over Actions > General Overview

Civil Procedure > ... > Responses > Defenses, Demurrers & Objections > Motions to Dismiss

Civil Procedure > ... > Summary Judgment > Supporting Materials > General Overview

*HN2*[⬇] **Summary Judgment, Motions for Summary Judgment**

Although a motion under *Fed. R. Civ. P. 12(b)(1)* cannot be converted into a *Fed. R. Civ. P. 56* motion, *Rule 56* is relevant to the jurisdictional challenge in that the body of decisions under *Rule 56* offers guidelines in considering evidence submitted outside the pleadings. Accordingly, the evidence submitted in connection with a subject matter jurisdiction challenge must be "competent," and any affidavits must conform to *Fed. R. Civ. P. 56(e)*.

Civil Procedure > ... > Subject Matter Jurisdiction > Federal Questions > General Overview

Labor & Employment Law > Employment Relationships > At Will Employment > Definition of Employers

Labor & Employment Law > Discrimination > Title VII Discrimination > General Overview

*HN3*[⬇] **Subject Matter Jurisdiction, Federal Questions**

Federal subject-matter jurisdiction over claims of employment discrimination in violation of Title VII exists as to a given defendant only if that defendant meets the statutory definition of an "employer."

Business & Corporate Compliance > ... > Title VII Discrimination > Scope & Definitions > Employers

Labor & Employment Law > Discrimination > Title VII

Discrimination > General Overview

*HN4*[⬇] **Title VII Discrimination, Employers**

See *42 U.S.C.S. § 2000e(b)*.

Business & Corporate Compliance > ... > Title VII Discrimination > Scope & Definitions > Employers

Labor & Employment Law > Employment Relationships > At Will Employment > Definition of Employers

Labor & Employment Law > Discrimination > Title VII Discrimination > General Overview

*HN5*[⬇] **Title VII Discrimination, Employers**

The date of the alleged act of discrimination is the relevant milestone for determining whether a given defendant is an employer under the definition of employer.

Business & Corporate Law > Agency Relationships > Types > Employees & Employers

Labor & Employment Law > Employment Relationships > At Will Employment > Definition of Employers

Business & Corporate Law > Agency Relationships > General Overview

Labor & Employment Law > Discrimination > Title VII Discrimination > General Overview

Labor & Employment Law > ... > Title VII Discrimination > Scope & Definitions > General Overview

*HN6*[⬇] **Types, Employees & Employers**

As is plain from the statutory language, in order for a person acting as an agent to be deemed an employer, the principal must be an employer covered by Title VII. Similarly, the statute defines an "employment agency" as any person regularly undertaking to procure employees for an employer. *42 U.S.C.S. § 2000e(c)*.

Business & Corporate Compliance > ... > Title VII

Discrimination > Scope & Definitions > Employers

Mergers & Acquisitions Law > General Business Considerations > General Overview

Labor & Employment Law > Discrimination > Title VII Discrimination > General Overview

Mergers & Acquisitions Law > Liabilities & Rights of Successors > Successor Liability Doctrine

**HN7[⬇]  Title VII Discrimination, Employers**

A purchaser of a business can be held liable for discriminatory employment actions of its predecessor so long as certain factors showing a sufficient continuity in identity are fulfilled. The argument that, under a "successor" theory, the employees of the predecessor business should be counted for the purposes of meeting _42 U.S.C.S. § 2000e(b)_'s jurisdictional requirements, has been rejected. The "successor liability" theory is merely a theory of liability for the acts of a predecessor.

Civil Procedure > Dismissal > Involuntary Dismissals > General Overview

Civil Procedure > ... > Subject Matter Jurisdiction > Supplemental Jurisdiction > General Overview

Civil Procedure > ... > Subject Matter Jurisdiction > Supplemental Jurisdiction > Pendent Claims

**HN8[⬇]  Dismissal, Involuntary Dismissals**

Especially when the federal claims are dismissed at an early stage in the litigation, dismissal of pendent state law claims is appropriate.

Civil Procedure > Dismissal > Involuntary Dismissals > General Overview

Civil Procedure > ... > Subject Matter Jurisdiction > Jurisdiction Over Actions > General Overview

Civil Procedure > ... > Subject Matter Jurisdiction > Supplemental Jurisdiction > Pendent Claims

**HN9[⬇]  Dismissal, Involuntary Dismissals**

A case should be dismissed sua sponte whenever it appears by suggestion of the parties or otherwise that the court lacks jurisdiction of the subject matter. _Fed. R. Civ. P. 12(h)(3)_.

Civil Procedure > ... > Service of Process > Time Limitations > General Overview

**HN10[⬇]  Service of Process, Time Limitations**

When a defendant has not been served with the original complaint, service of an amended complaint within 120 days of filing suit has been held to satisfy _Fed. R. Civ. P. 4(m)_.

**Counsel:** For LINA ASTARITA, plaintiff: J. Vincent Reppert, Reppert & Kelly, New York, NY.

For URGO BUTTS & CO., defendant: Sonya Spielberg, Edward R. Levin, Schmeltzer, Aptaker & Shepard, P.C. Washington, DC. For MARRIOTT CORPORATION, defendant: Clifford R. Atlas, Jackson, Lewis, Schnitzler & Krupman, New York, NY. David E. Block, JACKSON, LEWIS, SCHNITZLER & KRUPMAN, White Plains, NY.

**Judges:** Peter K. Leisure, U.S.D.J.

**Opinion by:** Peter K. Leisure

# Opinion

### _MEMORANDUM ORDER_

LEISURE, _District Judge_:

In the above captioned action, plaintiff Lina Astarita alleges that defendants discriminated against her because of her sex, including because of her pregnancy, by discharging her, or alternatively by failing to hire her. The complaint states claims based on Title VII of the Civil Rights Act of 1964 ("Title VII"), _42 U.S.C. § 2000e et seq. (1994)_, and the New York State Human Rights Law (the "NYSHRL"), _N.Y. Exec. Law § 296 et seq._ (McKinney 1993). Before the Court are motions (1) by defendant Urgo Butts & Co. ("UBC"), to dismiss for lack of subject matter jurisdiction, pursuant to _Rule 12(b)(1) of the Federal Rules of Civil Procedure_; (2) by **[*2]** the four individual defendants, to dismiss, pursuant to _Rule 12(b)(5)_, for failure to serve the complaint within 120 days of filing as required by _Rule 4(m)_; and (3) by plaintiff, for sanctions pursuant to Rule 11 for the filing of the

individual defendants' motions. For the reasons stated below, UBC's motion is granted, the individual defendants' motions are granted, and the request for sanctions is denied. Furthermore, the Court *sua sponte* dismisses defendant Westchester Residence Inn L.P. ("WRI"), for lack of subject matter jurisdiction.

## BACKGROUND

Starting in late 1983, plaintiff was employed in various management positions at a hotel called La Reserve, then owned by Robert Martin Co., which is not a party to this action. [1] Until 1993, La Reserve operated primarily as a transient hotel, but beginning in 1993 began operating primarily as a residential hotel. By this time, plaintiff had been promoted to General Manager of La Reserve. Late that year, Robert Martin Co. commenced discussions to sell La Reserve to UBC, a Maryland corporation [2] engaged in the business of, among other things, hotel management consulting, real estate development, and real estate consulting. [*3] Individual defendants Donald Urgo, sued herein as Don Urgo, and Allison Butts are allegedly shareholders and officers of UBC. UBC allegedly planned to convert the hotel under the "Residence Inn" franchise, a trademark of defendant Marriott International, Inc. ("Marriott"), which was to provide some of the financing for the purchase in exchange for an ownership interest.

WRI, apparently a Maryland limited partnership, [3] was to be the employer of the hotel's employees after the purchase. According to plaintiff, UBC was "the same as" or was "under common ownership with" WRI, was "the agent or alter ego" of WRI, and allegedly "was to act [*4] as the agent of Westchester Residence Inn for the purpose of interviewing and offering employment" to those La Reserve employees that were to be retained after the purchase. Am. Compl. P 18. Urgo and Butts are allegedly partners in WRI.

Negotiations for the purchase continued through 1994 and part of 1995. In early 1995, plaintiff allegedly provided

---

[1] The complaint refers to this entity alternately as "Robert Martin Co." and "Robert Martin & Co.," but for the sake of convenience, this opinion will simply use the former designation.

[2] The second amended complaint alleges, upon information and belief, that UBC is a Maryland corporation, but UBC, in its brief, asserts that it is incorporated in the District of Columbia.

[3] The complaint alleges WRI was Maryland corporation with principal offices at the same Maryland address as UBC's offices. UBC describes itself as a District of Columbia corporation, and makes no representation as to WRI's place of incorporation.

assistance to and met with various UBC and Marriott personnel in connection with closing of the purchase, conversion of La Reserve, and plaintiff's intended role as General Manager after the purchase. In early August of 1995, plaintiff informed defendants Philip Daniel and Richard Vilardo, respectively UBC's Vice President of Finance and Vice President, that she was pregnant and that she intended to continue working after [*5] a brief maternity leave.

In early September, plaintiff was informed that UBC was considering other candidates for the General Manager position, and two weeks later, she was informed that she would not be hired after the purchase. Her employment was terminated as of October 27, 1995, the day that the purchase closed. Plaintiff was allegedly the only La Reserve employee not offered a position. No General Manager was hired, apparently, until March or April of 1996, at which time a male with allegedly no experience as a hotel general manager, was hired.

Plaintiff initially brought suit against UBC, Marriott, and the four individual defendants. She filed suit on September 13, 1996, but did not serve a summons and complaint on the individual defendants. UBC, in lieu of an answer, moved for dismissal pursuant to *Rule 12(b)(1)* on the grounds that it is not an "employer" as that term is defined under Title VII. Plaintiff then amended her complaint to add WRI as a defendant, and to add allegations regarding UBC's relationship to WRI and its role as an "agent" in the transactions at issue. UBC renewed its motion for dismissal, relying upon the same briefs as those submitted in support of its [*6] motion to dismiss the original complaint.

The amended complaint was filed on January 30, 1997, and copies were sent by mail on April 16, 1997, to each of the individual defendants at their alleged business address with requests for waiver of service, pursuant to *Rule 4(d)(2)*. Defendants' waivers of service, if obtained, were never filed, and proof of service was never made. On May 5, 1997, the individual defendants appeared for the limited purpose of moving to dismiss for failure to serve. The motion was made returnable on May 30, 1997, the 120th day after the filing of the amended complaint. The caption of the motion corresponds to that of the original complaint.

## DISCUSSION

I. *Dismissal for Lack of Subject Matter Jurisdiction*

*HN1* ⬆ "On a motion under *Fed. R. Civ. P. 12(b)(1)* challenging the district court's subject matter jurisdiction, the court may resolve disputed jurisdictional fact issues by reference to evidence outside the pleadings, such as

affidavits." *Antares Aircraft v. Federal Republic of Nigeria, 948 F.2d 90, 96 (2d Cir. 1991)*, vacated on other grounds, 505 U.S. 1215 (1992). The party asserting subject matter jurisdiction "bears the burden of showing **[*7]** that the case is properly before the court." *Keene Corp. v. Fiorelli*, (In re Joint E. & S. Dist. Asbestos Litig.) (*In re Keene Corp.), 14 F.3d 726, 730 (2d Cir. 1993)* (citing *McNutt v. General Motors Acceptance Corp., 298 U.S. 178, 189, 80 L. Ed. 1135, 56 S. Ct. 780 (1936))*.

**HN2**[⬆] Although a motion under *Rule 12(b)(1)* "cannot be converted into a *Rule 56* motion, *Rule 56* is relevant to the jurisdictional challenge in that the body of decisions under *Rule 56* offers guidelines in considering evidence submitted outside the pleadings." *Kamen v. American Tel. & Tel. Co., 791 F.2d 1006, 1011 (2d Cir. 1986)*. Accordingly, the evidence submitted in connection with a subject matter jurisdiction challenge must be "competent," and any affidavits must conform to *Rule 56(e)*. *See id.*

**HN3**[⬆] Federal subject-matter jurisdiction over claims of employment discrimination in violation of Title VII exists as to a given defendant only if that defendant meets the statutory definition of an "employer." *See Perezic v. Crespo, 1996 U.S. Dist. LEXIS 6046*, *4, *1996 WL 233687*, at *2 (S.D.N.Y. 1996); *see also EEOC v. Arabian Am. Oil Co., 499 U.S. 244, 248-49, 113 L. Ed. 2d 274, 111 S. Ct. 1227 (1991)* **[*8]** (describing "employer" as used in Title VII as a "jurisdictional term[]"). Title VII defines that term as:

**HN4**[⬆] [A] person engaged in an industry affecting commerce who has fifteen or more employees for each working day in each of twenty or more calendar weeks in the current or preceding calendar year, and any agent of such a person ….

*42 U.S.C. § 2000e(b) (1994)*. **HN5**[⬆] The date of the alleged act of discrimination is the relevant milestone for determining whether a given defendant is an employer under this definition. *See Guadagno v. Wallack Ader Levithan Assoc., 932 F. Supp. 94, 95-96 (S.D.N.Y. 1996)*; EEOC Dec. No. 76-10, at n.3 (Aug. 14, 1975).

In this case, UBC has submitted an affidavit of defendant Butts, a shareholder and officer of UBC with personal knowledge of the relevant facts, as evidence that UBC's staff throughout 1994 and 1995 consisted, at most, of four individuals. *See* Butts Aff. P 5. Plaintiff submits no evidence to the contrary, and appears not to dispute this fact. Rather, plaintiff contends that UBC falls under the definition of an employer because it acted as an agent for WRI, which she contends is the actual employer. In the alternative, **[*9]** she contends that UBC acted as an employment agency. However,

**HN6**[⬆] as is plain from the statutory language, in order for a person acting as an agent to be deemed an employer, the principal must be an employer covered by Title VII. Similarly, the statute defines an "employment agency" as "any person regularly undertaking … to procure employees *for an employer*." *42 U.S.C. § 2000e(c) (1994)* (emphasis added).

WRI is not an employer within the meaning of Title VII. Although it apparently employed more than fifteen individuals after the purchase of the hotel, it had no employees prior to that date. WRI acquired the hotel on October 27, 1995, after which some nine weeks remained in the calendar year. Therefore, WRI could not have employed fifteen or more individuals for each of twenty weeks in the "current" calendar year, 1995, since it was not in existence for long enough in that year to meet the requirement; nor could it have done so in the "preceding calendar year, 1994, since at that time it had no employees.

Nor could WRI be considered an employer under a "successor liability" theory. **HN7**[⬆] A purchaser of a business can be held liable for discriminatory employment actions of its predecessor **[*10]** so long as certain factors showing a sufficient continuity in identity are fulfilled. *See Forde v. Kee Lox Mfg., 584 F.2d 4, 5-6 (2d Cir. 1978)*. However, neither La Reserve, the purchased business, nor Robert Martin Co., the seller and former employer, is alleged to have discriminated against plaintiff. Moreover, the Court is not persuaded that a "successor liability" theory could allow the Court to count Robert Martin Co.'s employees as WRI's, or to attribute Robert Martin Co.'s employer status to WRI. At least one court has addressed the argument that, under a "successor" theory, the employees of the predecessor business should be counted for the purposes of meeting *§ 2000e(b)*'s jurisdictional requirements. *See Clifton v. Mars Telecom, Inc., 1996 U.S. Dist. LEXIS 4250*, *8, 1996 WL 157288, at *3 (D. Kan. 1996). That court rejected the argument, as does this Court. The "successor liability" theory is merely a theory of liability for the acts of a predecessor, and here, plaintiff does not allege that the predecessor discriminated against her.

Plaintiff has failed to carry her burden upon a challenge to this Court's subject matter jurisdiction to show facts supporting such jurisdiction **[*11]** over UBC as an "employer" -- either directly or as an agent -- or as an "employment agency," as those terms are defined in *§ 2000e*. Accordingly, the motion to dismiss for lack of subject matter jurisdiction must be granted as to the Title VII claims.

UBC also seeks dismissal of plaintiffs NYSHRL claims, which are joined in this action under the Court's pendent jurisdiction. *See* Am. Compl. P 10. **HN8**[⬆] Especially when the federal claims are dismissed at an early stage in the

litigation, dismissal of pendent state law claims is appropriate. *See Carnegie-Mellon Univ. v. Cohill, 484 U.S. 343, 350 n.7, 98 L. Ed. 2d 720, 108 S. Ct. 614 (1988); United Mine Workers of Am. v. Gibbs, 383 U.S. 715, 726, 16 L. Ed. 2d 218, 86 S. Ct. 1130 (1966); Hughes v. Patrolmen's Benevolent Assoc., 850 F.2d 876, 881 (2d Cir. 1988).* Accordingly, the state law claims as to UBC are dismissed. [4]

[*12] Finally, as is clear from the foregoing discussion, it has come to the Court's attention that WRI could not be deemed to be an "employer" covered by Title VII for the conduct alleged herein. *HN9*[⬆] A case should be dismissed *sua sponte* "whenever it appears by suggestion of the parties or otherwise that the court lacks jurisdiction of the subject matter." *Fed. R. Civ. Proc. 12(h)(3).* Therefore, the Title VII claims against WRI must be dismissed. Furthermore, for the reasons stated above, the pendent state law claims against WRI should also be dismissed.

II. *Dismissal for Failure to Serve Within 120 Days of Filing*

It appears to be undisputed that plaintiff did not serve her original complaint upon defendants Urgo, Butts, Daniel, and Vilardo within 120 days of September 13, 1996, the date of filing her original complaint. Instead, plaintiff's only opposition to the motion appears to be that the motion addresses the original complaint instead of the amended complaint, and that the motion is therefore a nullity.

*HN10*[⬆] "When a defendant has not been served with the original complaint, service of an amended complaint within *120 days of filing suit* has been held to satisfy *Rule 4(m).*" [*13] *Bakal v. Ambassador Constr., 1995 U.S. Dist. LEXIS 10542,* *4, *1995 WL 447784,* at *2 (S.D.N.Y. 1995) (citing *Crossen v. Bernstein, 1994 U.S. Dist. LEXIS 8388,* *8, 1994 WL 281881,* at *8 (S.D.N.Y. 1994) (Leisure, J.); *White v. Steak & Ale of Little Rock, 839 F. Supp. 23, 25 (E.D. Ark. 1993)* (emphasis added)). However, in this case, like in *Bakal,* the amended complaint has not been timely served. Examination of the docket reveals that no waiver of service was filed, and no proof of service has been made to the Court, as required by *Rule 4(l)* when waiver of service is not given. As of the date of this order, not only have more than 120 days passed since the filing of suit, but more than 120 days have passed since the filing of the *amended complaint.*

Plaintiff has not argued or shown that her failure to serve

should be overlooked for "good cause" or should be deemed to result from excusable neglect. Plaintiff has been represented by counsel throughout this matter. She has not claimed that she was unable to locate the individual defendants. Moreover, she does not claim that, once defendants had failed within the prescribed thirty days to execute and return the waiver of service request, [*14] she was unable to serve process. As far as can be determined from the record presented, no effort has *ever* been made to effect formal service. Accordingly, the amended complaint is dismissed as to the four defendants, pursuant to *Rule 4(m).*

The Court is aware that applicable statutes of limitations bar the refiling of plaintiff's claims against the individual defendants. *Cf. Fed. R. Civ. Proc. 4(m),* Advisory Committee Notes, 1993 Amendments ("Relief may be justified, for example, if the applicable statute of limitations would bar the refiled action ...."). However, such relief is not mandated in every case where the statute of limitations concern is raised. *See Bakal, 1995 U.S. Dist. LEXIS 10542,* *7, *1995 WL 447784,* at *3 (citing *National Union Fire Ins. Co. v. Sun, 1994 U.S. Dist. LEXIS 11934,* *11, *1994 WL 463009,* at *4 & n.4 (S.D.N.Y. 25, 1994); *Petrucelli v. Bohringer & Ratzinger, 46 F.3d 1298, 1306 & n.7 (3d Cir. 1995)).* In this case, plaintiff offers no explanation or reasonable excuse for her failure to serve, and dismissal is warranted.

**CONCLUSION**

For the reasons stated above, the motion of defendant UBC to dismiss the amended complaint for lack of subject matter jurisdiction is HEREBY GRANTED. The previously [*15] filed motion of defendant UBC to dismiss the original complaint is deemed moot and is HEREBY DENIED. The action with respect to defendant WRI is HEREBY DISMISSED for lack of subject matter jurisdiction. The motions of defendants Urgo, Butts, Daniel, and Vilardo, to dismiss the action for lack of service of process are HEREBY GRANTED. Finally, plaintiff's motion for sanctions is HEREBY DENIED.

**SO ORDERED**

New York, New York

June 10, 1997

Peter K. Leisure

U.S.D.J.

---

[4] The Court is aware that there appears to be diversity of citizenship between plaintiff on one hand and the various defendants on the other. However, the record does not reveal whether plaintiff can meet the minimum amount in controversy necessary for exercise of diversity jurisdiction. No amount in controversy was alleged, and diversity was not alleged as an alternative ground of jurisdiction.

Wayne Gradl

1997 U.S. Dist. LEXIS 8112, *15

**End of Document**


Caution
As of: October 23, 2023 1:44 PM Z

## *Bakal v. Ambassador Constr.*

United States District Court for the Southern District of New York

July 26, 1995, Decided ; July 28, 1995, FILED

94 Civ. 584 (JSM)

**Reporter**
1995 U.S. Dist. LEXIS 10542 *; 1995 WL 447784

MINNIE BAKAL, Plaintiff, -v.- AMBASSADOR
CONSTRUCTION, MARK GREENBERG, MARCIA
MAGID and "RODNEY DOE", Defendants.

## Core Terms

individual defendant, amended complaint, official capacity,
original complaint, employees, statute of limitations,
damages, courts

## Case Summary

### Procedural Posture

Plaintiff victim sought to recover damages under Title VII,
the New York's Human Rights Law, and state tort law from
defendants, former employer and three of its employees. The
three employees filed a motion to dismiss under *Fed. R. Civ.
P.4*, *12*, *56*.

### Overview

The victim was a secretary for the employer. While there she
dated a coworker, but subsequently ended the relationship.
After the relationship ended the victim alleged that her
supervisor became hostile against her, and that she was
harassed. Her complaints to the employer were allegedly
unproductive. The victim brought a claim for harassment
under Title VII. The victim's complaint was served on the
employer, but not the employees. The victim eventually
served an amended complaint on the employees, well out of
the prescribed time. The court found that the victim failed to
show good cause as to her failure to serve the employees, and
dismissed the claims against them. The court found that the
decision would not prejudice the victim because she could
still recover against the employer, and because the courts
were unsettled as to whether a claim against the employees
was even viable. The court refused to dismiss the claims
against the employees with prejudice, finding that a timely
served employer could be vicariously liable for the conduct of
a late-served employee under a theory of "unity of interest."

### Outcome

The court dismissed the claims against the employees without
prejudice.

## LexisNexis® Headnotes

Civil Procedure > ... > Service of Process > Time
Limitations > Extension of Time

Governments > Legislation > Statute of
Limitations > Time Limitations

Civil Procedure > ... > Pleadings > Service of
Process > General Overview

Civil Procedure > ... > Service of Process > Time
Limitations > General Overview

Civil Procedure > ... > Service of Process > Time
Limitations > Untimely Service

*HN1*[⬇] **Time Limitations, Extension of Time**

*Fed. R. Civ. P. 4(m)* provides that, if a defendant has not been
served with the complaint within 120 days after it has been
filed, the court can either dismiss the action without prejudice
as to that defendant, or extend the time for service. While
*Fed. R. Civ. P. 4* further provides that an extension must be
granted where the plaintiff shows "good cause" for failure to
timely serve a defendant, dismissal is the appropriate result
where neither "good cause," nor even rudimentary efforts to
comply with the 120-day deadline, are shown. While there is
no set formula for what constitutes "good cause" under the
*Rule 4*, the courts agree that mere inadvertence or attorney
neglect do not suffice.

Civil Procedure > ... > Service of Process > Time Limitations > General Overview

Civil Procedure > ... > Pleadings > Service of Process > General Overview

*HN2*[⬇] **Service of Process, Time Limitations**

When a defendant has not been served with the original complaint, service of an amended complaint within 120 days of filing suit has been held to satisfy *Fed. R. Civ. P. 4(m)*.

Civil Procedure > ... > Pleadings > Amendment of Pleadings > Relation Back

Labor & Employment Law > Discrimination > Actionable Discrimination

Governments > Legislation > Statute of Limitations > General Overview

Governments > Legislation > Statute of Limitations > Time Limitations

Governments > Legislation > Statute of Limitations > Tolling

Labor & Employment Law > ... > Title VII Discrimination > Statute of Limitations > Waiver

*HN3*[⬇] **Amendment of Pleadings, Relation Back**

Dismissal of a Title VII, *42 U.S.C.S. § 1981*, complaint does not toll the 90-day filing period, nor would an amended complaint naming additional defendants on a Title VII claim "relate back" to the date of filing of the original complaint, unless the new defendants were not named in the original complaint due to a mistake as to their identity.

Governments > Legislation > Statute of Limitations > Time Limitations

Torts > ... > Employers > Scope of Employment > General Overview

Governments > Legislation > Statute of Limitations > General Overview

Governments > Legislation > Statute of Limitations > Tolling

Torts > ... > Employers > Activities & Conditions > General Overview

*HN4*[⬇] **Statute of Limitations, Time Limitations**

Under *N.Y. C.P.L.R. 203(b)*, the limitations period provided in *N.Y. C.P.L.R. 215* is interposed not only by service on the defendant, but also by service on a co-defendant who is "united in interest" with that defendant. Where a timely-served employer may be vicariously liable for the conduct of a late-served employee, the "unity of interest" question turns on whether the employee acted within the scope of his employment: if he did, then service on the employer tolls the statute; if he did not, there is no tolling.

**Counsel:** [*1] For plaintiff: Mr. Louis Ginsberg, The Ginsberg Law Firm, New York, NY.

For defendants: Mr. Morton J. Turchin, Turchin & Hoffman, P.C., New York, NY.

**Judges:** JOHN S. MARTIN, JR., U.S.D.J.

**Opinion by:** JOHN S. MARTIN, JR.

# Opinion

### OPINION AND ORDER

JOHN S. MARTIN, Jr., District Judge:

Plaintiff seeks to recover damages under Title VII, New York's Human Rights Law and state tort law from her former employer and three of its employees. The three individual defendants have moved under *Federal Rules of Civil Procedure 4*, *12* and *56* for dismissal of the claims brought against them by plaintiff. For the reasons given below, the action is dismissed without prejudice as to these three defendants.

### BACKGROUND

From 1991 until June 1993, plaintiff was employed by Ambassador Construction as a secretary. *See* Am Compl. P 6; Pl.'s Rule 3(g) Statement P 14. Plaintiff alleges that she dated defendant Greenberg, a construction superintendent at Ambassador, for four months beginning approximately in June 1992. Am. Compl. P 10. After this relationship ended, Greenberg and defendant Magid, Ambassador's office manager and plaintiff's supervisor there, allegedly "became hostile" to her, "falsely [*2] criticized plaintiff's job performance," and "demeaned [plaintiff] on a daily basis." *Id.*

PP 10, 14. Plaintiff consequently began to receive negative job evaluations. *Id.* Moreover, defendant Boone, a messenger and clerk at Ambassador whose immediate supervisor was Magid, allegedly subjected plaintiff to an incessant stream of verbal and physical abuse; plaintiff claims that Boone acted on instructions from Magid and Greenberg. *Id.* PP 15-17. Plaintiff also alleges that all three defendants began to spread false rumors about her "affairs and relationships outside Ambassador." *Id.* PP 18, 44-53. Plaintiff claims that she repeatedly complained of these actions to Ambassador's president and other company supervisors, apparently to no avail. *Id.* PP 21, 26-28.

On February 25, 1993, plaintiff filed a charge with the Equal Employment Opportunity Commission (EEOC), alleging sexual harassment in violation of Title VII. Turchin Aff. Ex. A. Ambassador was the only defendant named by the charge, the body of which referred to the company's "office manager." After an investigation of the charge, the EEOC issued a "right-to-sue" letter to plaintiff dated October 27, 1993. *Id.* [*3] Ex. C.

On January 31, 1994, plaintiff filed a complaint with this court naming Ambassador, Greenberg, Magid, and "Rodney Doe" as defendants. The complaint contained claims brought under Title VII, *42 U.S.C. § 1981*, § 40-c of New York's Civil Rights Law, and *§ 296 of New York's Executive Law*, as well as common-law claims for battery, intentional infliction of emotional distress, slander, libel, and breach of plaintiff's right to privacy. The complaint was served on Ambassador in February 1994. *See* Magid Aff. P 3; Greenberg Aff. P 3; Boone Aff. P 3. However, no effort was made to serve the original complaint on the three individual defendants. Defs.' Rule 3(g) Statement P 11; Pl.'s Rule 3(g) Statement P 11.

On March 1, 1995, plaintiff filed an amended complaint which contained no reference to *§ 1981* and to *§ 40-c of New York's Civil Rights Law*, but added a claim under § 8-101 of the Administrative Code of the City of New York. The body of the amended complaint also referred to defendant Boone by name. It otherwise contained no significant changes. Plaintiff served summons and the amended complaint on defendants Magid and Greenberg on March 6, and on defendant Boone on March [*4] 8. Magid Aff. P 3; Greenberg Aff. P 3; Boone Aff. P 3.

## DISCUSSION

*HN1*[⬆] *Federal Rule of Civil Procedure 4(m)* provides that, if a defendant has not been served with the complaint within 120 days after it has been filed, the court can either dismiss the action without prejudice as to that defendant, or extend the time for service. While the Rule further provides that an extension must be granted where the plaintiff shows "good cause" for failure to timely serve a defendant, dismissal is the appropriate result where neither "good cause," nor even rudimentary efforts to comply with the 120-day deadline, are shown. *National Union Fire Insurance Co. v. Sun, 1994 WL 463009*, at *2-*4 (S.D.N.Y. Aug. 25, 1994); *Knorr v. Coughlin, 159 F.R.D. 5 (N.D.N.Y. 1994)*. While there is no set formula for what constitutes "good cause" under the Rule, *La Bounty v. Lee, 1994 WL 378479*, at *1 (N.D.N.Y. July 15, 1994), the courts agree that mere inadvertence or attorney neglect do not suffice. *See Alexander v. Forest City Pierpont Associates, 1995 WL 406135* (E.D.N.Y. June 26, 1995); *Alvarez v. Edgecomb Facility, 1993 WL 127190*, at *2 (S.D.N.Y. 1993) (citing *Zankel v. United States, [*5] 921 F.2d 432, 436 (2d Cir. 1990))*.

In the present case, the individual defendants never were served with the original complaint filed by plaintiff. *HN2*[⬆] When a defendant has not been served with the original complaint, service of an amended complaint within 120 days of filing suit has been held to satisfy *Rule 4(m)*, *Crossen v. Bernstein*, 1994 WL 281881, at *8 (S.D.N.Y. June 23, 1994); *White v. Steak & Ale of Little Rock, Inc., 839 F. Supp. 23, 25 (E.D. Ark. 1993)*; however, plaintiff served her amended complaint on the individual defendants well beyond this 120-day period. Nor can plaintiff's failure to timely serve these three defendants be attributed to "good cause" or excusable neglect. Plaintiff has not claimed that circumstances existed which would have made timely service on Boone, Greenberg and Magid difficult or impossible, and exactly the opposite appears to have been the case: from the date on which plaintiff filed her complaint until now, each of the individual defendants has resided within the New York metropolitan area and worked at Ambassador, the location of whose facilities obviously was familiar to plaintiff. *See* Magid Aff. P 4; Greenberg Aff. P 4; Boone Aff. [*6] P 4. Moreover, plaintiff was represented by counsel from the beginning of this lawsuit; and although plaintiff points out that her original attorneys practiced primarily in state court, special expertise in federal practice hardly is necessary to grasp the significance of *Rule 4*. The cases which Ms. Bakal cites, *FDIC v. Denson, 139 F.R.D. 346 (S.D. Miss. 1990)* and *Barner v. Ford Motor Co., 132 F.R.D. 495 (N.D. Ill. 1990)*, in which the plaintiffs made a diligent effort to complete service promptly, are readily distinguishable from her own case: plaintiff concedes that "no effort was made" to serve the individual defendants with the original complaint, *see* Defs.' Rule 3(g) Statement P 11; Pl.'s Rule 3(g) Statement P 11; and she took little enough interest in her lawsuit that her lawyers were unable to reach her for a period of five weeks when, in May of 1994, they attempted to determine whether she wished to continue with the suit, Turchin Reply Aff. Ex. E. Thus

dismissal of the amended complaint as against the individual defendants is appropriate. *See National Union Fire Insurance Co. v. Sun, 1994 WL 463009*, at *3-*4 (S.D.N.Y. Aug. 25, 1994).

The court recognizes that **[*7]** dismissal of the amended complaint as against the individual defendants will result in plaintiff's Title VII claim against them being barred by the 90-day statute of limitations contained in *42 U.S.C. § 2000e-5(f)(1)*; **HN3**[⬆] dismissal of a Title VII complaint does not toll the 90-day filing period, *Minnette v. Time Warner, 997 F.2d 1023, 1027 (2d Cir. 1993)*; nor would an amended complaint naming additional defendants on a Title VII claim "relate back" to the date of filing of the original complaint, unless the new defendants were not named in the original complaint due to a mistake as to their identity, *see Cornwell v. Robinson, 23 F.3d 694, 706 (2d Cir. 1994)* -- which is not the case here. The court also is mindful of the Advisory Committee's comment in 1993 that "relief [under *Rule 4(m)*] may be justified...if the applicable statute of limitations would bar the refiled action." But where, as here, plaintiff can provide no reasonable excuse for the failure to make timely service, the fact that a reinstitution of the action will be barred by the statute of limitations is not by itself a reason to deny the motion to dismiss. *See National Union Fire Insurance Co. v. Sun, 1994 [*8] WL 463009*, at *4 & n.4 (S.D.N.Y. Aug. 25, 1994); *see also Petrucelli v. Bohringer & Ratzinger, 46 F.3d 1298, 1306 & n.7 (3rd Cir. 1995)* ("We emphasize that the running of the statute of limitations does not require the district court to extend time for service of process.").

In any event, dismissal of the complaint in the present case will not result in any prejudice to the plaintiff. She still can recover the damages she seeks under Title VII from Ambassador and, as set forth below, she can still obtain recovery against the individual defendants for the same conduct on the basis of her state-law causes of action.

Moreover, it is doubtful that plaintiff would have a valid cause of action against the individual defendants under Title VII. While the Second Circuit has not yet ruled on the issue, the federal courts are divided on the question of whether Title VII provides a remedy against the individual employees responsible for the prohibited conduct in addition to that provided against the employer. *Compare, e.g., Grant v. Lone Star Co., 21 F.3d 649* (5th Cir.), *cert. denied, 130 L. Ed. 2d 491,      U.S.    , 115 S. Ct. 574 (1994); Miller v. Maxwell's Int'l, [*9]     Inc., 991 F.2d 583 (9th Cir. 1993)*, *cert. denied, U.S.    , 114 S. Ct. 1049 (1994); Busby v. City of Orlando, 931 F.2d 764 (11th Cir. 1991)* and *Coraggio v. Time Inc. Magazine Co.,* 1995 WL 242047 (S.D.N.Y. April 26, 1995) (no individual liability) *with Dirschel v. Speck,* 1994 WL 330262 (S.D.N.Y. 1994) and *Bridges v. Eastman Kodak Co.,*

*800 F. Supp. 1172 (S.D.N.Y. 1992)* (supervisory employee can be held individually liable); *see also EEOC v. AIC Security Investigations, 55 F.3d 1276, 1995 U.S. App. LEXIS 12139* (7th Cir. May 22, 1995) (no individual liability under ADA); *Birkbeck v. Marvel Lighting Corp., 30 F.3d 507* (4th Cir.) (same under ADEA), *cert. denied, 130 L. Ed. 2d 600,     U.S.   , 115 S. Ct. 666 (1994)*. The reasoning supporting each of the conflicting positions is fully set forth in *Coraggio,* 1995 WL 242047, at *7-*9, and need not be repeated here. It is sufficient to note that the court finds more persuasive the reasoning of those cases which conclude that Title VII's remedies apply only to the actual employer and not the individual employees who engaged in the prohibited conduct.

While recognizing that **[*10]** damages are not available against individual employees, some courts have allowed Title VII actions to be maintained against individuals in their official capacity. This "official capacity" theory, which was first articulated in cases involving government officials, *see Busby v. City of Orlando, 931 F.2d 764, 772 (11th Cir. 1991); Harvey v. Blake, 913 F.2d 226, 227-28 (5th Cir. 1990); Padway v. Palches, 665 F.2d 965, 968 (9th Cir. 1982)*, has since been applied to employees of private organizations, *see, e.g., Coraggio,* 1995 WL 242047, at *8; *Romand v. Zimmerman, 881 F. Supp. 806, 813 (N.D.N.Y. 1995)* (ADA case); *Garcia v. Elf Atochem North America, 28 F.3d 446, 451 n.2 (5th Cir. 1994); Miller v. Maxwell's Int'l, Inc., 991 F.2d 583, 585-86 (9th Cir. 1993)*.

In my view, there is no rational basis for recognizing a right to sue an employee of a private entity in his or her "official capacity."

Suits against government officials in their "official capacity" have traditionally been permitted to avoid *Eleventh Amendment* and sovereign immunity problems that might arise if a plaintiff were to sue a government entity directly. *See generally Ex parte Young, 209 [*11] U.S. 123, 28 S. Ct. 441, 52 L. Ed. 714 (1908); Osborn v. Bank of the United States, 22 U.S. (9 Wheat) 738, 6 L. Ed. 204 (1824)*. In such cases, it has been deemed appropriate to allow an official capacity suit against the government official who is responsible for the challenged activity. Such actions are not intended to provide any relief against or other personal consequences to that particular individual. Moreover, when the individual leaves office, the individual is dropped from the litigation and the successor is be substituted as the party defendant. *See, e.g., Fed. R. Civ. P. 25(d)*.

There is no need for such "official capacity" litigation in the case of private entities that are themselves subject to suit. It would serve no useful purpose to have, as parties to the litigation, individuals who would drop out of the case the

moment they left the employ of the employer defendant. It has been suggested that it is appropriate to have individuals sued in their "official capacity" where they are individually responsible for the prohibited acts in order to hold them publicly accountable for their actions. *Coraggio v. Time Inc. Magazine Co.* 1995 WL 242047, at *8 (S.D.N.Y. **[*12]** April 26, 1995). The function of the courts, however, is to provide a remedy against those that Congress has determined should be held liable for the plaintiff's damages, not to affix moral blame. If Congress has made a determination that individual employees should not be personally liable for acts of discrimination, it is not for the courts to second guess that judgement and provide some type of moral sanction against those who engaged in prohibited conduct. If an individual is to be required to bear the tremendous financial and emotional expense that civil litigation often involves, it should be because the end of that litigation may result in an award of damages against that person. An individual should not be require to bear such costs simply to protect his or her reputation in an action that the employer may or may not choose to settle.

The individual defendants also argue that plaintiff's claims for battery, intentional infliction of emotional distress, and libel and slander are time-barred. Thus, although *Fed. R. Civ. P. 4(m)* speaks of dismissal without prejudice, the court will consider whether dismissal of these claims with prejudice is appropriate. The defendants correctly **[*13]** note that the statute of limitations on these claims is one year. *C.P.L.R. § 215*; *see Rosado v. City of New York, 713 F. Supp. 124 (S.D.N.Y. 1989).* However, **HN4**[↑] under *C.P.L.R. § 203(b)*, the limitations period provided in *§ 215* is interposed not only by service on the defendant, but also by service on a co-defendant who is "united in interest" with that defendant. Where a timely-served employer may be vicariously liable for the conduct of a late-served employee, the "unity of interest" question turns on whether the employee acted within the scope of his employment: if he did, then service on the employer tolls the statute; if he did not, there is no tolling. *Collom v. Village of Freeport,* 1987 WL 18170, at *3 (E.D.N.Y. Oct. 1, 1987), *citing Scheff v. St. John's Episcopal Hosp., 115 A.D.2d 532, 496 N.Y.S.2d 58, 60-61 (App. Div. 1985)* and *Parker v. Port Authority, 113 A.D.2d 763, 493 N.Y.S.2d 355 (App. Div. 1985).*

In this case, the Magid, Greenberg and Boone concede that plaintiff served her initial complaint on Ambassador, the individual defendants' employer, in February of 1994; even accepting the individual defendants' contention that plaintiffs' third, fourth and fifth **[*14]** causes of action accrued by March 31, 1993, *see* Defs.' Rule 3(g) St. P 13, such service was timely as to Ambassador. Moreover, although neither the original nor the amended complaint is a model of clarity, both pleadings do state that plaintiff seeks monetary relief from "defendants" on each of the claims asserted by plaintiff. The court -- as it must -- reads the complaint in plaintiff's favor, as seeking to hold *all* "defendants," including Ambassador, liable on each of these claims. Since there may prove to be sufficient "unity of interest" between Ambassador and the individual defendants to deprive the latter of their statute of limitations defense to plaintiff's third, fourth and fifth causes of action, dismissal of these claims with prejudice is unwarranted. Should discovery show that the individual defendants acted beyond the scope of their employment when they harmed the plaintiff, and thus were not "united in interest" with Ambassador, the individual defendants may move for summary judgment dismissing plaintiff's third, fourth and fifth claims on statute of limitations grounds. *See Collom,* 1987 WL 18170, at *3; *Sargent v. City of New York, 128 A.D.2d 693, 513 **[*15]** N.Y.S.2d 194 (App. Div. 1987).*

**SO ORDERED.**

Dated: New York, New York

July 26, 1995

JOHN S. MARTIN, JR., U.S.D.J.

**End of Document**

 Neutral
As of: October 23, 2023 1:45 PM Z

# *Butler v. Coca-Cola Refreshments USA, Inc.*

United States District Court for the Eastern District of New York

July 1, 2013, Decided; July 1, 2013, Filed

12 Civ. 1791 (BMC)

**Reporter**

2013 U.S. Dist. LEXIS 92086 *; 119 Fair Empl. Prac. Cas. (BNA) 109; 2013 WL 3324995

YVETTE BUTLER, Plaintiff, - against - COCA-COLA REFRESHMENTS USA, INC., Defendant.

**Subsequent History:** Costs and fees proceeding at, Request granted *Butler v. Coca-Cola Refreshments USA, Inc., 2013 U.S. Dist. LEXIS 120834 (E.D.N.Y., Aug. 26, 2013)*

## Core Terms

termination, retaliation, temporal proximity, discriminatory termination, hostile work environment claim, prima facie case, arbitrator, retaliatory, attendance, complaints, boss, hostile work environment, admissible evidence, protected activity, summary judgment, premotion, warning, motive, retaliation claim, defense motion, binding, tardy, adverse action, limitations, violations, mechanics, withdrawn, hostile, parties, pretext

**Counsel: [\*1]** For Yvette Butler, Plaintiff: Steven A. Morelli, LEAD ATTORNEY, The Law Offices of Steven A. Morelli, P.C., Garden City, NY; Paul Bartels, Garden City, NY.

For Coca-Cola Refreshments USA, Inc., Defendant: Bradford G. Harvey, LEAD ATTORNEY, Miller & Martin, LLP, Chattanooga, TN; Elise M. Bloom, Keisha-Ann G. Gray, LEAD ATTORNEYS, Proskauer Rose LLP, New York, NY; Michelle A. Annese, LEAD ATTORNEY, Proskauer Rose LLP, Newark, NJ.

**Judges:** Brian M. Cogan, United States District Judge.

**Opinion by:** Brian M. Cogan

## Opinion

### MEMORANDUM DECISION AND ORDER

**COGAN**, District Judge.

Plaintiff brings this employment discrimination action under *42 U.S.C. § 1981*, alleging that she was subjected to a racially hostile work environment and then terminated in retaliation for complaining about it. Defendant has moved for summary judgment, arguing primarily that her hostile work environment claim is time-barred and that the retaliation claim fails for a variety of other reasons. For the reasons set forth below, defendant's motion is granted.

### I. The Hostile Work Environment Claim

Plaintiff's response to defendant's motion as to her hostile work environment claim raises some issues about her counsel's conduct before the Court. I had explained **[\*2]** at the premotion conference that one of the purposes of the conference was to narrow the issues that would be raised in the motion, if possible, so that the parties would not waste their or the Court's time on issues as to which the outcome was clear.[1] At that time, plaintiff's complaint included not only hostile work environment and retaliation claims, but a claim for discriminatory termination of her employment. It soon became apparent at the conference, however, that plaintiff would be unable to offer admissible evidence to raise a factual issue concerning discriminatory termination. As discussed more fully below, her termination occurred after repeated disciplinary measures for lateness, her acceptance of a "Last Chance Agreement," and her violation of the terms of that agreement. Her termination "for cause" had been grieved and upheld by a neutral arbitrator — a "highly probative," although not dispositive, factor in determining whether a plaintiff would be able to state a *prima facie* case of discrimination. See *Collins v. New York City Transit Auth., 305 F.3d 113, 119 (2d Cir. 2002)*. When it became apparent that there was no admissible evidence to suggest a discriminatory motive **[\*3]** behind plaintiff's termination,

---

[1] I had obtained, as my Individual Practice Rules require, detailed letters from the parties in advance of the premotion hearing in which each set forth what the record was likely to show and why their respective positions had merit. Thus, as I advised the parties at the premotion conference, the conference was effectively oral argument on defendant's motion.

plaintiff's counsel unambiguously agreed to withdraw the discriminatory termination claim. The record on this could not be clearer; counsel stated "We will withdraw that claim."

Defendant, therefore, did not move against plaintiff's discriminatory termination claim because, following the premotion conference, it was no longer in the case. Although the possible detrimental consequence that the withdrawal of the discriminatory termination claim would have on plaintiff's hostile work environment claim was discussed at the conference, it apparently did not occur to plaintiff's counsel until preparing her opposition to defendant's motion that, indeed, absent the discriminatory termination claim, there was no argument left to avoid the conclusion that her hostile work environment claim was time-barred. That [*4] is because all of the other allegedly hostile acts occurred more than four years prior to the filing of the complaint, making them untimely, see *Jones v. R.R. Donnelley & Sons Co., 541 U.S. 369, 124 S. Ct. 1836, 158 L. Ed. 2d 645 (2004)* (establishing that *28 U.S.C. § 1658(a)*'s four-year limitations period applies to the *§ 1981* claims at issue here), and plaintiff needed to portray her purportedly discriminatory termination as the last in a series of related hostile acts so that she could invoke the "continuing violation doctrine." See generally *Patterson v. Cnty. of Oneida, 375 F.3d 206, 220 (2d Cir. 2004)* ("A claim of hostile work environment is timely so long as one act contributing to the claim occurred within the statutory period; if it did, 'the entire time period of the hostile environment may be considered by a court for the purposes of determining liability.'"). In other words, only plaintiff's termination occurred within four years of the commencement of this action and, without her termination to serve as an "anchor," plaintiff's hostile work environment claim is untimely.

Based on this apparent realization, plaintiff's counsel surprisingly has chosen to disregard the concession made on the [*5] record withdrawing the discriminatory termination claim. Plaintiff's brief in opposition to defendant's summary judgment motion now wrongly seeks, at best, to portray the concession as merely agreeing to put that claim "on hold," pending the determination of defendant's motion as to the hostile work environment and retaliation claims. Compounding her distortion of the record, she offers the same hearsay evidence to show the supposed viability of the discriminatory termination claim that her counsel had agreed at the hearing could not be offered for that purpose because it was inadmissible, without offering any argument to show that it is admissible.[2] Therefore, there is nothing in plaintiff's

opposition to this motion that makes her discriminatory termination claim any more viable than when her counsel withdrew it at the hearing.

Lest there be any doubt by plaintiff's counsel, let me make it clear once again: the discriminatory termination claim was withdrawn at the hearing and remains withdrawn. It was withdrawn because counsel said so, and he said so because neither at the hearing nor in her misconceived opposition to defendant's motion has plaintiff produced admissible evidence to satisfy the fourth prong of the standard set forth in *McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973)*, for establishing a *prima facie* case, *i.e.*, there is no admissible evidence suggesting that plaintiff was terminated as a [*7] result of racial discrimination. See *Ruiz v. Cnty. of Rockland, 609 F.3d 486, 492 (2d Cir. 2010)* (requiring a plaintiff to show, among other things, that "the adverse action took place under circumstances giving rise to the inference of discrimination").

A concession in open court is fully binding on a represented party, see *Lowy v. Bay Terrace Co-op. Section VIII, Inc., 869 F.2d 173 (2d Cir. 1989)*. "Absent egregious circumstances, a distinct and formal admission made before, during, or even after a proceeding by an attorney acting in his professional capacity binds his client as a judicial admission." *Ali v. Reno, 22 F.3d 442, 446 (2d Cir. 1994)* (parentheses, internal quotation marks, and citation omitted). See also *Oscanyan v. Arms Co., 103 U.S. 261, 263, 26 L. Ed. 539 (1880)* ("The power of the court to act in the disposition of a trial upon facts conceded by counsel is as plain as its power to act upon the evidence produced."); 4 John Henry Wigmore, Evidence in Trials at Common Law § 1063, at 67 (Chadbourn rev. 1972) ("[t]he concessions of attorneys of record bind their clients in all matters relating to the trial and progress of the cause") (quoting *Truby v. Seybert, 12 Pa. 101, 105 (1849)*) [*8] (internal quotation marks omitted). It cannot be the case that the parties can file with the Court detailed letters stating their respective positions, come to court to argue their positions, agree to the scope of the motion, and then remain free to disregard the entire hearing. That would be the

_____

(all of whom are non-Mexican minorities) with Mexicans because they work harder. This testimony is hearsay and, thus, inadmissible. *Fed. R. Evid. 802*. Likewise, [*6] plaintiff's statements about how she was treated by another supervisor, Vito Caravella, and comments that Caravella made to her also constitute inadmissible hearsay, or are based on plaintiff's personal feelings. The allegations in plaintiff's complaint about being the target of racial slurs and comments also do not constitute admissible evidence. See *Newton v. City of New York, 640 F. Supp. 2d 426, 448 (S.D.N.Y. 2009)* ("A complaint is not evidence, except insofar as it contains admissions. On a motion for summary judgment, each party must proceed on the basis of admissible evidence.").

_____

[2] Specifically, plaintiff refers to her testimony that she was told by co-workers that Ron Sampath, a supervisor who eventually initiated her termination, wanted to replace the mechanics on the third-shift

equivalent of parties appearing before the Staff Counsel in the Second Circuit and agreeing upon the narrowing of their claims, and then disregarding their agreement and proceeding to brief the appeal as if the conference had never occurred. A premotion hearing falls under the provisions of *Rule 16*, and concessions made at the conference for the purpose of narrowing the issues in a case are fully binding in subsequent proceedings. See 6A Wright & Miller et al., Federal Practice and Procedure §1527 (3d ed. 2013) ("Courts generally hold stipulations, agreements, or statements of counsel made at the pretrial conference binding for purposes of the trial. This practice furthers the Rule 16 policy of limiting the trial to those issues that are actually in dispute without impairing the basic rights of the litigants") (footnotes omitted). Cf. *NRT Metals, Inc. v. Manhattan Metals (Non-Ferrous) Ltd., 576 F. Supp. 1046, 1053 (S.D.N.Y. 1983)* [*9] ("The policy behind *Rule 16* — to limit the trial to those issues that are actually in dispute — would be crippled were pre-trial orders held to have no binding effect upon the parties.").[3]

With this conclusion, the disposition of plaintiff's hostile work environment claim is unavoidable. Even plaintiff seems to recognize that once the discriminatory termination claim is withdrawn, the hostile work environment claim fails under the statute of limitations. There is not a single other hostile event alleged to have occurred within four years of the filing of this action.

Finally, I note that even if plaintiff had not withdrawn the discriminatory termination claim, that claim could not serve as the foundation for plaintiff's continuing violation [*10] theory of a hostile work environment. An employee's termination is the paradigmatic "discrete act" that cannot be part of a hostile work environment claim. See, e.g., *Brown v. Dep't of Educ., No. 10 Civ. 5023, 2012 U.S. Dist. LEXIS 59291, 2012 WL 1319859, at *4 (S.D.N.Y. Apr. 11, 2012)* (holding that plaintiff's "termination . . . is a 'discrete act' of alleged discrimination and therefore [is] unable to 'pull in' her earlier hostile work environment allegations."). Plaintiff's hostile work environment claim is accordingly dismissed as time-barred.

**II. Retaliatory Termination**

[3] Although the Court "may relieve counsel from any statement or stipulation made during a [pretrial] conference in order to prevent injustice," 6A Wright & Miller, Federal Practice and Procedure §1527, the flaws in plaintiff's discriminatory termination claim, coupled with the absence of admissible evidence to support it, lead the Court to conclude that there is no basis for relieve plaintiff from the withdrawal of her discriminatory termination claim.

A. Factual Background

Plaintiff began working as a mechanic for defendant in 2003. She acknowledges, as she must on this record, that she had a problem with timely reporting to work, which she attributes to her parental obligations. Defendant maintains an Attendance Control Program ("ACP"), which it negotiated with plaintiff's union. The policy calls for a graduated disciplinary measure if an employee is either absent, late arriving, or early leaving at least 7% of available workdays in a calendar year quarter.

Under this program, plaintiff received an oral warning that she had exceeded the percentage limits of the ACP on April 13, 2004. She received [*11] a final written warning for subsequent violations on August 4, 2004. This final warning apparently was not final because plaintiff received another final written warning for ensuing violations on October 21, 2004, and yet another final written warning on February 6, 2006. Then on November 21, 2006, after more attendance issues, plaintiff, her union, and defendant signed what is known as a "Last Chance Agreement," which provided that "[a]ny future infraction by [plaintiff] which violates the Company's Attendance Policy shall warrant immediate termination." There was no expiration date on the agreement. Plaintiff asserts that she held the belief that the agreement had a one-year term, although there is no evidence in the record as to the basis for her belief or whether she expressed that belief to anyone prior to her termination.

The protected activity upon which plaintiff relies for her retaliatory discharge claim arose out of an incident on September 6, 2007. On that day, plaintiff's supervisor, Vito Caravella, sent plaintiff home when he claimed she did not respond to his calls on her handheld radio. Plaintiff, however, was on a break at the time of these alleged calls, and was in [*12] fact standing in front of the plant. Plaintiff was not disciplined for the incident. However, she complained about being unreasonably sent home, first anonymously to defendant's employee hotline on September 12, 2007, and then in writing to defendant's Human Resources Manager, on September 19, 2007 — a writing in which she disclosed that she was the anonymous caller on September 12. In her two complaints, plaintiff made the following points, among others: (1) her supervisors did not want her to work for them because she was a female; (2) Caravella used a lot of profanity and yelled at plaintiff after she told him she had an accident and needed to go to the bathroom; (3) Caravella told her she "should go back where she came from" and that "she should be paid on the lower scale"; and (4) plaintiff had not received adequate training.

The September complaints alluded to earlier flare ups between plaintiff and Caravalla, as well as her department

manager, Ron Sampath. These relationships had indeed been troubled. At various times from the end of 2004 up through the September 6 incident, plaintiff had complained about various incidents involving Caravello, Sampath, or her co-workers. These **[*13]** complaints either preceded or were followed (depending on when one starts counting) by various disciplinary measures or criticisms made against plaintiff. For example, in 2004 she complained that she had an "unfair" workload as compared to male mechanics. She also asserted that she was disciplined for taking a 60-minute lunch in April 2005 right after she had complained about her treatment, even though she had never taken a 60-minute lunch.[4]

After her September 2007 complaints, plaintiff continued to have attendance problems during that last quarter of 2007; she was late four days during that quarter. December 2007 was a very short month for plaintiff (and other mechanics) because of seasonal layoffs, which plaintiff does not contend were discriminatory or retaliatory. As a result of the layoffs, plaintiff's absent/late days constituted a higher proportion of available "working days," as defendant and the union defined them, than those days would have had plaintiff worked the entire quarter (assuming, of course, that plaintiff would not have been late or absent on almost all of those extra **[*14]** work days). The shortened quarter gave plaintiff a 9.1% incident rate, and defendant, at the instigation of Sampath, enforced the Last Chance Agreement on January 23, 2008 and terminated plaintiff.

Plaintiff and her union grieved the termination. The parties mutually selected a highly experienced labor arbitrator. Defendant relied on the terms of the Last Chance Agreement. Plaintiff, through an attorney appointed by the union, argued that the Last Chance Agreement, which was more than a year old by that time, was stale and should not be so rigorously enforced; that she had car trouble in the last quarter of 2007 which she had documented; and that the car had been fixed and she would not be late again.

The arbitrator, in a reasoned decision dated February 18, 2008, upheld plaintiff's discharge. He found that plaintiff was "remorseful concerning her tardy record" but rejected her argument that the age of the Last Chance Agreement meant it should not be enforced:

> Union counsel's argument might have some validity if Grievant had maintained a tardy-free record for the first three quarters of 2007. However, that was far from being the case. Grievant's tardy/early leave percentage for the first **[*15]** three quarters of 2007 are 5.2%, 5.6%, and

6.5%, respectively. If Grievant had one more lateness during the third quarter, she would have been terminated then as her tardy percentage would have exceeded 7%.
> The Last Chance Agreement is clear and unambiguous. Grievant was on notice as to what she could not do tardiness-wise. Despite such knowledge, Grievant exceeded the 7% maximum in the fourth quarter of 2007 thereby automatically triggering the termination provision of the Last Chance Agreement.

Plaintiff filed this action in Queens Supreme Court under *42 U.S.C. § 1981* just days before the expiration of the four-year statute of limitations, and defendant removed the case to this Court.

B. Analysis

The applicable standard for proving retaliation under *42 U.S.C. § 1981* is the familiar burden shifting test established in *McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668*. See *El Sayed v. Hilton Hotels Corp., 627 F.3d 931, 932-33 (2d Cir. 2010)*. The McDonnell Douglas test requires that, first, the plaintiff establish a *prima facie* case of retaliation. To establish a prima facie case of retaliation, the plaintiff must:

> adduce evidence sufficient to permit a rational trier of fact **[*16]** to find (1) that he engaged in protected [activity] under [the anti-discrimination statutes], (2) that the employer was aware of this activity, (3) that the employer took adverse action against the plaintiff, and (4) that a causal connection exists between the protected activity and the adverse action, i.e., that a retaliatory motive played a part in the adverse employment action.

*Kessler v. Westchester County Dep't of Soc. Servs., 461 F.3d 199, 205-06 (2d Cir. 2006)*. If the plaintiff satisfies these criteria, the burden shifts to the defendant to produce a non-retaliatory reason for the allegedly adverse action. Then, if the defendant satisfies this step, the plaintiff must prove that "more likely than not the employer's decision was motivated, at least in part, by an intent to retaliate against him." *El Sayed, 627 F.3d at 933*.

Defendant acknowledges that plaintiff has satisfied the first three requirements of her *prima facie* case. The issue is over the fourth requirement, and the use of temporal proximity in establishing it. With regard to the establishment of a *prima facie* case through temporal proximity, the Second Circuit has "not drawn a bright line to define the outer limits beyond **[*17]** which a temporal relationship is too attenuated to establish a causal relationship between the exercise of a federal constitutional right and an allegedly retaliatory action." *Espinal v. Goord, 558 F.3d 119, 129 (2d Cir. 2009)*

---

[4] These incidents form part of the basis for plaintiff's time-barred hostile work environment claim.

(quoting *Gorman-Bakos v. Cornell Coop. Extension, 252 F.3d 545, 554 (2d Cir. 2001))*. Instead, the Second Circuit has directed district courts "to exercise [their] judgment about the permissible inferences that can be drawn from temporal proximity in the context of particular cases." *Espinal, 558 F.3d at 129*. This is a rather imprecise directive as to an issue that is supposed to be resolvable as a matter of law (or not) and which arises with great frequency, as claims of illegal retaliation occur in a variety of contexts. It is, therefore, not surprising that the exercise of such judgment by courts has produced district court and even Circuit decisions that are all over the map with regard to how temporally distant protected activity may be from the adverse action to support or refute a reasonable inference of causation, and every time the issue arises, litigants can choose from a broad array of case law to find cases that support their position. Compare Espinal **[*18]** (six months not too long) with *Hollander v. American Cyanamid Co., 895 F.2d 80, 85-86 (2d Cir. 1990)* (three months too long). One could assert with some force that this case-by-case weighing of factual circumstances compels a re-evaluation of whether this is a proper exercise in the context of summary judgment analysis.

The imprecision extends to the role of temporal proximity in applying the fourth factor of McDonnell Douglas' *prima facie* case as opposed to considering temporal proximity in the third step of the McDonnell Douglas analysis. See *Aka v. Jacob K. Javits Convention Ctr., No. 09 Civ. 8195, 2011 U.S. Dist. LEXIS 114002, 2011 WL 4549610, at \*9 (S.D.N.Y. Sept. 30, 2011)* ("Mere temporal proximity between a plaintiff's protected activity and an adverse employment action is sufficient to create an inference of retaliation for purposes of proving a *prima facie* case. However, temporal proximity, without more, 'is insufficient to satisfy [the plaintiff's] burden to bring forward some evidence of pretext' at the third stage of the McDonnell Douglas inquiry.") (internal citations omitted). In *El Sayed, 627 F.3d at 932-33*, the Second Circuit assumed *arguendo* that plaintiff had satisfied his burden of showing a *prima* **[*19]** *facie* case by reason of a three week gap between his protected activity and his termination, but dismissed the claim because plaintiff had shown nothing more than that temporal proximity. This seems a sensible approach and illustrates that in analyzing retaliation claims, the parsing of the fourth factor in the *prima facie* case from the third step in the showing required to raise a factual issue often serves little practical purpose. The case also confirms the principle that temporal proximity alone is rarely if ever enough to raise a factual issue of retaliation sufficient to prevent summary judgment.

On that basis, I will go right to the third step of the McDonnell Douglas analysis and determine whether plaintiff has offered sufficient evidence of pretext or other circumstantial evidence of retaliation in her firing sufficient to raise a factual issue. I should note that in doing this, I am also breezing through defendant's required showing at the second step of McDonnell Douglas, as I find the record is patently clear that plaintiff violated the ACP in the fourth quarter of 2007, which gave defendant a legitimate nondiscriminatory reason to terminate her under the Last Chance Agreement. **[*20]** Although plaintiff raises various arguments about the policy's "rounding" of tardy incidents up or down to the nearest integer, and the unfair effect of her shortened December work month, the policy remains clear and defendant's application of it was technically correct. Plaintiff's arguments go more to the question of whether the rigorous enforcement of the ACP and the Last Chance Agreement was a pretext for doing that which defendant was lying in wait to do at its earliest opportunity, an argument that is, in any case, properly raised at the third step of the McDonnell Douglas analysis.

Proceeding, then, to the third step of McDonnell Douglas, I have considered all of the record evidence and assessed whether there is any way a jury could reasonably find that plaintiff was terminated in retaliation for her September complaints. Starting with the issue of temporal proximity, it is ironic, and typical, that each side contends that the timing supports their position. Plaintiff thus points out that it was "only" four months between complaint and termination, which to her suggests retaliation, with case law support for that conclusion, while defendant notes my observation at the premotion **[*21]** hearing that four months seems like a long time to lie in wait and buttresses that observation with reference to other cases.

I think temporal proximity in this case is a wash. Four months may or may not be a long time to retaliate, depending on the circumstances. But neutralizing this factor does not help plaintiff. Even if I concluded that the temporal proximity factor weighed in plaintiff's favor, a jury could not render a verdict in for plaintiff based solely on this factor. See *El Sayed, 627 F.3d at 933* ("The temporal proximity of events may give rise to an inference of retaliation for the purposes of establishing a prima facie case of retaliation under Title VII, but without more, such temporal proximity is insufficient to satisfy appellant's burden to bring forward some evidence of pretext."). The question thus becomes what other evidence could plaintiff put in front of a jury that would allow it to reasonably find that the Last Chance Agreement was invoked as a pretext or that she was fired in retaliation for her protected activity?

There is not much. Plaintiff first notes the technical nature of the ACP in terms of rounding of late days, but I have already found, like the arbitrator, **[*22]** that notwithstanding the

drafting limitations of the ACP, there is only one reasonable way to read it — the way defendant reads it. I could not allow a jury to find otherwise based on the language of the ACP. Indeed, plaintiff has offered no other reasonable interpretation of the agreement; she simply points to its inartful drafting.

Of course, even allowing plaintiff's argument and rounding her days down instead of up would have no effect without accepting her second point, namely that she should have been given a break because of the layoff-shortened December month had an impact on her absence calculation under the ACP. In other words, plaintiff asks the Court to assume that December had not been a shortened month and that she would have been on time for every extra workday that would be added to the quarter as a result. (This is a somewhat dubious assumption because it would require an attendance record superior to what plaintiff actually had for the entire year. Since, however, plaintiff is opposing summary judgment, she is entitled to every inference). Under plaintiff's requested assumption, she would have a 6.45% absence rate for the fourth quarter of 2007, which would be rounded [*23] down to 6% — below the 7% threshold required by the ACP to appropriately impose discipline. Significantly, however, plaintiff does not dispute that she was treated the same as the other mechanics that month nor that seasonal layoffs were the norm for this business. And, under the terms of the ACP, defendant was allowed to exclude layoff days in calculating plaintiff's absence/tardiness rate.

Plaintiff asserts that the ACP was confusing and that she was not aware of its precise operation. She also asserts, without basis, that she thought the Last Chance Agreement only ran through November 2007. These arguments miss the point. The record is clear that, unlike defendant, plaintiff was not counting her tardy/absence days. She reported to work on time when she could and she did not when she could not — which was a lot. In no way does plaintiff's failure to understand the ACP imply that defendant improperly invoked the policy and the Last Chance Agreement to punish her for her complaints in September.

Plaintiff also argues that the ACP allowed defendant to exercise discretion, and considering her bad history with Sampath and the undisputed fact that he was the one who recommended her termination, [*24] a jury could reasonably find that her September complaints were a substantial factor in defendant's decision to invoke the Last Chance Agreement. This is a hard hoe to hoe for a former employee who was subject to an oral warning for violating the ACP, three final warnings, and a Last Chance Agreement. Plaintiff protests that some of her attendance problems were inaccurately recorded or trivial, and that she entered into the Last Chance Agreement under pressure. Even if these claims are credited,

they do not overcome their cumulative effect of plaintiff's attendance problems in evaluating defendant's invocation of the Last Chance Agreement, especially since plaintiff has offered no evidence that she even attempted to grieve any of these issues, and the record certainly demonstrates that plaintiff knew how to complain when she wanted, despite her professed reluctance to do so.

Moreover, plaintiff has failed to show that anyone other than Sampath *could* have recommended invocation of the Last Chance Agreement concerning plaintiff. Sampath was, after all, the manager of plaintiff's department. It would be a dangerous precedent to hold that where there is a documented history of violations [*25] of a company's documented attendance policy, a troubled history with the boss is nonetheless sufficient to get a case before a jury as to improper retaliation. To overcome that prospect, there must be something more about the "troubled history" with the boss, specifically some evidence of illegal conduct or motivation — not just that the boss is an unreasonable boss, even a horribly unreasonable boss. Otherwise, the case falls within the numerous discrimination cases holding that incivility alone is not actionable. See, e.g., *Alfano v. Costello, 294 F.3d 365, 377 (2d Cir. 2002)* ("Everyone can be characterized by sex, race, ethnicity, or (real or perceived) disability; and many bosses are harsh, unjust, and rude. It is therefore important in hostile work environment cases to exclude from consideration personnel decisions that lack a linkage or correlation to the claimed ground of discrimination."); *Sanchez-Vazquez v. Rochester City Sch. Dist., No. 11-CV-6590, 2012 U.S. Dist. LEXIS 96301, 2012 WL 2856824, *3 (W.D.N.Y. July 11, 2012)* ("*Section 1981* and other employment discrimination statutes do not establish a general civility code for the workplace."). It remains the case that the "boss from hell" has not, without [*26] more, violated federal law.

Plaintiff's effort to demonstrate illegal conduct or motivation fails for the same reason that she withdrew her discrimination claim. That is, although no rational person would want a boss like plaintiff describes Sampath (and I assume her description to be true for purposes of this motion), there is no admissible evidence that he or any other representative of defendant involved in her termination had any improper motivation under federal law. Plaintiff seems to claim that her co-workers' alleged hostile conduct (reprising her time-barred hostile work environment claim), plus one statement from Caravella that she should "go back where she came from," show retaliatory animus, but she has produced no evidence that any of these people had input into the decision to terminate her.

The paucity of plaintiff's proof on this issue is most exposed when she attempts to resurrect a statement that Sampath

allegedly made, going so far as to describe this statement as her "most damning" evidence in support of her retaliation claim. The statement attributed to Sampath is that he wanted to replace the mechanics on plaintiff's shift (mostly black) with Mexicans because Mexicans **[*27]** work harder. The problem with this statement (and the reason she withdrew her discrimination claim at the promotion conference) is that there is no admissible evidence that Sampath ever made it. Plaintiff does not claim she ever heard him say it. She contends, instead, that several other employees heard him say it and they told her about it on some unspecified date. But despite extensive pretrial discovery in this case, plaintiff has not obtained affidavits or deposition testimony from these alleged witnesses, and her second-hand rendering is obviously inadmissible hearsay. See *Whidbee v. Garzarelli Food Specialties, Inc., 223 F.3d 62, 71 (2d Cir. 2000)* ("while second-hand comments may be relevant, a district court deciding a summary judgment motion must be provided with admissible evidence demonstrating the truth of the non-movant's assertions."). I thought plaintiff's attorney agreed with this conclusion, at least he said that he did at the promotion hearing, and we expressly agreed that this purported evidence would not be included in his summary judgment opposition. Yet here it is again, suffering from the same evidentiary failing as it did at the promotion hearing.

Accordingly, **[*28]** plaintiff has offered insufficient evidence upon which a jury could reasonably find that an intent to retaliate against her for her September complaints was a substantial factor in her termination. But there is more.

Under the Second Circuit's decision in *Collins v. New York City Transit Auth., 305 F.3d 113*, the arbitration ruling against plaintiff constitutes substantial evidence against a finding of retaliatory motive in the context of a motion for summary judgment. Plaintiff attempts to avoid the arbitrator's decision by pointing out that she did not assert her claims of retaliation in that proceeding and that her union attorney could have done a better job. Neither of these responses is sufficient. The case law is clear that the failure to raise Title VII claims in the context of a labor arbitration does not deprive the award of its evidentiary force under Collins, see, e.g., *Simpson v. New York State Dep't of Civil Serv., No. 02-CV-1216, 2005 U.S. Dist. LEXIS 3399, 2005 WL 545349, at *16 (N.D.N.Y. Mar. 1, 2005)* ("Under Collins and its progeny, failure to address the discrimination issue in an arbitration does not diminish the impact of that arbitration on a subsequent discrimination action."), and the shortcomings **[*29]** plaintiff attributes to her attorney are minor, insufficient to negate the fact that she had a full opportunity to get her story out before a neutral arbitrator. Although this decision does not have a preclusive effect on plaintiff's Title VII retaliation claim, see *Collins, 305 F.3d at 119*, the arbitrator's decision that plaintiff's

termination was based on a legitimate business reason complements the inadequacy of her proof of retaliatory motive.

## CONCLUSION

Defendant's motion for summary judgment [32] is granted, and the case is dismissed.

**SO ORDERED**.

Digitally signed by Brian M. Cogan

U.S.D.J.

Dated: Brooklyn, New York

July 1, 2013

---

End of Document

 Positive
As of: October 23, 2023 1:50 PM Z

# *Carter v. New Venture Gear, Inc.*

United States District Court for the Northern District of New York

September 26, 2007, Decided; September 26, 2007, Filed

5:00-CV-1744

**Reporter**

2007 U.S. Dist. LEXIS 71695 *; 2007 WL 2847217

REBA CARTER, Plaintiff, v. NEW VENTURE GEAR, INC., DAIMLERCHRYSLER CORP., Mike Allen as President of UNITED AUTOMOBILE, AEROSPACE AND AGRICULTURAL IMPLEMENT WORKERS OF AMERICA LOCAL 624, Stephen Yokich as President of UNITED AUTOMOBILE, AEROSPACE AND AGRICULTURAL IMPLEMENT WORKERS OF AMERICA, Defendants.

**Subsequent History:** Affirmed by *Carter v. New Venture Gear, Inc., 2009 U.S. App. LEXIS 3237 (2d Cir. N.Y., Feb. 18, 2009)*

## Core Terms

deposition, harassment, allegations, material fact, second amended complaint, coworker, summary judgment, summary judgment motion, sexual harassment, cause of action, matter of law, discriminatory, light most favorable, disparate treatment, plaintiff's claim, prima facie case, work environment, reassignment, assault, brownie, machine, infliction of emotional distress, racial discrimination, question of fact, racial epithet, union steward, no evidence, complaints, employees, reprimand

**Counsel:** [*1] K. Felicia Davis, Esq., Syracuse, New York, Attorney for Plaintiffs.

Hancock & Estabrook, LLP, John T. McCann, Esq., of Counsel, Lindsey Helmer Hazelton, Esq., of Counsel, Syracuse, New York, Attorneys for Defendants New Venture Gear, Inc. and DaimlerChrysler Corp.

Blitman & King LLP, Kenneth L. Wagner, Esq., of Counsel, Syracuse, New York, Attorneys for Defendants Mike Allen as President of United Automobile, Aerospace and Agricultural Implement Workers of America Local 624, and Stephen Yokich as President of United Automobile, Aerospace and Agricultural Implement Workers of America.

**Judges:** Hon. Norman A. Mordue, Chief U.S. District Judge.

**Opinion by:** Norman A. Mordue

## Opinion

**Hon. Norman A. Mordue, Chief U.S. District Judge:**

## MEMORANDUM-DECISION AND ORDER

### INTRODUCTION

In this action alleging racial and sexual discrimination and harassment, there are two motions presently before the Court: first, a motion for summary judgment by defendants New Venture Gear, Inc. and DaimlerChrysler Corp. (collectively, "NVG") (Dkt. No. 101), and second, a motion for summary judgment by defendants Mike Allen as President of United Automobile, Aerospace and Agricultural Implement Workers of America Local 624, and Stephen Yokich as President [*2] of United Automobile, Aerospace and Agricultural Implement Workers of America (collectively, "union") (Dkt. No. 103). For the reasons set forth below, the Court grants the motions and dismisses the second amended complaint on the merits.

### SECOND AMENDED COMPLAINT

Plaintiff, an African-American woman, commenced this action on November 15, 2000. In her second amended complaint (Dkt. No. 16), she alleges that during the course of her employment at NVG from July 2, 1984 to October 15, 1999, she suffered racial discrimination, disparate treatment, and racial and sexual harassment. The second amended complaint alleges discriminatory incidents as follows: in April 1999 her department was awarded a bonus, which was shared with everyone but plaintiff; in May 1999 she was reprimanded for making bad parts, although she was not

responsible; and in July 1999, despite her seniority, she was moved from her machine job to another job. She further alleges that NVG's conduct has created a system of disparate treatment wherein "incidents reported by Black employees are ignored or not dealt with[, and] ... similarly treated non-Black employees are not treated in such a manner." She avers that she was subjected **[*3]** to racially motivated comments and epithets, physical threats, and assaults by white coworkers, but when she complained to NVG management officials they did not respond or brushed off the incidents as "horseplay." She also claims that she was subjected to sexual harassment by a supervisor, Mark Trzonkowski. As against the union, of which she was a dues-paying member, plaintiff avers that whenever she requested union representation, the union steward, Gil Odjick, would fail to respond or refuse to provide adequate representation.

The first cause of action is against NVG for violations of Title VII of the Civil Rights Act of 1964, *42 U.S.C. § 2000e, et seq.* ("Title VII"). The second cause of action is against NVG under *42 U.S.C. § 1981* ("*section 1981*"). The third cause of action is against the union based on *section 1981*. The fourth and fifth causes of action are against the union for unlawful labor practices under *29 U.S.C. §§ 158* and *185*. The remaining causes of action are New York State law claims for assault and battery, intentional infliction of emotional distress, negligent infliction of emotional distress, and breach of contract.

## APPLICABLE LAW

Summary judgment is appropriate "where **[*4]** there exists no genuine issue of material fact and, based on the undisputed facts, the moving party is entitled to judgment as a matter of law." *Beth Israel Med. Ctr. v. Horizon Blue Cross and Blue Shield of N.J., Inc., 448 F.3d 573, 579 (2d Cir. 2006)* (internal quotation marks omitted). A dispute about a genuine issue of material fact exists if the evidence is such that "a reasonable [factfinder] could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)*. In determining whether there is a genuine issue of material fact, a court must resolve all ambiguities, and draw all inferences, against the movant. *See United States v. Diebold, Inc., 369 U.S. 654, 655, 82 S. Ct. 993, 8 L. Ed. 2d 176 (1962)*.

The Local Rules of the Northern District provide a procedural framework for the resolution of summary judgment motions, placing the burden on the parties to present the evidence that either supports or defeats the motion. The movant must first submit a Statement of Material Facts setting forth the undisputed facts upon which it relies and specific citations to

the record where each fact is established. See N.D.N.Y.*L.R. 7.1(a)(3)*. The court must satisfy itself that the cited record **[*5]** evidence supports the movant's assertions of fact and that those facts show that the movant is entitled to judgment as a matter of law. *New York State Teamsters Conf. Pension and Ret. Fund v. Express Servs., Inc., 426 F.3d 640, 649 (2d Cir. 2005)*.

Once the movant submits a properly supported Statement of Material Facts, the non-moving party must file a response thereto. "Any facts set forth in the [movant's] Statement of Material Facts shall be deemed admitted unless specifically controverted by the opposing party." N.D.N.Y.*L.R. 7.1(a)(3)*. The Second Circuit has endorsed this rule, noting: "Rules governing summary judgment practice are essential tools for district courts, permitting them to efficiently decide summary judgment motions by relieving them of the onerous task of 'hunt[ing] through voluminous records without guidance from the parties.'" *Id.* (citing *Holtz v. Rockefeller & Co., 258 F.3d 62, 74 (2d Cir. 2001))* (alteration in original).

## NVG'S MOTION

### Race discrimination

As noted, plaintiff alleges three discriminatory incidents. First, she claims that in April 1999 her department was awarded a bonus, which was shared with everyone but plaintiff. Second, she claims that in May 1999 **[*6]** she was reprimanded for making bad parts, although she was not responsible. Third, she claims that in July 1999 (the correct date is October 14, 1999), despite her seniority, she was moved from her machine job to another job.

The legal standard applied to claims of race discrimination under Title VII is the same as that applied to *section 1981* claims. The Court analyzes plaintiff's race discrimination claims under the burden-shifting framework of *McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-04, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973)*. The first step requires the plaintiff to prove a *prima facie* case of discrimination by showing (1) membership in a protected class; (2) possession of basic skills necessary for the job; (3) an adverse employment action; and (4) circumstances giving rise to an inference of race discrimination. *See Slattery v. Swiss Reins. Am. Corp., 248 F.3d 87, 91 (2d Cir. 2001)*.

Where a plaintiff has made out a *prima facie* case, the burden of production shifts to the employer to articulate a legitimate, nondiscriminatory reason for its actions. *See Bickerstaff v. Vassar College, 196 F.3d 435, 446 (2d Cir. 1999)*. The

defendant's burden of production is not a demanding one; it need only offer an explanation **[*7]** for the employment decision, and that race was." *Id.*

The burden then shifts back to the plaintiff to show "that the proffered reason was not the true reason for the employment decision, and that race was." *Id.* (internal quote omitted). "The plaintiff's opportunity to demonstrate that the employer's proffered reason was false [then] merges with her ultimate burden to persuade the trier of fact that she has been the victim of intentional discrimination (*i.e.,* that an illegal discriminatory reason played a motivating role in the adverse employment decision)." *Id. at 446-47.*

Applying the first step of the *McDonnell Douglas* analysis to the case at bar, the Court notes that NVG does not dispute that plaintiff is a member of a protected class and that she has made the minimal showing needed to satisfy the second element of the test. *See Slattery, 248 F.3d at 92.* Rather, NVG argues that, with respect to all three allegedly discriminatory incidents, plaintiff fails to meet the both the third and fourth elements, because there is no evidence of any adverse employment action, nor is there evidence of any circumstances giving rise to an inference of race discrimination. It further argues that, assuming that plaintiff **[*8]** has made out a *prima facie* case, NVG has met its burden of articulating a legitimate, nondiscriminatory reason for its actions, and that plaintiff has failed to demonstrate that the reason given was not the true reason for the employment decision and that race was. Thus, NVG argues, plaintiff has not met her ultimate burden of showing that she has been the victim of intentional discrimination.

Addressing first the claim that in April 1999 plaintiff's department was awarded a bonus, which was shared with everyone but plaintiff, defendants adduce an affidavit from Andrew J. Quinn, who was Human Resources Coordinator and then Labor Relations Representative at NVG during the times in question. Quinn's responsibilities included personnel issues such as termination, discipline, labor relations, and benefits, as well as investigating complaints of discrimination and harassment. Quinn agrees that plaintiff did not receive a share of the bonus, but affirms that plaintiff was not entitled to do so. He explains that eligibility depended on the employee's active employment during the time leading up to the bonus, and that plaintiff's absences from work, including an extended absence from October **[*9]** 20, 1998 to March 22, 1999, disqualified her from receiving the bonus. Plaintiff appears to have abandoned this claim on this motion. In any event, plaintiff makes no showing that this action occurred under circumstances giving rise to an inference of discrimination; thus, she fails to make out a *prima facie* case. Moreover, accepting *arguendo* that plaintiff has made out a

*prima facie* case, NVG has shown a legitimate non-discriminatory reason for the incident, and plaintiff presents no evidence that the reason is false and that the real reason is discrimination. This claim lacks merit as a matter of law.

With respect to plaintiff's claim that in May 1999 she was reprimanded for making bad parts although she was not responsible, defendants establish by way of Quinn's affidavit that NVG has no record of any such disciplinary action. Even assuming she was given a written reprimand, this without more does not constitute adverse employment action. Plaintiff apparently has abandoned this claim. Plaintiff presents no evidence that the reprimand had any adverse effect on her employment or that it occurred under circumstances giving rise to an inference of discrimination. Moreover, accepting *arguendo* **[*10]** that plaintiff has made out a *prima facie* case, plaintiff presents no evidence that the reason for the reprimand was racial discrimination. This claim lacks merit as a matter of law.

Third, plaintiff claims that in July 1999, despite her seniority, she was moved from her machine job to another job. Quinn's affidavit shows that the change in plaintiff's job assignment from machine operator to a loading operation occurred not in July 1999, but on October 14, 1999, shortly after her return from an extended disability leave from July 20, 1999 to October 4, 1999. [1] Quinn explains that plaintiff was part of a group working under an incentive system. Plaintiff's supervisor had concerns about her level of production as a machine operator and reassigned her to a loading operation in an effort to increase production for the group. Quinn states that the loading operation was easier, was still within the functions of plaintiff's work group, and took her out of a position where she was holding up production for her group and reducing the group's earnings. According to Quinn, plaintiff's rate of pay was not affected by the change; plaintiff does not claim otherwise. Rather, plaintiff complains about **[*11]** the work-group incentive system itself, which has no bearing on this particular incident and which does not constitute evidence of a racially-discriminatory adverse employment action. [2] As such, plaintiff fails to make out a *prima-facie* case on this claim. Moreover, even accepting *arguendo* that plaintiff has made out a *prima facie* case, NVG has shown a legitimate non-discriminatory reason for the

---

[1] Quinn states that on October 15, 1999, the day after her reassignment, plaintiff went out on disability leave and never returned to work at NVG.

[2] She also complains about being assigned to sweep, although she testified that she had been given sweeping assignments for years and gave no reason to believe that these assignments were racially motivated.

reassignment, and plaintiff presents no evidence that the reason given was false or that the real reason is discrimination. This claim lacks merit as a matter of law.

**Disparate treatment**

Quinn's affidavit states that at all relevant times NVG employed approximately 3,500 hourly workers, about 600 of whom (17%) were minorities, and that discipline was administered not on the basis of race but on the facts and circumstances of each case. Plaintiff's [*12] Statement of Material Facts does not specify what incidents she relies on in support of her claim of disparate treatment. She does relate an incident in which a coworker, Brian Zaccanelli, allegedly threw a brownie which hit her in the back. She compares the brownie incident to one in which Zaccanelli threatened to shoot a white coworker, Joy Fragola, and "threatened to kill everybody and kill her." Certainly, no reasonable factfinder could draw an inference of disparate treatment from the fact that NVG called the police in response to Zaccanelli's threat to shoot everyone but did not call the police in response to his throwing a brownie.

Plaintiff also complains that she and a black coworker, Patricia Glen, reported to management that a white coworker was smoking marijuana on the job, and management did nothing. She does not, however relate comparable incidents involving black employees smoking marijuana, nor is there any other reason to view this as an incident of disparate treatment. NVG has demonstrated that there was no disparate treatment as a matter of law, and plaintiff fails to present evidence to the Court raising a material question of fact on the issue.

**Racial harassment**

*Racial [*13] harassment -- hostile workplace*

To prevail on a claim of racial harassment based on a hostile work environment, plaintiff must establish: "(1) that the workplace was permeated with discriminatory intimidation that was sufficiently severe or pervasive to alter the conditions of her work environment, and (2) that a specific basis exists for imputing the conduct that created the hostile environment to the employer." *Richardson v. N.Y. State Dep't of Corr. Serv., 180 F.3d 426, 436 (2d Cir. 1999)* (internal quotation marks and citation omitted; alteration in original). The first element of a hostile work environment claim has both an objective and subjective component: "the misconduct must be severe or pervasive enough to create an objectively hostile or abusive work environment, and the victim must also

subjectively perceive that environment to be abusive." *Terry v. Ashcroft, 336 F.3d 128, 148 (2d Cir.2003)* (internal quotation marks and citation omitted). It is obvious that plaintiff perceived the environment to be abusive; thus the Court focuses on evidence regarding whether the work environment could objectively be deemed hostile.

According to NVG, based on Quinn's affidavit, NVG was aware [*14] of only two complaints made by plaintiff. In one, she complained that Brian Zaccanelli had thrown a brownie at her, striking her in the back. It is undisputed that no one stated that they had witnessed the incident; nevertheless, according to Quinn, the area manager assembled the whole department and told them that horseplay was unacceptable and would result in discipline. There is nothing in the written complaint or in plaintiff's deposition testimony to suggest racial overtones to the incident.

Plaintiff's other complaint to management was a claim that in Gilbert A. Odjick, a coworker and union steward, had called her a "bitch." [3] It is undisputed that, in response to her complaint, NVG imposed on Odjick a three-day disciplinary layoff on June 2, 1998, for use of abusive language. Plaintiff averred that she maintained a personal notebook contemporaneously with the various incidents; in this notebook, plaintiff referred to the incident twice, stating that Odjick called her a bitch; however, in her deposition testimony concerning this occurrence, plaintiff alleged for the first time that Odjick called her a "black bitch." She stated that prior to this comment, she and Odjick had been [*15] friends, but that afterwards, they stopped being friends, although she still had to talk to him at times because he was her union steward. Even accepting plaintiff's belated assertion that Odjick used a racial reference, this is an isolated incident.

Aside from the allegations regarding comments made by Zaccanelli, which will be discussed below, the record references cited by plaintiff in her Statement of Material Facts are devoid of evidence that the various incidents of which she complains are related to her race. The portions of plaintiff's deposition upon which she relies, viewed in a light most favorable to her, would not support a finding that the incidents were racially motivated. Indeed, plaintiff's testimony shows that she did not believe some incidents were racially related, and that her belief that some other incidents were racially related is based solely on speculation. For example, when asked at her deposition whether the brownie incident constituted an assault of a racial nature, she said no. She was also questioned about an incident [*16] when

---

[3] Odjick explained that he had offered her a ride on his motorcycle, and the comment was a joking reference to her as his "motorcycle bitch."

someone named Jimmy kicked her the back; she testified that it was not a racial assault, but rather "[h]e was under the influence of alcohol, so he was doing some karate kicks and one of them landed in my back." She testified about another occasion when one white employee, Mike, threw a hammer at another white employee. She said he wasn't throwing it at her but it almost hit her. Asked whether she thought he did it because she was black, she replied: "I think he did it because they didn't care. They didn't care, who is she?" She also stated that one Mark Karasaki, apparently a foreman, touched her on her shoulder and waist; when she was asked whether she considered it a racial assault, she stated: "Well he wasn't going around touching all the white girls, so, yeah, I would think so."

With respect to Brian Zaccanelli, plaintiff stated in her second amended complaint and her deposition that he subjected her to racial epithets "on a daily basis." This conclusory statement is not supported by specific evidence from plaintiff or anyone else. Rather the deposition pages cited by plaintiff in her Statement of Material Facts supports, at most, a finding that Zaccanelli used a racial epithet [*17] towards plaintiff on a couple of specific occasions. Plaintiff states in her typewritten notes that he called her a "black bitch" after she reported to a supervisor that he had been hitting his machine with a hammer and that on another occasion he called her a bitch. A coworker, Patricia Glen, testified in 2004 that on one occasion four or five years previously, she had heard Zaccanelli use a racial epithet to plaintiff. These are the only specific allegations in the materials cited by plaintiff regarding Zaccanelli's racial epithets. It is true that plaintiff makes broad statements that she was subjected to Zaccanelli's racial epithets "on a daily basis"; however, after years of discovery and hundreds of pages of depositions, plaintiff cannot compensate for the absence of specific evidence by making unsubstantiated conclusory assertions.

Plaintiff also states that Zaccanelli would spit his tobacco in front of her and would throw items across her head or across her face when she walked past his area. Both plaintiff and Glen indicated that Zaccanelli and others engaged in "childish games," like throwing gloves, figs, candy, or chips. For the most part, the testimony from plaintiff and [*18] Glen on this topic indicates that others were throwing objects back and forth and that plaintiff and/or Glen just happened to be in the area. For example, plaintiff testified regarding Glen, "I don't think it was on purpose at first but they hit her, she threw something back and it was just like a whole all out war over there." The record does not support a finding that Zaccanelli's conduct was directed solely at plaintiff or at black employees; for example, plaintiff testified that he threatened to shoot a white employee, Joy Fragola, and that "everybody" was afraid of him. Glen testified that he was a "bully" and a "clown."

Plaintiff testified in her deposition that a coworker, Russ Liddiard, threatened her physical safety by brandishing a hammer at her. There is nothing to support a finding that this incident was related to her race. Plaintiff further claims in her second amended complaint and Statement of Material Facts that white male coworkers harassed her by leaving dead mice near her work area and objects such as blue dye in her work gloves. The deposition pages cited in her Statement of Material Facts contain no mention of dead mice, and there is no basis to find that the dye [*19] in the work gloves was related to race. She also stated that once someone placed a "rag" on the safety switch of her machine when she was not present, and that as a result she knew she was nearly injured. She did not know who did this. When asked how she knew this incident was directed at her race, she replied: "I'm black."

According to plaintiff, on October 13, 1999, she found a note written by coworkers. She testified at her deposition that the note included a racial epithet; however, the note itself was produced and it said: "Get out we do not want you here." There is nothing in the record to support plaintiff's speculation that the note was racially-motivated. [4]

Plaintiff submits a statement by Jeffrey W. Traver; although it is notarized it is not under oath and is therefore not competent evidence. In any event, Traver's statement provides no real support for plaintiff's claim of racial harassment. Travers states that Zaccanelli "has made racist remarks directed toward Reba in front of myself and others" but gives no specifics; this conclusory statement is insufficient to raise a question of fact at this advanced stage in the litigation. Travers states that when he worked at NVG, he was discriminated against "because of his personal situation," that is, he needed to take leave because his wife was ill. He also states that he believes plaintiff was reassigned from her position so that it could be given to one "Ann Klein," who was "fraternizing" with the shift supervisor. In other words, he gives non-racially-related explanations for the allegedly unfair treatment meted out to him and plaintiff.

In sum, a close review of the actual evidence on which plaintiff relies to support her allegations of racial harassment reveals a dearth of objective proof of racially-related

---

[4] In fact, this note was written at the time that plaintiff was reassigned from machine operator to loading operations. It is undisputed that the group was working under an incentive plan whereby one slow person affected the pay of the entire group. Plaintiff testified that the foremen told her she was being reassigned because she was holding down the earnings of her coworkers by not working up to speed. Thus, not only was there no racial reference in the note or in the surrounding circumstances, but rather the circumstances support [*20] a non-racially-related motivation.

incidents. Plaintiff's contention that other **[*21]** black workers endured racial harassment fares as poorly; for example, she cites to the deposition of Juner Pullen as showing that Pullen's daughter, who was black, was "the victim of a hangman's noose being left on her job"; however, Pullen's own testimony is that the noose had been left not for Pullen's daughter but for a white person, and there is no evidence that the incident was racially related. The allegations, viewed in the light most favorable to plaintiff, do not amount to a showing that the workplace was permeated with discriminatory racial intimidation that was sufficiently severe or pervasive to alter the conditions of her work environment. *See Richardson, 180 F.3d at 436.*

*Racial harassment -- imputing the conduct to NVG*

Moreover, with respect to the few incidents which arguably have racial overtones, the evidence fails to show that a specific basis exists for imputing such conduct to NVG. NVG relies on the affidavit from Quinn, stating that NVG management received only two complaints from plaintiff. Quinn states that NVG management was not aware that plaintiff was having any other problems. Plaintiff does not claim that she made any other written complaints to management.

As **[*22]** discussed above, in one of her two complaints to management, plaintiff claimed that Zaccanelli had thrown a brownie at her, striking her in the back. The area manager assembled the whole department and told them that horseplay was unacceptable and would result in discipline. As noted, there is nothing in the written complaint or in plaintiff's deposition testimony about this incident to suggest that it had racial overtones or that management handled it inappropriately.

Plaintiff's other complaint to management that Gil Odjick, a co-worker and union steward, had called her a "bitch." NVG responded to plaintiff's complaint by imposing on Odjick a three-day disciplinary layoff for use of abusive language. As noted, plaintiff alleged for the first time in her deposition in this action that the term used by Odjick on that occasion was actually "black bitch." Clearly, this belated allegation of a racial reference is not a ground to impute to NVG the knowledge that Odjick had used a racial slur. Moreover, NVG dealt with the incident in a manner that cannot reasonably be considered inappropriate.

NVG submits affidavit evidence from Quinn and John Keller, NVG's Corporate Security and Fire Protection **[*23]** Manager, that, aside from these two complaints, management had no knowledge of the incidents alleged. In support of her allegation that she reported Zaccanelli's racial slur to NVG's management, but that NVG took no action,

plaintiff's testimony is unclear and confusing, and is insufficient to raise a question of fact. [5] With respect to other incidents, plaintiff stated that she did not report the incidents when Zaccanelli would spit his tobacco in front of her and would throw items across her head or across her face when she walked past his area. With respect to her claim that Russ Liddiard threatened her physical safety by brandishing a hammer at her, the record is unclear whether and to whom she reported this. Further, on the question of reports to management, her Statement of Material Facts cites to page 80 of the October 9, 2003 deposition, in which she states that she reported the incident of the rag in the safety switch to the union steward and that she "made a report up front with Keller's secretary," whose name she did not know. With respect to her claim that Mark Karasaki touched her inappropriately, she could not remember to whom she reported it. Overall, in support of her **[*24]** allegation that she reported various matters to NVG's management, but no action was taken, plaintiff relies on vague, non-specific, and confusing evidence that is wholly insufficient to create a question of fact. As such, there is no competent evidence that NVG knew or should have known of the alleged harassment and did nothing to stop it. *See Richardson v. N.Y. State Dep't of Corr. Serv., 180 F.3d 426, 441 (2d Cir.1999).*

Quinn's affidavit demonstrates that NVG had a well-defined policy against racial discrimination and took immediate action to respond to racial incidents at the plant. As noted, NVG had over 3,500 hourly employees; to the limited extent that plaintiff has shown that she reported certain incidents and they were not acted upon, no inference of racial motivation can reasonably be drawn on this record. On this record, NVG has shown that it is entitled to summary judgment dismissing the racial harassment claims. Plaintiff's evidence, viewed in a

---

[5] For example, in support of her statement in her Statement of Material Facts that she "reported the behavior" of Zaccanelli to various named management people, plaintiff cites to pages 40 and 41 of her October 9, 2003 deposition. Counsel for NVG asked whether she reported to management the racial epithet she specifically alleged that Zaccanelli had made to her, she said she reported it to Odjick, some unidentified foreman, Cindy (last name unknown), and Billy Owens, "to find out what can be done," because "having to listen to that every night [was] just starting to … drive me crazy. And they know what they were doing and they were doing a good job of it, because they was really, really getting to the point." Counsel for NVG then asked her, "Now when you refer to they, **[*25]** I believe you only identified Brian Zaccanelli" and she responded; "No. When I say they, I mean the company, the union stewards, the surrounding. I mean, it was like everybody was out to get me." At a different place in the deposition, she states that she left a note for Keller with respect to the same incident, but that he never got back to her.

light most favorable to her, does not raise a question of fact on the issue.

### Sexual harassment

Plaintiff's Charge of Discrimination filed with the EEOC on December 9, 1999, alleged only discrimination based on race. Thus, her sexual harassment claims are barred because they are unexhausted. Plaintiff argues **[*26]** that the sexual harassment claims are sufficiently related to the race-related allegations in the charge so that it would be unfair to bar the sexual harassment claims. *See Butts v. City of New York Dep't of Housing Preservation and Dev't, 990 F.2d 1397, 1402 (2d Cir. 1993)*. The "sufficiently related" theory applies in three situations: (1) where the conduct complained of would fall within the scope of the EEOC investigation which can reasonably be expected to grow out of the charge of discrimination; (2) where the claim alleges an employer's retaliation for filing an EEOC charge; and (3) where a plaintiff alleges further incidents of discrimination carried out in the same manner alleged in the EEOC charge. *See id. at 1402-03*. None of plaintiff's sexual harassment claims are reasonably related to the allegations in her EEOC charge under any of these three theories. Thus, they are dismissed as unexhausted.

The Court notes also that plaintiff's claims of sexual harassment suffer from the same defects as her claims of racial harassment. For example, the deposition pages cited in plaintiff's Statement of Material Facts include her testimony that one Mark (Karasaki, Tesorik, or Trzonkowski), **[*27]** a foreman, touched her on her shoulder and waist. She says she reported it to his boss and maybe to Keller. Asked when this occurred, she said "perhaps" 1997. She also stated that "Alex" touched her on her shoulders and put his arm around her, and she testified: "I won't say he did it in a bad way, but he did it on too many occasions." She reported this to "whoever his boss was." She thinks it occurred in 1996. With respect to Odjick, she testified that prior to the "bitch" statement that resulted in disciplinary action in 1998, she and Odjick had been friends and put his arm around her and that "a couple of times" he had touched her "on the shoulders." She also said he used to put his arm around her, that he was "just a touchy, touchy person," and that when she told him to stop he would apologize. She is not sure whether she reported it to anyone. Not only are plaintiff's allegations vague and unspecific, they appear to relate to a few not severely offensive incidents over a three-year period. The allegations, viewed in the light most favorable to plaintiff, do not amount to a showing that the workplace was permeated with discriminatory sexual intimidation that was sufficiently severe or pervasive to alter **[*28]** the conditions of her work environment. *See Richardson, 180 F.3d at 436*.

### State law claims

Plaintiff's opposing papers do not address NVG's motion insofar as it seeks dismissal on the merits of her state law claims for assault and battery, intentional infliction of emotional distress, negligent infliction of emotional distress and breach of contract. Thus, she is deemed to have consented to summary judgment dismissing these claims.

### Conclusion -- NVG's motion

To conclude, NVG has presented competent evidence that it is entitled to judgment as a matter of law dismissing plaintiff's claims against it. Plaintiff's submissions fail to demonstrate to the Court that there are material questions of fact barring summary judgment. Thus, even viewing the evidence in the light most favorable to plaintiff, the Court finds that summary judgment in favor of NVG is warranted.

### THE UNION'S MOTION

### *Section 1981* claim

Plaintiff's *section 1981* claim against the union avers that it failed adequately to represent her due to her race by failing to advocate for her in connection with the brownie incident, the rag-in-the-safety-latch incident, and the alleged sexual harassment by "Alex Trzonkowski." The second amended **[*29]** complaint also claims the union had a "system of dual representation" wherein it treated black union members different from similarly-situated white employees and that the union was indifferent to the racial discrimination at NVG.

The union's motion for summary judgment is supported by an affidavit from plaintiff's union stewards John J. Courcy and Gilbert A. Odjick in which they respond to the allegations in the second amended complaint and set forth in detail the circumstances of their representation of plaintiff. These affidavits establish that there was no discriminatory motive to the actions taken. For essentially the same reasons discussed above in connection with related claims against NVG, plaintiff's allegations of racial discrimination by the union are without record support and fail to raise a question of fact. [6]

---

[6] For example, in her Statement of Material Facts she states that she "would often request union representation," and Odjick "would either fail to respond, or refuse to provide adequate representation[,]" citing to a deposition page that has nothing to do with union representation.

Indeed, in her deposition, plaintiff testified that she could not recall any time when she wanted to file a grievance and the union refused to take it. Later she testified that the union refused to file a grievance in connection with her reassignment on October 14, 1999, because Odjick told her that there was nothing they could do. Odjick's and Courcy's affidavits **[*30]** regarding the reassignment incident explained there was no contract violation and that therefore the union could not pursue a grievance on her behalf. When asked whether she thought the reason the union did not grieve this incident was because she was female or black, she said that it was "because [she] was labeled as a troublemaker."

With respect to the alleged sexual harassment by plaintiff's supervisor Mark Trzonkowski, Odjick stated that plaintiff's complaints about Trzonkowski did not concern sexual harassment but rather his efforts -- such as scrutinizing her break time -- to deal with her deficient production rate. Apparently in response to this issue, plaintiff states in her Statement of Material Facts that she "attempted to report the sexual harassment of supervisor Alex [sic] Trzonkowski, but was thwarted by ... Odjick's failure to respond despite repeated requests[,]" citing to deposition pages that **[*31]** have nothing to do with union representation. And plaintiff states in her Statement of Material Facts that Odjick called her a "bitch" on three occasions; again, the deposition pages cited refer only to the one incident resulting in Odjick's three-day suspension.

Viewing the facts in the light most favorable to plaintiff, the Court finds that the union has demonstrated its entitlement to dismissal of the claims against it for racial discrimination under *section 1981*. Plaintiff fails to demonstrate that there is evidence raising a material question of fact on the *section 1981* claim. Plaintiff asserts no sex discrimination claim against the union, nor would the record support such a claim. To the extent that this cause of action may be read as alleging breach of the duty of fair representation, it is time-barred as discussed below.

### Breach of contract and breach of duty of fair representation claims

Plaintiff's causes of action against the union for breach of its duty of fair representation are barred by the six-month limitations period applicable to such claims. *See Del Costelo v. International Brotherhood of Teamsters, 462 U.S. 151, 169, 103 S. Ct. 2281, 76 L. Ed. 2d 476 (1983)*. Plaintiff does not dispute the statement **[*32]** in Quinn's affidavit that she has not worked for NVG since October 15, 1999. She mailed to the union a complaint dated October 20, 1999 regarding the October 14, 1999 reassignment issue. According to Odjick's

and Courcy's affidavits, they had already explained to plaintiff that the reassignment did not constitute a contract violation. The union defendants were first sued in the first amended complaint (Dkt. No. 2), filed on January 4, 2001, over a year after the last incident that could possibly support these causes of action. Thus, the claims are time-barred. [7] Plaintiff cannot evade this limitation by recasting her cause of action as one for breach of contract.

### State law claims

Plaintiff's opposing papers do not address the union's motion insofar as it seeks dismissal on the merits of her state law claims for assault and battery, intentional infliction of emotional distress, negligent infliction of emotional distress and breach of contract. Thus, she is deemed to have consented to summary judgment dismissing these claims.

### Conclusion  [*33] - the union's motion

To conclude, the union has presented competent evidence that it is entitled to judgment as a matter of law dismissing plaintiff's claims against it. Plaintiff's submissions fail to demonstrate to the Court that there are material questions of fact barring summary judgment. Thus, even viewing the evidence in the light most favorable to plaintiff, the Court finds that summary judgment in favor of the union is warranted.

### CONCLUSION

It is therefore

ORDERED that the motion for summary judgment (Dkt. No. 101) by defendants New Venture Gear, Inc. and DaimlerChrysler Corp. is granted and the second amended complaint is dismissed in its entirety on the merits; and it is further

ORDERED that the motion for summary judgment (Dkt. No. 103) by defendants Mike Allen as President of United Automobile, Aerospace and Agricultural Implement Workers of America Local 624, Stephen Yokich as President of United Automobile, Aerospace and Agricultural Implement Workers of America is granted and the second amended complaint is dismissed in its entirety on the merits.

---

[7] In any event, the union's refusal to grieve an incident that did not violate the collective bargaining agreement is not a breach of its duty of fair representation.

IT IS SO ORDERED.

September 26, 2007

Syracuse, New York

Norman A. Mordue

Chief United States District Court Judge


## CIVIL JUDGMENT

**DECISION [*34] BY COURT.** This action came to trial or hearing before the Court. The issues have been tried or heard and a decision has been rendered.

**IT IS ORDERED AND ADJUDGED**

**that defendants' motions for summary judgment are granted, and the second amended complaint is dismissed in its entirety on the merits.**

**September 26, 2007**

**Date**

**End of Document**

 Cited
As of: October 17, 2023 10:02 PM Z

## *Davis v. Harrison County*

United States District Court for the Southern District of Mississippi, Southern Division

January 28, 2015, Decided; January 28, 2015, Filed

CIVIL NO.: 1:14-CV-286-HSO-RHW

**Reporter**
2015 U.S. Dist. LEXIS 9701 *

KIRSTEN DAVIS, as Administratrix of the Estate of Troy M. Davis, Deceased, PLAINTIFF v. HARRISON COUNTY, MISSISSIPPI, and JOHN MCADAMS, DEFENDANTS

## Core Terms

motion to dismiss, second complaint, civil action, duplicates, files, procedural advantage, municipal liability, legal authority, subject matter, complaints

**Counsel:** [*1] For Kirsten Davis, as Administratrix of the Estate of Troy M. Davis, Deceased, Plaintiff: David W. Baria, LEAD ATTORNEY, BARIA LAW FIRM, PLLC - Bay St. Louis, Bay St. Louis, MS.

For Harrison County, Mississippi, Defendant: Tim C. Holleman, LEAD ATTORNEY, Patrick Taylor Guild, BOYCE HOLLEMAN AND ASSOCIATES, P.A., Gulfport, MS.

For John McAdams, Defendant: Donald C. Dornan, Jr., LEAD ATTORNEY, DORNAN LAW OFFICE, PLLC, Gulfport, MS.

**Judges:** HALIL SULEYMAN OZERDEN, UNITED STATES DISTRICT JUDGE.

**Opinion by:** HALIL SULEYMAN OZERDEN

## Opinion

**MEMORANDUM OPINION AND ORDER DENYING PLAINTIFF'S [7] MOTION TO STAY, GRANTING DEFENDANT HARRISON COUNTY, MISSISSIPPI'S [8] MOTION TO DISMISS, AND GRANTING DEFENDANT JOHN MCADAMS' [12] MOTION TO DISMISS**

BEFORE THE COURT is the Motion to Stay [7] filed by Plaintiff Kirsten Davis, as Administratrix of the Estate of

Troy M. Davis, Deceased. Defendants Harrison County, Mississippi, and John McAdams have filed Responses [10] [11] to the Motion to Stay. Also before the Court are the separate Motions to Dismiss [8] [12] filed by Defendant Harrison County, Mississippi, and Defendant John McAdams. Plaintiff has filed a Response [14] to both Motions. Having considered the parties' submissions, the [*2] record, and relevant legal authorities, the Court is of the opinion that Plaintiff's Motion to Stay should be denied, Defendants' Motions to Dismiss should be granted, and this case should be dismissed.

### I. BACKGROUND

On December 13, 2013, the Estate of Troy M. Davis, through its Administratrix Kirsten Davis, filed a complaint against Harrison County, Mississippi, and John McAdams (collectively, "Defendants") in this Court. The case was assigned to Chief United States District Judge Louis Guirola Jr. *See* Docket, Case Number 1:13-CV-459-LG-JCG ("*Davis I*"). The *Davis I* complaint identified the plaintiff as "the Estate of Troy M. Davis . . . administered by Kirsten Davis[]" and advanced against Defendants a claim for municipal liability under *42 U.S.C. § 1983* stemming from a county administrator's alleged embezzlement of $33,000.00 from the Estate of Troy M. Davis. *Davis I* Compl. ¶¶ 2, 3-24 [1]. On January 22, 2014, the *Davis I* plaintiff filed an amended complaint which asserted the same claims and redesignated the plaintiff as "Kirsten Davis as Administratrix of the Estate of Troy M. Davis, Deceased[] . . . ." *Davis I* First Am. Compl. ¶ 1 [3]. Defendants in *Davis I* have moved to dismiss that case on grounds [*3] that the *Davis I* plaintiff failed to timely effect service of process upon them. Harrison County Mot. to Dismiss 3 [16]; McAdams' Mot. to Dismiss 4 [18].

On July 22, 2014, Plaintiff instituted the present case. The Complaint [1] in this case advances a claim for municipal liability against these same Defendants that is substantively identical to the claim lodged against Defendants in *Davis I*. Compl. ¶¶ 6-31 [1]. In the Complaint before this Court, Plaintiff is identified as "Kirsten Davis as Administratrix of the Estate of Troy M. Davis." *Id.* at ¶ 1. On November 24,

2014, Plaintiff filed the Motion to Stay [7] requesting a stay of this case "pending ruling in [*Davis I*]" on Defendants' motions to dismiss in *Davis I*. Mot. to Stay 1 [7]. Defendants here object to any stay arguing this case unnecessarily duplicates *Davis I* and Plaintiff has cited no authority for imposing a stay. Harrison County's Resp. to Mot. to Stay 2 [10]; McAdams' Resp. to Mot. to Stay 1 [11].

II. DISCUSSION

"When a plaintiff files a second complaint alleging the same cause of action as a prior, pending, related action, the second complaint may be dismissed." *Friends of the Earth, Inc. v. Crown Cent. Petroleum Corp., 95 F.3d 358, 362 (5th Cir. 1996)* (quoting *Oliney v. Gardner 771 F.2d 856, 859 (5th Cir. 1985))* (internal marks omitted). "This rule finds particular [*4] application where, as here, the plaintiff files the second complaint to achieve procedural advantage by 'circumventing the rules pertaining to the amendment of complaints.'" *Id*. "[T]here is no reason why courts should be bothered or litigant[s] harassed with duplicating lawsuits on the same docket . . . ." *Oliney, 771 F.2d at 859* (citing *Sutcliffe Storage and Warehouse Co. v. United States, 162 F.2d 849, 851 (1st Cir. 1947))*.

It appears beyond dispute that no factual or temporal difference exists between the identity of the parties, the subject matter, or claims of this case and those in *Davis I*, which is presently pending before Judge Guirola. In fact, the record indicates that this case is nearly identical to *Davis I*. That Plaintiff filed this case "to insure [*sic*] no statute of limitation runs while awaiting" a decision on the motions to dismiss pending in *Davis I* reveals Plaintiff's purpose for filing this civil action was simply to avoid the statute of limitations related to the claims being asserted. Pl.'s Resp. in Opp'n to Mot. to Dismiss 1 [14]. Such a purpose is insufficient to avoid dismissal of this action. *See Friends of the Earth, 95 F.3d at 362* (noting the rules prohibiting the filing of duplicative complaints in separate civil actions are particularly applicable where "the plaintiff files the second complaint to achieve procedural [*5] advantage") (citation omitted). Because Plaintiff has "no right to maintain two separate actions involving the same subject matter at the same time in the same court and against" Defendants, this civil action should be dismissed. *Oliney, 771 F.2d at 859* (quoting *Walton v. Eaton Corp., 563 F.2d 66, 70 (3d Cir. 1977))*.

III. CONCLUSION

For the foregoing reasons, the Court concludes that Plaintiff's Motion to Stay [7] should be denied and that Defendants' Motions to Dismiss [8] [12] should be granted resulting in the dismissal of this case.

IT IS, THEREFORE, ORDERED AND ADJUDGED that the Motion to Stay [7] filed by Plaintiff Kirsten Davis, as Administratrix of the Estate of Troy M. Davis, Deceased, is **DENIED**.

IT IS, FURTHER, ORDERED AND ADJUDGED that Defendant Harrison County, Mississippi's Motion to Dismiss [8] is **GRANTED** and Plaintiff's claims against Harrison County are **DISMISSED**.

IT IS, FURTHER, ORDERED AND ADJUDGED that Defendant John McAdams' Motion to Dismiss [12] is **GRANTED** and Plaintiff's claims against McAdams are **DISMISSED**.

SO ORDERED AND ADJUDGED, this the 28th day of January, 2015.

*/s/ Halil Suleyman Ozerden*

HALIL SULEYMAN OZERDEN

UNITED STATES DISTRICT JUDGE

**FINAL JUDGMENT**

This matter came on to be heard on the Motions to Dismiss [8] [12] filed by Defendant [*6] Harrison County, Mississippi, and Defendant John McAdams. The Court, after considering the parties' submissions, the record, and relevant legal authorities, finds that in accordance with the Memorandum Opinion and Order Denying Plaintiff's [7] Motion to Stay, Granting Defendant Harrison County, Mississippi's [8] Motion to Dismiss, and Granting Defendant John McAdams' [12] Motion to Dismiss entered herewith,

IT IS, THEREFORE, ORDERED AND ADJUDGED that Defendant Harrison County, Mississippi's Motion to Dismiss [8] and Defendant John McAdams' Motion to Dismiss [12] are **GRANTED** and this civil action is **DISMISSED**.

SO ORDERED AND ADJUDGED, this the 28th day of January, 2015.

*/s/ Halil Suleyman Ozerden*

HALIL SULEYMAN OZERDEN

UNITED STATES DISTRICT JUDGE

**End of Document**

 Caution
As of: October 18, 2023 4:23 PM Z

## DiFillippo v. Special Metals Corp.

United States District Court for the Northern District of New York

September 6, 2016, Decided; September 6, 2016, Filed

6:13-cv-00215 (MAD/ATB)

**Reporter**

2016 U.S. Dist. LEXIS 119771 *; 2016 WL 4621087

LINDA DiFILLIPPO, Plaintiff, vs. SPECIAL METALS CORPORATION, WILLIAM FARLEY, DONALD BIERSTINE, RONALD THOMPSON, NICHOLAS MASCHINO, KEITH DABBS, and TERRY WHITE, Defendants.

**Prior History:** _Difillipo v. Special Metals Corp., 299 F.R.D. 348, 2014 U.S. Dist. LEXIS 42736 (N.D.N.Y., Mar. 26, 2014)_

## Core Terms

termination, arbitrator, demotion, Plant, allegations, summary judgment motion, retaliation, training, asserts, Inspection, arbitral decision, prima facie case, disability, trainees, retaliation claim, employees, retaliatory, hostile work environment claim, adverse employment action, reasons, amended complaint, documents, admits, summary judgment, discriminatory, declarations, impartiality, compromised, grievance, violating

**Counsel:** [*1] For Plaintiff: A.J. BOSMAN, ESQ., DANIEL W. FLYNN, ESQ., OF COUNSEL, BOSMAN LAW FIRM, L.L.C., Rome, New York.

For Defendants: BRIAN J. BUTLER, ESQ., COLIN M. LEONARD, ESQ., SUZANNE M. MESSER, ESQ., OF COUNSEL, BOND, SCHOENECK & KING, PLLC, Syracuse, New York.

**Judges:** Mae A. D'Agostino, United States District Judge.

**Opinion by:** Mae A. D'Agostino

## Opinion

**MEMORANDUM-DECISION AND ORDER**

**I. INTRODUCTION**

On October 12, 2012, Plaintiff, Linda DiFillippo, commenced this action against Defendants Special Metals Corporation ("Special Metals"), William Farley, Donald Bierstine, Ronald Thompson, Nicholas Maschino, Keith Dabbs, and Terry White. Dkt. No. 5 at 11. Plaintiff's amended complaint alleges (1) gender discrimination in violation of _Title VII of the Civil Rights Act of 1964 ("Title VII")_, the New York State Human Rights Law ("NYSHRL"), and _Article I, Section 11 of the New York State Constitution_; (2) retaliation in violation of Title VII, the NYSHRL, _Title V of the Americans with Disabilities Act ("ADA")_, and the _Rehabilitation Act ("RA")_; and (3) disability discrimination in violation of _Title I of the ADA_, the RA, the NYSHRL, and the _Article I, Section 11 of the New York State Constitution_. Dkt. No. 27 at 9-12. Plaintiff seeks $1,000,000 in compensatory and punitive damages for the injury and harm caused by Defendants, as well as [*2] costs, injunctive and declaratory relief. _See id._ at 1, 14.

Currently pending before the Court is Defendants' motion for summary judgment. _See_ Dkt. No. 62-7 at 1. Plaintiff opposes Defendants' motion. Dkt. No. 77. For the following reasons, Defendants' motion is granted.

**II. BACKGROUND**

On August 8, 2005, Plaintiff began her employment with Defendant Special Metals in the Plant Utility Department. Dkt. No. 76 at ¶¶ 3, 5. Plaintiff has Chronic Obstructive Pulmonary Disease ("COPD"), asthma, emphysema, and chronic bronchitis, which led to her being placed on a permanent medical restriction at the beginning of her employment with Special Metals. Dkt. No. 77 at 12. On or about February 28, 2006, Plaintiff suffered a hand injury which led to another medical restriction beginning in May 2006. _Id._

Plaintiff bid for a position in the Inspection Department multiple times between 2005 and 2010, but she was never selected for the position. Dkt. No. 76 at ¶ 6. Plaintiff alleges that after her bid was denied in February 2010, the company's

Safety Director, Joe Mack, told her that she was ineligible for the position because she had a permanent medical restriction. *Id.* The collective bargaining agreement ("CBA") [*3] in place in February of 2010 stated that employees with medical restrictions were not eligible for a bid. *Id.* at ¶ 7.

Plaintiff filed a charge with the EEOC after she was denied a bid in the Inspection Department in April 2010. Dkt. No. 77 at 13. On June 3, 2010, Special Metals offered Plaintiff the position in the Inspection Department and she began her training on June 14, 2010. Dkt. No. 76 at ¶ 10.

Inspectors at Special Metals inspect raw material, in-process material, and finished products to ensure that the materials meet the customer's specifications. *Id.* at ¶ 13. The position requires great attention to detail because errors that are not identified by Inspectors can lead to serious injury or death. *Id.* In order to be an Inspector at Special Metals, a person must complete forty hours of classroom work in addition to on-the-job training. *Id.* at ¶¶ 24, 26. Plaintiff asserts that all four of the male trainees were allowed to simultaneously undergo classroom training as well as hands-on training within the first two weeks, but that she was left in the classroom for eight hours and did not begin hands-on training until the last week and a half of her training. *Id.* at ¶¶ 19, 26. While [*4] all Inspection trainees were moved to different areas of inspection on a regular basis, Plaintiff was assigned to fifteen different areas within the department, more areas than any other trainee in 2010. *Id.* at ¶ 29. Plaintiff asserts that she was never given enough training or time to learn any given task. *Id.* at ¶ 39.

Plaintiff alleges that Joseph Sefcheck, the Inspector that she shadowed, had a gender bias. *Id.* at ¶¶ 37, 39. According to Plaintiff, Mr. Sefcheck participated in conversations tinged with sexual innuendo about her and he criticized her perfume, make-up, and clothes on a daily basis. *Id.* Plaintiff also alleges that Mr. Sefcheck engaged in crude comments about another female employee after he caused disciplinary action to be issued against her. *Id.* Plaintiff claims that Mr. Sefcheck refused to assist Plaintiff and that he mocked her efforts to acquire the information needed to complete tasks. *Id.* at ¶ 40.

Defendants claim that Plaintiff made at least thirty-three mistakes while in the Inspection Department. Dkt. No. 62-6 at ¶ 44. Plaintiff asserts that four of her purported errors occurred on days when she was not working. Dkt. No. 76 at ¶ 44. Additionally, four of the [*5] purported errors occurred on February 1, 2011 when she was only clocked in for twenty minutes. *Id.* On or about February 24, 2011, the Company informed Plaintiff that she would be demoted from the Inspection Department and returned to her previous position in the Plant Utility Department. *Id.* at ¶ 46. Plaintiff alleges

that while she was in the Inspection Department, Adam Smith had a higher number of recorded errors than her, but he was not demoted. *Id.* at ¶ 47. Plaintiff also alleges that Joe Lebert had a higher error percentage than her, but he was not demoted. *Id.*

The Union filed a grievance regarding Plaintiff's demotion. *Id.* The Company met with Plaintiff regarding the grievance on May 17, 2011. *Id.* at ¶ 52. Defendants assert that during this meeting, Plaintiff revealed that she had a number of Company records at home in violation of Plant Rule #19. *Id.* at ¶¶ 52-53. Plaintiff claims that the only company documents that she had at home were her notes and other materials that Defendant White gave her permission to take home. *Id.* Defendants allege that Plaintiff acknowledged that she had received and reviewed the Plant Rules at the time that she commenced her employment, but Plaintiff [*6] asserts that she "does not know whether she kept a copy of the Plant Rules book after she signed it" and that Defendant Farley denied her request for a copy of the Plant Rules book to review. *Id.* at ¶ 56. The Plant Rules indicate that employees who fail to adhere to the Company's standards of conduct or violate any of the Plant Rules may be subjected to appropriate disciplinary action, which could include discharge. *Id.* at ¶ 55. Defendants assert that the Company terminated Plaintiff after they determined that she violated Plant Rule #19. Dkt. No. 62-6 at ¶ 65. Plaintiff claims that she was terminated on the basis of her gender, disability, and in retaliation for a protected activity and that Defendants are using Plant Rule #19 as pretext. Dkt. No. 76 at ¶ 65.

The Union filed a grievance regarding Plaintiff's termination and informed Special Metals of its intention to take the grievance to arbitration. Dkt. No. 62-6 at ¶¶ 67-68. On or around September 16, 2011, Special Metals offered Plaintiff a Last Chance Agreement, which would have reinstated Plaintiff's employment if she agreed to adhere to the Plant Rules and serve a probationary period during which she could be terminated without [*7] recourse through a grievance procedure if she was found to violate Company rules. *Id.* at ¶ 69. Plaintiff did not sign the Last Chance Agreement. *Id.* at ¶ 70. Plaintiff alleges that she was only offered a Last Chance Agreement after she requested one. Dkt. No. 76 at ¶ 69. Plaintiff also asserts that the Last Chance Agreement contained language where she had to admit to violating Plant Rule #19. *Id.* She asked that this language be removed, but Special Metals refused. *Id.*

In March of 2012, the Company participated in a three-day arbitration session during which Plaintiff and seven other Special Metals employees testified under oath regarding the events leading up to the Company's decision to demote Plaintiff from the Inspection Department to the Plant Utility

Department, and also the Company's decision to terminate Plaintiff's employment at Special Metals. *Id.* at ¶ 71. The arbitration was binding pursuant to section 8.10 of the CBA. Dkt. No. 62-1 at 29. On the issue of demotion, the Union's position was that Plaintiff did not receive appropriate training or warnings of poor performance. *Id.* at 173. Additionally, the Union asserted that neither the number nor the percentage of errors made by Plaintiff were greater than those made **[*8]** by other inspectors. *Id.* at 174. The arbitrator ultimately found that the issue of Plaintiff's demotion was not arbitrable, but if it were arbitrable, he would uphold the demotion. Dkt. No. 76 at ¶ 77. In his opinion, the arbitrator stated that, "[g]iven the number of errors and the importance of accuracy to the survival of the Company, it cannot reasonably be argued that the Grievant was improperly demoted." *Id.*

On the issue of termination, the Union's position was that Plaintiff was not adequately warned of the consequences of bringing documents home and that the penalty of termination was not reasonably related to the seriousness of the alleged offense and Plaintiff's past work record. *See* Dkt. No. 62-1 at 177. The arbitrator held that Special Metals had just cause for terminating Plaintiff. Dkt. No. 76 at ¶ 78. The arbitrator evaluated Plaintiff's knowledge of the rule and the circumstances under which the rule was violated. Dkt. No. 62-1 at 178. Specifically, the arbitrator noted that, in its investigation of the incident, Plaintiff admitted to the Company that, "'[i]f she knew she was violating a plant rule for taking records off site, she would have never admitted to taking them.'" *Id.* at 176. During the investigation **[*9]** and before the arbitrator, Plaintiff maintained that she had permission to remove the documents. *See id.* The arbitrator noted that Plaintiff's belief that she had permission to take documents home with her may have been believable at one point. *See id.* at 179. In May of 2011, however, which was after Plaintiff's demotion, she asked another employee to bring the documents to her home. *See id.* As such, the arbitrator found that the evidence demonstrated that Plaintiff knew that it was improper to take such documents home with her and continued to do so after she no longer had any legitimate use for the documents. *See id.*

On October 12, 2012, Plaintiff commenced this action in Oneida County Supreme Court. *See* Dkt. No. 1. On February 26, 2013, Defendants removed the case to this Court. *See id.* Currently before the Court is Defendants' motion for summary judgment. *See* Dkt. No. 62.

## III. DISCUSSION

### A. Standard of review

A court may grant a motion for summary judgment only if it determines that there is no genuine issue of material fact to be tried and that the facts as to which there is no such issue warrant judgment for the movant as a matter of law. *See Chambers v. TRM Copy Ctrs. Corp., 43 F.3d 29, 36 (2d Cir. 1994)* (citations omitted). When analyzing a summary **[*10]** judgment motion, the court "'cannot try issues of fact; it can only determine whether there are issues to be tried.'" *Id. at 36-37* (quotation and other citation omitted). Moreover, it is well-settled that a party opposing a motion for summary judgment may not simply rely on the assertions in its pleading. *See Celotex Corp. v. Catrett, 477 U.S. 317, 324, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986)* (quoting *Fed. R. Civ. P. 56(c), (e)*).

In assessing the record to determine whether any such issues of material fact exist, the court is required to resolve all ambiguities and draw all reasonable inferences in favor of the nonmoving party. *See Chambers, 43 F.3d at 36* (citing *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255, 106 S. Ct. 2505, 2513-14, 91 L. Ed. 2d 202 (1986))* (other citations omitted). Where the non-movant either does not respond to the motion or fails to dispute the movant's statement of material facts, the court may not rely solely on the moving party's *Rule 56.1* statement; rather, the court must be satisfied that the citations to evidence in the record support the movant's assertions. *See Giannullo v. City of N.Y., 322 F.3d 139, 143 n.5 (2d Cir. 2003)* (holding that not verifying in the record the assertions in the motion for summary judgment "would derogate the truth-finding functions of the judicial process by substituting convenience for facts").

### B. Federal and State Gender Discrimination

Defendants argue that Plaintiff was terminated for a legitimate, non-discriminatory reason — her violation **[*11]** of Plant Rule #19 — and that Plaintiff cannot establish a prima facie case of discrimination nor demonstrate that the reasons stated for termination are a pretext for discrimination. Dkt. No. 62-7 at 13-14. In response, Plaintiff asserts that her disparate treatment as compared to the other four male trainees constitutes evidence of discriminatory intent that could lead a reasonable jury to conclude that she was terminated for discriminatory reasons. Dkt. No. 77 at 8.

"To establish a prima facie case of gender discrimination under Title VII and the NYSHRL, a plaintiff must demonstrate: (1) membership in a protected class; (2) satisfactory job performance; (3) an adverse employment action; and (4) circumstances surrounding the employment action that give rise to an inference of discrimination." *Fahrenkrug v. Verizon Servs. Corp., 652 Fed. Appx. 54, 2016 U.S. App. LEXIS 11048, 2016 WL 3448300, *2 (2d Cir. 2016)*

(citing *Montana v. First Fed. Sav. & Loan Ass'n of Rochester, 869 F.2d 100, 106-07 (2d Cir. 1989)*); *see also McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-03, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973)*; *Forrest v. Jewish Guild for the Blind, 3 N.Y.3d 295, 316, 819 N.E.2d 998, 786 N.Y.S.2d 382 (2004)* (holding that the *McDonnell Douglas* framework applies to discriminatory discharge claims brought pursuant to the NYSHRL) (citations omitted).

Discrimination claims are evaluated pursuant to the burden-shifting analysis articulated in *McDonnell Douglas, 411 U.S. at 802-03*.

> Under *McDonnell Douglas*, the plaintiff bears the initial burden of establishing a prima facie case of discrimination. *411 U.S. at 802, 93 S. Ct. 1817*. If the plaintiff does [*12] so, the burden shifts to the defendant to articulate "some legitimate, nondiscriminatory reason" for its action. *Id.* Once such a reason is provided, the plaintiff can no longer rely on the prima facie case, but may still prevail if she can show that the employer's determination was in fact the result of discrimination.

*Gorzynski v. JetBlue Airways Corp., 596 F.3d 93, 106 (2d Cir. 2010)* (citing *Holcomb v. Iona Coll., 521 F.3d 130, 138 (2d Cir. 2008))*. To rebut the articulated justification for the adverse action, "the plaintiff must show both that the reason was false, and that discrimination was the real reason." *St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 511 n.4, 113 S. Ct. 2742, 125 L. Ed. 2d 407 (1993)* (internal quotations omitted). However, conclusory allegations of discrimination are insufficient to defeat a motion for summary judgment. *See Diggs v. Niagara Mohawk Power Corp., No. 1:14-cv-244 (GLS/CFH), 2016 U.S. Dist. LEXIS 50035, *9 (N.D.N.Y. Apr. 14, 2016)* (citing *Holcomb, 521 F.3d at 137*); *see also Schwapp v. Town of Avon, 118 F.3d 106, 110 (2d Cir. 1997)*.

With respect to Plaintiff's prima facie case, it is undisputed that, as a woman, Plaintiff is a member of a protected class under Title VII. *See 42 U.S.C. § 2000e-2(a)*. It is also undisputed that because Plaintiff was demoted and terminated, she was subjected to an adverse employment action. *See Fahrenkrug, 2016 U.S. App. LEXIS 11048, 2016 WL 3448300, at *4*. Therefore, in order to establish a prima facie case of gender discrimination, Plaintiff must show that she was qualified for the position that she held and that the circumstances surrounding her termination [*13] give rise to an inference of discrimination. A plaintiff may create an inference of discrimination by showing disparate treatment, *i.e.*, by showing that his employer "treated him less favorably than a similarly situated employee outside his protected group." *Graham v. Long Island R.R., 230 F.3d 34, 39 (2d Cir. 2000)*. To create an inference of discrimination by showing

disparate treatment, plaintiff must show that he was "'similarly situated in all material respects'" to the individuals with whom he seeks to compare himself. *Id.* (quoting *Shumway v. United Parcel Serv., Inc., 118 F.3d 60, 64 (2d Cir. 1997)*).

In Plaintiff's memorandum of law in opposition to Defendants' motion for summary judgment, she asserts that the record establishes disparate treatment because she could not share in overtime as soon as other trainees, she was shuffled around to different training areas from day to day unlike other trainees, she was not allowed to be removed from Mr. Sefcheck's supervision in mark-to-cut when other trainees were, and she was not allowed to ask Mr. Sefcheck questions. Dkt. No. 77 at 8. Despite this evidence, Defendants argue that Plaintiff cannot establish a prima facie case of discrimination because she has not shown that the arbitrator's decision regarding her termination was wrong as a matter of fact, or [*14] that the impartiality of the arbitration proceeding was somehow compromised. Dkt. No. 62-7 at 20. Defendants rely on the Second Circuit decision *Collins v. N.Y. City Transit Auth.* to make this argument. *Collins v. N.Y. City Transit Auth., 305 F.3d 113, 119 (2d Cir. 2002)*.

In *Collins*, the appellant, an African-American male, was terminated from his employment, and he filed a grievance against his employer claiming he was discriminatorily discharged. *Collins, 305 F.3d at 117*. Following the filing of the grievance, the appellant was represented by his union at an arbitration hearing. *Id.* The arbitrator upheld the termination after a finding of just cause. *Id.* In April 1993, the appellant commenced an action against the Transit Authority for discriminatory and retaliatory employment termination in violation of Title VII as well as other claims. *Id. at 118*. On October 30, 2000, the district court granted summary judgment in favor of the employer dismissing the remaining claims and the appellant appealed. *Id.* The Second Circuit affirmed the district court's decision to grant the employer's motion for summary judgment and stated that while the appellant proffered enough evidence to create an issue of fact of whether his termination resulted from discriminatory or retaliatory purposes, "that [*15] proffer was not sufficient to overcome the additional probative weight of the arbitration award allowing his termination." *Id. at 119*.[1] The court

---

[1] The Second Circuit recognized that the "*Collins* defense" may be viewed as either "an attack on a [plaintiff's] showing of an inference of discrimination or retaliation in the prima facie case or as an attack on plaintiff's satisfaction of the subsequent requirement that a proffered legitimate reason for an employment action is shown to be pretextual." *Collins, 305 F.3d at 118 n.1*. The Court chose to treat the defense as an attack on the prima facie case, but noted that

concluded that a negative arbitration decision does not preclude a Title VII action by a discharged employee. *Id.* (other citations omitted). However, if an independent arbitrator's decision "follows an evidentiary hearing and is based on substantial evidence," a Title VII plaintiff "must present strong evidence that the decision was wrong as a matter of fact" or that the "impartiality of the proceeding was somehow compromised" in order to survive a motion for summary judgment. *See Collins, 305 F.3d at 119; see also Attard v. City of N.Y., 451 Fed. Appx. 21, 24 (2d Cir. 2011).*

*Collins* has consistently been followed and applied by the district courts in the Second Circuit. In *Diggs*, the plaintiff was an African-American male employed by Niagara Mohawk who was discharged after he used company tools at his home for personal gain in violation of the company's standards of conduct. *See Diggs, 2016 U.S. Dist. LEXIS 50035, at *1-*5.* The plaintiff challenged the termination through an arbitration hearing. *Id.* The arbitrator upheld the termination after finding there was just cause for termination because the plaintiff violated company policy. *Id. at *6.* The plaintiff challenged the arbitrator's decision in the Northern District of New York alleging racial discrimination on the grounds that three white employees were given far less discipline for similar conduct. *Id. at *7.* The defendant moved for summary judgment relying on *Collins. Id. at *11.* The court applied the standard set forth in *Collins* and granted the defendant's motion for summary judgment because the plaintiff did not show that the arbitrator's decision was wrong as a matter of fact, or that the impartiality of the arbitration proceeding was somehow compromised. *Id. at *12.*

In her memorandum of law, Plaintiff **[*17]** correctly argues that a negative arbitration decision does not preclude a subsequent Title VII action. *See* Dkt. No. 77 at 4-6. Plaintiff's argument, however, is misplaced. Defendants have not argued that the arbitrator's decision bars Plaintiff from commencing this lawsuit or that they should be granted summary judgment on *res judicata* or collateral estoppel grounds. The cases upon which Plaintiff has relied are inapposite. *See, e.g., Morel v. American Building Maintenance Co., 124 Fed. Appx. 671 (2d Cir. 2005)* (reversing the trial court's grant of summary judgment on the grounds of *res judicata* and collateral estoppels where the plaintiff's wrongful termination claim had been rejected by an arbitrator). Rather, as Defendants correctly argue, the arbitrator's decision is simply strong evidence in support of their position. *See Collins, 305 F.3d at 115-19.*

"[b]ecause issues of this nature tend to collapse as a practical matter" under the *McDonnell Douglas* burden shifting framework, it **[*16]** did not intend to preclude the use of the defense as an attack on a claim of pretext. *Id.*

Moreover, the law is well settled that Plaintiff's failure to raise a discrimination claim before an arbitrator is "immaterial" to whether the arbitral decision should be given substantial weight. *See Spell v. United Parcel Service, No. 09 Civ. 4375, 2012 U.S. Dist. LEXIS 137495, 2012 WL 4447385, *2 (E.D.N.Y. Sept. 25, 2012)* (citing cases). "As long as the arbitrator has properly evaluated the factual, nondiscriminatory reasons for the termination, 'the fact that the arbitration did not adjudicate [plaintiff's] discrimination claim is irrelevant. . . .'" **[*18]** *Id.* (quoting *Weeks v. N.Y.S. Div. of Parole, 78 Fed. Appx. 764, 766 (2d Cir. 2003))* (other citation omitted). As discussed, the arbitrator considered substantial evidence in support of Defendants' decision to demote and terminate Plaintiff and Plaintiff has failed to present any evidence or arguments suggesting that the arbitrator was biased.[2]

Although Plaintiff's discrimination and retaliation claims are not precluded by the **[*19]** arbitrator's decision, Defendants are nevertheless entitled to summary judgment. Plaintiff has failed to put forth new evidence that was not before the arbitrator or argued that the arbitrator's impartiality was compromised. Even assuming that Plaintiff satisfied her prima facie case of discrimination, Defendants presented substantial evidence demonstrating Plaintiff's poor work performance and violation of Plant Rule #19 which Plaintiff has failed to establish was a pretext for discrimination.

Plaintiff's attempts to attack the evidence presented are simply unavailing. For example, Plaintiff argues that four of the purported errors that occurred between January 18 and 22, 2011 were incorrectly attributed to her because she did not work on those days. *See* Dkt. No. 77 at 22. Plaintiff's own evidence, however, clearly establishes that she was, in fact, working on the above dates. *See* Dkt. No. 72-1 at 37. For

---

[2] In her memorandum of law, Plaintiff asserts that the arbitrator's decision to uphold the termination for just cause cannot preclude her from receiving relief because the motivation for her termination was unlawful. *See* Dkt. No. 77 at 3. This argument fails because "courts in this Circuit have held that whether discrimination claims were made before the arbitrator is irrelevant, because '[t]here is no suggestion in *Collins* that the plaintiff had presented his evidence of discriminatory . . . intent to the arbitrator.'" *Diggs, 2016 U.S. Dist. LEXIS 50035, at *13* (quoting *Brenner v. City of N.Y. Dep't of Educ., 132 F. Supp. 3d 407, 2015 U.S. Dist. LEXIS 124509, 2015 WL 5475628, *6 (E.D.N.Y. 2015))* (other quotation and citation omitted); *see also Gallimore-Wright v. Long Island R. Co., 354 F. Supp. 2d 478, 491-92 (S.D.N.Y. 2005); Simpson v. N.Y. State Dep't of Civ. Serv., No. 02-CV-1216 (NPM/DRH), 2005 U.S. Dist. LEXIS 3399, *45 (N.D.N.Y. Mar. 1, 2005))* ("Under *Collins* and its progeny, failure to address the discrimination issue in an arbitration does not diminish the impact of that arbitration on a subsequent discrimination action") (citations omitted).

example, the time sheets provided show that Plaintiff worked from January 17, 2011 at 11:14 p.m., through January 18, 2011 at 7:34 a.m. *See id.* While it does appear that Plaintiff did not work the night shift between January 18 and January 19, she did work the night shifts on January [*20] 20 (which ended on January 21) and January 21 (which ended on January 22). *See id.* Similarly, Plaintiff argues that "[t]he list of errors also shows that Plaintiff committed four errors on February 1, 2011 when she was only clocked in for twenty minutes." Dkt. No. 77 at 22. A review of the time sheets, however, demonstrates that Plaintiff commenced work on January 31, 2011 at 11:05 p.m., and her shift ended February 1, 2011 at 11:30 a.m. *See* Dkt. No. 72-1 at 37.

Moreover, Plaintiff fails to demonstrate that she was similarly situated to other male employees or that she was treated differently from other such individuals. As Defendants point out, Plaintiff was not the only Special Metals employee to be demoted out of the Inspection Department for performance related issues. *See* Dkt. No. 62-7 at 13 n.6. In February of 2010, Mark Calenzo and Peter Decarlis were demoted for performance related issues. *See* Dkt. No. 62-1 at ¶ 17. Further, as to her termination, Plaintiff admits that other employees were terminated for violating Plant Rule #19. *See* Dkt. No. 62-5 at 45.

Further, Plaintiff admits that, despite not being aware of any other employees who were offered last chance agreements after violating [*21] Plant Rule #19, she was offered such an agreement, whereupon she would have been reinstated. *See* Dkt. No. 62-5 at 46-48. Plaintiff, however, refused to sign the agreement when the Company refused to remove language in which Plaintiff would have admitted to violating Plant Rule #19. *See id.* Moreover, Plaintiff admits that male employees were terminated for violating Plant Rule #19. *See id.* at 73-74.

Plaintiff repeatedly claims during her deposition that she was discriminated against when Defendants repeatedly provided her with inadequate training. *See* Dkt. No. 62-5 at 55-65. Thereafter, however, she admits that Chris Debrango and Jim Krupa also received inadequate training and that this poor training is why they ultimately requested to be removed from the positions to which they were assigned. *See id.* at 62-63. The fact that these men allegedly received the same poor training as Plaintiff clearly undermines her claimed gender discrimination.

Further, Plaintiff attempts to argue that Special Metals has inconsistently applied its "disciplinary policy." Dkt. No. 77 at 22-23. Plaintiff discusses two male employees, Keith Ward and Adam Smith, who violated Plant Rule #19 but were not terminated in support of her argument [*22] that her own termination was pretextual. *See id.* Neither of these individuals, however, were accused of the unauthorized removal of Company property or records. The allegations against Mr. Ward involved "poor work performance" and an inability "to clean up following your assigned tasks." Dkt. No. 81 at 7. Mr. Smith was accused of "horseplay on company property" in violation of Plant Rule #19. *See id.* at 9. As such, contrary to Plaintiff's contentions, these employees were not similarly situated to Plaintiff.

Moreover, the Court notes that, throughout her response, Plaintiff has relied upon the declarations of Debra Bader and Michael Geddes, which were both executed on January 19, 2016. *See* Dkt. Nos. 74 & 75. First, the Court notes that these declarations appear to be identical to the declarations Ms. Bader and Mr. Geddes submitted in the case *Bader v. Special Metals Corp.*, No. 6:11-cv-882 (N.D.N.Y.), which was dismissed by stipulation of the parties with the approval of the court on June 10, 2014. The Bader and Geddes declarations contain facts related to a different lawsuit, brought by an entirely different plaintiff, asserting different claims, relating to a different time period. Specifically, [*23] Ms. Bader's declaration discusses events that allegedly occurred between the start of her employment with Special Metals in 1978 to the last day of her employment in April of 2010. *See* Dkt. No. 74. Plaintiff's claims in this case primarily concern events that occurred between June 14, 2010, when she started working in the Inspection Department as an Inspector Trainee, and June 17, 2011, when she was terminated from her employment. The only mention of Plaintiff in Ms. Bader's declaration states that Ms. Bader was identified as having information relevant to Plaintiff's case on **January 8, 2010** and she was subpoenaed to give deposition testimony in **August of 2010**. *See* Dkt. No. 74 at ¶¶ 34-35. Interestingly, this action was not filed until October of 2012. As such, Ms. Bader herself admits that she had information relevant to Plaintiff's previous lawsuit against Special Metals, not the present matter. Similarly, Mr. Geddes' declaration discusses alleged events relating to Ms. Bader from 2007 to April of 2010. *See* Dkt. No. 75. It is unclear what relevance these documents have to Plaintiff's allegations in this case and they are insufficient to create an issue of fact.

In conclusion, the [*24] Court finds that Plaintiff has failed to meet her burden establishing that Defendants' reasons for her demotion and termination were a pretext for discrimination. Plaintiff's "termination occurred . . . only after a decision, based on substantial evidence, of an undisputedly independent, neutral, and unbiased adjudicator that had the power to prevent the termination." *Collins, 305 F.3d at 119*. The arbitrator's findings, which were made after three days of testimony, are highly probative of the absence of discriminatory intent. Plaintiff's conclusory allegations to the contrary, which are based almost entirely on her own beliefs,

are insufficient to create a question of fact as to whether Defendants' legitimate, non-discriminatory reasons were, in fact, a pretext for discrimination. *See Simpson v. N.Y.S. Dep't of Civil Service, No. 02-cv-1216, 2005 U.S. Dist. LEXIS 3399, 2005 WL 545349, *19 (N.D.N.Y. Mar. 1, 2005)* (citations omitted). Accordingly, the Court grants Defendants' motion for summary judgment as to Plaintiff's gender discrimination claims.

## C. Federal and State Gender Retaliation

Title VII prohibits employers from discriminating against an employee who "has opposed any practice made an unlawful employment practice" or "has made a charge, testified, assisted, or participated [*25] in any manner in an investigation, proceeding, or hearing[.]" *42 U.S.C. § 2000e-3(a).* Courts analyze Title VII retaliation claims according to the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973).* *See Terry v. Ashcroft, 336 F.3d 128, 141 (2d Cir. 2003)* (citation omitted).

To make out a *prima facie* case of retaliation under Title VII, a plaintiff must adduce evidence sufficient to permit a rational trier of fact to find:

"(1) that he engaged in protected participation or opposition under Title VII . . . , (2) that the employer was aware of this activity, (3) that the employer took adverse action against the plaintiff, and (4) that a causal connection exists between the protected activity and the adverse action, *i.e.*, that a retaliatory motive played a part in the adverse employment action."

*Kessler v. Westchester County Dep't of Soc. Servs., 461 F.3d 199, 205-06 (2d Cir. 2006)* (other citations omitted). "Upon such a showing, the defendant must articulate legitimate non-discriminatory reasons for its actions, whereupon the plaintiff bears the burden of showing that the defendant's explanations are pretext for the true discriminatory motive." *Holt v. KMI-Cont'l, 95 F.3d 123, 130 (2d Cir. 1996).* Retaliation claims under the ADA and NYSHRL are analyzed under the same framework as that employed in Title VII cases. *Krasner v. City of N.Y., 580 Fed. Appx. 1, 3-4 (2d Cir. 2014)* (citing *Treglia v. Town of Manlius, 313 F.3d 713, 719 (2d Cir. 2002)); see also Lovejoy-Wilson v. NOCO Motor Fuel, Inc., 263 F.3d 208, 223 (2d Cir. 2001).*

The first prong of this analysis is satisfied by Plaintiff's filing of charges [*26] with the EEOC. Dkt. No. 62-1 at 182, 184. At the summary judgment stage, Plaintiff's allegation that she told Defendants that she would be filing an EEOC charge is

sufficient to satisfy the second prong. Dkt. No. 27 at ¶ 26. Defendants' demotion and firing of Plaintiff qualify as "adverse employment actions." Dkt. No. 76 at ¶¶ 46, 65; *see also Phillips v. Bowen, 278 F.3d 103, 109 (2d Cir. 2002)* ("Adverse employment actions include discharge, refusal to hire, refusal to promote, demotion, reduction in pay, and reprimand").

Ultimately, because "Title VII retaliation claims must be proved according to traditional principles of but-for causation," the plaintiff must show "that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer." *Univ. of Tex. Sw. Med. Ctr. v. Nassar, 133 S. Ct. 2517, 2533, 186 L. Ed. 2d 503 (2013); see, e.g., Kirkland v. Cablevision Systems, 760 F.3d 223, 225 (2d Cir. 2014); Zann Kwan v. Andalex Grp. LLC, 737 F.3d 834, 845 (2d Cir. 2013).* "'[B]ut-for' causation does not require proof that retaliation was the only cause of the employer's action, but only that the adverse action would not have occurred in the absence of the retaliatory motive." *Kwan, 737 F.3d at 846.* To meet this burden, the plaintiff may rely on evidence presented to establish her prima facie case as well as additional evidence. Such additional evidence may include direct or circumstantial evidence of discrimination. *See [*27] Desert Palace, Inc. v. Costa, 539 U.S. 90, 99-101, 123 S. Ct. 2148, 156 L. Ed. 2d 84 (2003).* It is insufficient, however, for a plaintiff merely to show that she satisfies "*McDonnell Douglas'* s minimal requirements of a prima facie case" and to put forward "evidence from which a factfinder could find that the employer's explanation . . . was false." *James v. N.Y. Racing Ass'n, 233 F.3d 149, 157 (2d Cir. 2000).* Instead, the key is whether there is sufficient evidence in the record from which a reasonable trier of fact could find in favor of plaintiff on the ultimate issue, *i.e.*, whether the record contains sufficient evidence "that retaliation was a but-for cause of the adverse employment action." *Weber v. City of New York, 973 F. Supp. 2d 227, 271 (E.D.N.Y. 2013)* (citation omitted).

In the present matter, the Court finds that Plaintiff has failed to put forth evidence demonstrating that her demotion or termination were causally related to any protected activity. As Defendants correctly contend, Plaintiff's co-workers identified numerous errors that she was making and brought them to Mr. Maschino's attention. *See* Dkt. No. 62-3 at Exh. E. Mr. Sefcheck, the Union steward, advocated for Plaintiff to be given additional time to learn the job and, as a result, was provided with more training opportunities in the mark-to-cut area than any of the other trainees. *See id.* at ¶¶ 22-23; Dkt. No. 62-1 at ¶¶ 46-47. [*28] Moreover, Plaintiff admits that Mr. Maschino, Mr. Sefcheck, Nick Farley, and other inspectors discussed the errors that she was making while serving as an Inspector Trainee. *See* Dkt. No. 63-7 at 7-10.

Further, Plaintiff does not dispute that she was not the only Special Metals employee who was demoted out of the Inspection Department for performance-related issues. In February of 2010, Mark Calenzo and Peter Decarlis were demoted for performance-related issues. *See* Dkt. No. 62-1 at ¶ 17.

Moreover, this result is further supported by the fact that a considerable amount of time separates the filing of the EEOC complaint and the alleged retaliatory conduct. Plaintiff filed EEOC charges on March 11, 2010 and April 14, 2010, which is the closest-in-time protected conduct to her demotion. *See* Dkt. No. 27 at ¶ 24. Plaintiff, however, was not demoted until February 25, 2011. *See id.* at ¶ 26. Considering the significant and repeated mistakes Plaintiff made while serving as an Inspector Trainee, the nearly ten months that elapsed from the protected activity to the demotion is insufficient to support the inference that the alleged retaliation would not have occurred in the absence of the alleged [*29] improper motive. *See Soloviev v. Goldstein, 104 F. Supp. 3d 232, 251 (E.D.N.Y. 2015)* (citing *Zann Kwan v. Andalex Grp. LLC, 737 F.3d 834, 845 (2d Cir. 2013))* (other citation omitted); *Imperato v. Otsego Cnty. Sheriff's Dep't, No. 3:13-cv-1594 (BKS/DEP), 2016 U.S. Dist. LEXIS 50155, *61 (N.D.N.Y. Apr. 14, 2016)* (quoting *Perry v. NYSARC, Inc., 424 Fed. Appx. 23, 26 (2d Cir. 2011)*; *see also Clark Cnty. Sch. Dist. v. Breeden, 532 U.S. 268, 273-74, 121 S. Ct. 1508, 149 L. Ed. 2d 509 (2001))*.

As to her termination, Plaintiff does not dispute that, in the five-year period preceding her termination, four male employees were terminated for violating Plant Rule #19. *See* Dkt. No. 62-3 at 2-5. The consistent application of the rule to male employees further demonstrates the lack of retaliatory motive in Defendants' actions.

Additionally, Plaintiff asserts that there is direct evidence of retaliatory animus related to her termination in the form of comments that were made about her. *See* Dkt. No. 77 at 18. Plaintiff claims that she was told by co-workers that "they are out to get you" and "they are gunning for you." *Id.* Plaintiff also asserts that Defendant Farley informed Mike Geddes that Plaintiff was "not coming back, she doesn't have a case," which she claims is direct evidence of retaliatory animus. *Id.* (citing Geddes Affm ¶ 10). Although Mike Geddes does claim that Defendant Farley did make this statement, he claims that it was made "either in 2008 or 2009." Dkt. No. 75 at ¶ 10. As such, contrary to Plaintiff's assertions, this statement, [*30] which occurred in either 2008 or 2009, in a context entirely unrelated to the present matter, is not "direct evidence of retaliatory animus." *Imperato, 2016 U.S. Dist. LEXIS 50155, at *61*.

Considering the arbitrator's decision upholding Plaintiff's

termination, and in light of the foregoing, the Court finds that Plaintiff has failed to put forth evidence upon which a reasonable juror could conclude that Defendants' non-retaliatory reasons for Plaintiff's demotion and termination were a pretext for retaliation. Accordingly, the Court grants Defendants' motion for summary judgment as to Plaintiff's retaliation claims.

### D. Federal and State Disability Discrimination and Retaliation

The ADA prohibits "discrimination against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." *42 U.S.C. § 12112(a)*. To establish a prima facie case of discrimination under the ADA, a plaintiff must show that: "(1) his employer is subject to the ADA; (2) he was disabled within the meaning of the ADA; (3) he was otherwise qualified to perform the essential functions of his job, with or without [*31] reasonable accommodation; and (4) he suffered adverse employment action because of his disability." *Sista v. CDC Ixis North America, Inc., 445 F.3d 161, 169 (2d Cir. 2006)* (citing *Giordano v. City of New York, 274 F.3d 740, 747 (2d Cir. 2001))*.

The ADA makes it unlawful for an employer to "discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter." *42 U.S.C. § 12203(a)*. A retaliation case under the ADA requires "a showing that the employee was engaged in an activity protected by the ADA." *Gold v. Carus, 131 Fed. Appx. 748, 750 (2d Cir. 2005)* (quotations and citation omitted). ADA retaliation claims are analyzed under the same framework as Title VII retaliation claims. *See Sarno v. Douglas Elliman-Gibbons & Ives, Inc., 183 F.3d 155, 159 (2d Cir. 1999)* ("[The Second Circuit] conclude[s] that it is appropriate to apply the framework used in analyzing retaliation claims under Title VII in analyzing a claim of retaliation under the ADA").

"[The ADA's] anti-retaliation provision must be construed to cover a broad range of employer conduct." *Thompson v. North American Stainless, LP, 562 U.S. 170, 173, 131 S. Ct. 863, 178 L. Ed. 2d 693 (2011)* (citation omitted). Keeping that premise in mind, the Second Circuit has held that "retaliatory co-worker harassment, if sufficiently severe, may constitute adverse employment action so as to satisfy the second element of the retaliation [*32] prima facie case." *Martin v.*

*New York State Dep't of Corr. Servs., 224 F. Supp. 2d 434, 448 (N.D.N.Y. 2002)* (citing *Richardson v. New York State Dep't of Correctional Serv., 180 F.3d 426, 446 (2d Cir. 1999))*. In determining whether the co-worker harassment is "sufficiently severe," the court should consider whether the plaintiff has "endure[d] a materially adverse change in the terms and conditions of employment." *Martin, 224 F. Supp. 2d at 448* (quoting *Galabya v. New York City Bd. of Educ., 202 F.3d 636, 640 (2d Cir. 2000))* (citation omitted). Further, "material adversity is to be determined objectively, based on the reactions of the reasonable employee." *Rivera v. Rochester Genesee Regional Transp. Authority, 743 F.3d 11, 25 (2d Cir. 2012)*.

Defendants argue that Plaintiff cannot establish a prima facie case of discrimination because (1) she has not shown that the arbitrator's decision regarding her termination was wrong as a matter of fact, or that the impartiality of the arbitration proceeding was somehow compromised, and (2) Plaintiff is not disabled within the meaning of the ADA or Rehabilitation Act. Dkt. No. 62-7 at 20-21.

In the present matter, the Court finds that Plaintiff has failed to establish that she was retaliated against in violation of the ADA or that she suffered an adverse employment action because of her disability. First, the only disability mentioned in Plaintiff's amended complaint is the hand injury that she suffered on or about February 28, 2006. *See* Dkt. No. 27 at ¶ 17. In her response, Plaintiff now argues that, in addition **[*33]** to her hand, she has "COPD, asthma, emphysema, chronic bronchitis, etc." and that her "'permanent medical restriction' with Special Metals involves her respiratory condition." Dkt. No. 76 at ¶ 84. Second, Plaintiff does not make any mention of what makes her a qualified individual with a disability in her EEOC complaint. *See* Dkt. No. 72-1 at 15, 17. In the letter of determination, however, the EEOC makes clear that the alleged disability is that Plaintiff has a "history of asthma and COPD." *Id.* at 21. In this letter, no mention is made of Plaintiff's hand injury. *See id.* at 20-22.[3] As such, the only allegation in the amended complaint relating to disability discrimination/retaliation (Plaintiff's 2006 hand injury) was not raised before the EEOC and, therefore, not administratively exhausted. As such, for this reason alone, Plaintiff's ADA discrimination and retaliation claims are subject to dismissal.

Second, even assuming these claims are properly before the Court, the only plausible allegation of disability

discrimination is that Plaintiff **[*34]** was discriminated against because of her disability in February of 2010 when she was denied the Inspection Trainee position. *See* Dkt. No. 77 at 15. Upon this denial, Plaintiff filed a charge with the EEOC and, in June of 2010, Plaintiff entered into a Conciliation Agreement and was awarded, among other things, the Inspection Trainee position she had sought. *See* Dkt. No. 82-1 at ¶ 9. Under the terms of the Conciliation Agreement, Plaintiff "agree[d] not to sue [Special Metals] with respect to any allegations contained in the . . . charge." Dkt. No. 63-1 at 5. As such, to the extent that Plaintiff is attempting to allege that her initial denial of the Inspector Trainee position was discrimination in violation of the ADA, that claim was already disposed of through the Conciliation Agreement and Plaintiff waived her right to sue as part of that settlement. *See EEOC v. Bay Ridge Toyota, Inc., 327 F. Supp. 2d 167, 171 (E.D.N.Y. 2004)* ("When the parties enter into a conciliation agreement . . . the employees waive their rights to sue with respect to the matters alleged in the EEOC charge").

Moreover, as stated earlier, if an independent arbitrator's decision "follows an evidentiary hearing and is based on substantial evidence", a plaintiff asserting a discrimination claim **[*35]** "must present strong evidence that the decision was wrong as a matter of fact" or that the "impartiality of the proceeding was somehow compromised" in order to survive a motion for summary judgment. *Collins, 305 F.3d at 119*. "Absent new evidence or a reason to question the integrity of those proceedings, the arbitral decision 'has probative weight regarding the requisite causal link between an employee's termination and the employer's illegal motive.'" *Young v. Benjamin Dev. Co., 2009 U.S. Dist. LEXIS 18280, *24 (S.D.N.Y. Feb. 17, 2009)* (quoting *Collins, 305 F.3d at 120*). Here, Plaintiff has failed to allege that the decision was wrong as a matter of fact or that the impartiality of the proceeding was somehow compromised. Since Plaintiff has not offered any evidence or reason to question the integrity of the arbitration proceedings, she has failed to establish a causal link between her termination and her alleged disability. Finally, even assuming these other ailments were properly alleged in the amended complaint as part of Plaintiff's ADA claims, Plaintiff has failed to set forth any evidence, other than her own conclusory allegations, that she was discriminated against or retaliated against in violation of the ADA.

Based on the foregoing, the Court grants Defendants' motion for summary judgment with respect to **[*36]** her disability discrimination and retaliation claims.

**E. Hostile Work Environment**

---

[3] Although Plaintiff filed a complaint with the EEOC in August of 2008 relating to her hand injury, that complaint is not properly before the Court. *See* Dkt. No. 72-1 at 2-3.

In their motion, Defendants contend that, to the extent that Plaintiff could be attempting to allege a hostile work environment claim, it must be dismissed. *See* Dkt. No. 62-7 at 33-34. Specifically, Defendants contend that Plaintiff failed to raise this claim with the EEOC and, therefore, it is not exhausted and it is not reasonably related to either of the EEOC charges. *See id.* at 32-33. Alternatively, Defendants argue that the amended complaint simply alleges that Plaintiff was "'repeatedly and daily subject to silent treatment, taunting, and humiliation,'" which they claim fails to plausibly allege a hostile work environment claim. *Id.* (quoting Dkt. No. 27 at ¶ 34). In her response, Plaintiff provides some additional details regarding this alleged claim. *See* Dkt. No. 77 at 25-26.

First, the Court finds that neither of the relevant EEOC charges are reasonably related to the alleged hostile work environment claim and, therefore, the claim has not been exhausted. In EEOC Charge No. 525-2011-00320, Plaintiff complained only of retaliation in violation of the ADA. *See* Dkt. No. 62-1 at 182. In the EEOC charge relating [*37] to her termination, Plaintiff alleges only that, "[u]pon information and belief, male employees and/or employees without a disability and or employees who have not complained of discrimination have not been terminated for misconduct based on [Plant Rule #19]." *Id.* at 184-85. The allegations in the EEOC charges, which make only vague and general allegations regarding the alleged disparate treatment of men and women, are insufficient to exhaust a hostile work environment claim. *See Morris v. David Lerner Assocs., 680 F. Supp. 2d 430, 437 (E.D.N.Y. 2010)* (citing cases); *Fleming v. Verizon N.Y., Inc., 419 F. Supp. 2d 455, 464 (S.D.N.Y. 2005)* (finding hostile work environment claim not reasonably related to EEOC charge because EEOC charge only made general allegations regarding employer's disparate treatment of men and women). Accordingly, the Court finds that Plaintiff failed to exhaust any alleged hostile work environment claim. *See Bader v. Special Metals Corp., 985 F. Supp. 2d 291, 328-29 (N.D.N.Y. 2013)* (holding that the alleged hostile work environment claim was not reasonably related to the EEOC complaint) (citing cases).

Even assuming Plaintiff did exhaust this claim, the Court finds that she failed to plausibly allege a hostile work environment claim. Plaintiff's amended complaint contains eleven causes of action: seven gender and disability discrimination claims and four gender and disability retaliation claims. [*38] Not once does Plaintiff allege that she was subject to a hostile work environment. Further, the only allegations in the amended complaint that could be considered to support such a claim, fail to plausibly allege such a cause of action. *See La Marco v. N.Y.S. Nurses Ass'n, 118 F. Supp. 2d 310, 316-17 (N.D.N.Y. 2000)* (citing *Williams v. County of Westchester, 171 F.3d 98, 100 (2d Cir. 1999)).*

Moreover, even assuming that Plaintiff's amended complaint plausibly alleges such a claim (which it does not), notably absent from Plaintiff's response is any allegation that she reported this allegedly pervasive hostile conduct to a supervisor or human resources, despite a policy in place regarding such conduct. Special Metals has established that, through its anti-harassment and discrimination policies and training, it "exercised reasonable care to prevent and correct promptly any sexually harassing behavior." *Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 765, 118 S. Ct. 2257, 141 L. Ed. 2d 633 (1998); see also* Dkt. No. 62-1 at ¶ 45. In fact, Plaintiff has admitted that, when brought to its attention, inappropriate material was removed from the workplace. Specifically, Plaintiff complains that management did not adequately respond when she informed them that someone had written something inappropriate about her on the men's bathroom wall. *See* Dkt. No. 62-5 at 75-79. Thereafter, however, Plaintiff admits that the writing was [*39] removed from the bathroom wall on the same day she brought it to her supervisor's attention. *See id.* at 78. The undisputed facts clearly establish that, despite the reasonable care taken to avoid and prevent hostile work conditions, Plaintiff "unreasonably failed to take advantage of [these] preventive or corrective opportunities . . . or to avoid harm otherwise." *Burlington Indus., Inc., 524 U.S. at 765; see also Petrosino v. Bell Atlantic, 385 F.3d 210, 225 (2d Cir. 2004).*

Based on the foregoing, the Court grants Defendants' motion for summary judgment as to Plaintiff's hostile work environment claim.

**F. Rehabilitation Act**

Defendants contend that, in addition to all of the reasons discussed above, Plaintiff's claim under the Rehabilitation Act is subject to dismissal because Special Metals was not a recipient of federal funds during Plaintiff's employment, as required under the Act. *See* Dkt. No. 62-7 at 36-37. Plaintiff failed to respond to this argument and, therefore, the Court finds that she has abandoned this claim. *See Blake v. Race, 487 F. Supp. 2d 187, 217 (E.D.N.Y. 2007)* (citing cases). In the alternative, since Plaintiff failed to present any evidence demonstrating that Special Metals received federal assistance and is therefore subject to the Rehabilitation Act, the Court grants Defendants' motion for summary judgment. *See Reyes v. Fairfield Properties, 661 F. Supp. 2d 249, 263 (E.D.N.Y. 2009)* (citation [*40] omitted).

**G. Tenth and Eleventh Causes of Action**

In her Tenth and Eleventh Causes of action, Plaintiff asserts claims under *Article I, Section 11 of the New York State Constitution*. As Defendants correctly contend, these claims must be dismissed. Where, as here, adequate remedies exist under federal and state laws to protect the asserted rights, there is "no private right of action under the New York State Constitution." *G.D.S. ex rel. Slade v. Northport-E. Northport Union Free Sch. Dist., 915 F. Supp. 2d 268, 280 (E.D.N.Y. 2012)* (citations omitted); *Kalsi v. N.Y.C. Transit Auth., 62 F. Supp. 2d 745, 761 (E.D.N.Y. 1998)*.

Based on the foregoing, the Court grants Defendants' motion for summary judgment as to these claims.

## IV. CONCLUSION

After carefully reviewing the record in this matter, the parties' submissions and the applicable law, and for the above-stated reasons, the Court hereby

**ORDERS** that Defendants' motion for summary judgment (Dkt. No. 62) is **GRANTED** in its entirety; and the Court further

**ORDERS** that Plaintiff's claims are **DISMISSED** with prejudice; and the Court further

**ORDERS** that the Clerk of the Court shall serve a copy of this Memorandum-Decision and Order on all parties in accordance with the Local Rules; and the Court further

**ORDERS** that the Clerk of the Court shall enter judgment in Defendants' favor and close this case.

**IT IS SO ORDERED**.

Dated: September 6, 2016

Albany, New **[*41]** York

/s/ Mae A. D'Agostino

**Mae A. D'Agostino**

**U.S. District Judge**

Wayne Gradl

 Caution
As of: October 23, 2023 1:52 PM Z

# *Carter v. New Venture Gear, Inc.*

United States Court of Appeals for the Second Circuit

February 18, 2009, Decided

No. 07-4672-cv

**Reporter**
310 Fed. Appx. 454 *; 2009 U.S. App. LEXIS 3237 **

REBA CARTER, Plaintiff-Appellant, - v - NEW VENTURE GEAR, INC., DIAMLER CHRYSLER CORPORATION, MIKE ALLEN, as President of United Automobile, Aerospace and Agricultural Implement Workers of America Local 624, and STEPHEN YOKICH, as President of the International Union, United Automobile Aerospace and Agricultural Implement Workers of America, Defendants-Appellees.

**Notice:** PLEASE REFER TO FEDERAL RULES OF APPELLATE PROCEDURE RULE 32.1 GOVERNING THE CITATION TO UNPUBLISHED OPINIONS.

**Prior History:** *Carter v. New Venture Gear, Inc., 2007 U.S. Dist. LEXIS 71695 (N.D.N.Y, Sept. 26, 2007)*

## Core Terms

hostile, work environment, district court, allegations, genuine, sexual harassment claim, disparate treatment, summary judgment, material fact, coworkers

## Case Summary

### Procedural Posture

Plaintiff-appellant employee sued, inter alia, defendant-appellee employer, alleging racial discrimination, disparate treatment, and hostile work environment through racial and sexual harassment. The employee's claims were asserted under, inter alia, Title VII of the Civil Rights Act of 1964. The U.S. District Court for the Northern District of New York granted summary judgment to the employer on all claims. The employee appealed.

### Overview

The circumstances surrounding the employee's allegations did not give rise to an inference of race discrimination. No assertions made by the employee supported the notion that the employer contemplated race in her job assignment. Furthermore, even assuming that the employee had made out a prima facie case, the employer had met its burden of articulating a legitimate, nondiscriminatory reason for its actions, namely, the employee's perceived lack of productivity and extended absences, and the employee had failed to demonstrate that the reason given was pretext. Thus, the employee had not met her ultimate burden of showing that she had been the victim of racial discrimination. On the disparate treatment claim, the employee provided no evidence that similarly situated black workers were punished differently than white coworkers for actual, comparable incidents. The employee stated she reported to an apparently indifferent management that a white coworker was smoking marijuana on the job, though she did not provide analogous occurrences involving black employees smoking marijuana that would have supported disparate treatment based on race.

### Outcome

The judgment of the district court was affirmed.

## LexisNexis® Headnotes

Civil Procedure > Appeals > Reviewability of Lower Court Decisions > Preservation for Review

*HN1*[↕] **Reviewability of Lower Court Decisions, Preservation for Review**

The appellate court generally does not consider issues raised for the first time in a reply brief.

Civil Procedure > ... > Summary Judgment > Entitlement as Matter of Law > General Overview

Civil Procedure > ... > Summary Judgment > Appellate Review > Standards of Review

**HN2[ ] Summary Judgment, Entitlement as Matter of Law**

The appellate court reviews de novo the district court's grant of summary judgment, construing presented evidence and resolving ambiguities in a light most favorable to the nonmoving party. Summary judgment is only warranted upon a showing by the movant that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law. *Fed. R. Civ. P. 56(c)*. A dispute about a genuine issue of material fact exists if the evidence is such that a reasonable factfinder could return a verdict for the nonmoving party.

Labor & Employment Law > ... > Evidence > Burdens of Proof > Burden Shifting

Labor & Employment Law > Discrimination > Disparate Treatment > Scope & Definitions

**HN3[ ] Burdens of Proof, Burden Shifting**

To make out a prima facie case under Title VII, a plaintiff must show: (1) she is a member of a protected class; (2) she is qualified to perform the job in question; (3) there was an adverse employment action; and (4) circumstances supporting an inference of discrimination. Once a plaintiff establishes a prima facie Title VII case, the burden shifts to the employer to provide a legitimate, nondiscriminatory reason for the employment decision at issue. If the employer satisfies this requirement, the burden shifts back to the plaintiff to prove by a preponderance of the evidence that the employer was acting with pretext.

Labor & Employment Law > ... > Employment Practices > Adverse Employment Actions > Discipline

**HN4[ ] Adverse Employment Actions, Discipline**

A plaintiff alleging discrimination based on disparate disciplinary treatment must demonstrate, in applying the McDonnell Douglas test, that she was subject to an adverse employment action and that a similarly situated employee not in the relevant protected group received better treatment. Specifically, a plaintiff must show that she engaged in an act of "comparable seriousness," but was punished more severely than similarly situated coworkers based on an application of disciplinary rules or a code of conduct.

Labor & Employment Law > ... > Harassment > Racial Harassment > Hostile Work Environment

**HN5[ ] Racial Harassment, Hostile Work Environment**

To survive a motion for summary judgment on a racial harassment claim relating to a hostile work environment, a plaintiff must demonstrate: (1) that the workplace was permeated with discriminatory intimidation that was sufficiently severe or pervasive to alter the conditions of his or her work environment, and (2) that a specific basis exists for imputing the conduct that created the hostile environment to the employer. The first element of a hostile work environment claim has both an objective and subjective component: the misconduct must be severe or pervasive enough to create an objectively hostile or abusive work environment, and the victim must also subjectively perceive that environment to be abusive. A hostile work environment claim may be based on one incident, but the court requires that the incident constitute an "intolerable alteration" of the plaintiff's working conditions, so as to substantially interfere with or impair his ability to do his job.

Labor & Employment Law > Collective Bargaining & Labor Relations > Duty of Fair Representation

**HN6[ ] Collective Bargaining & Labor Relations, Duty of Fair Representation**

A union has a duty to serve the interests of all its members without hostility or discrimination toward any, to exercise its discretion with complete good faith and honesty, and to avoid arbitrary conduct. Breach of this duty occurs only when a union's conduct toward a member is arbitrary, discriminatory, or in bad faith, or when the union causes an employer to discriminate against employees on arbitrary, hostile, or bad faith grounds. The duty of fair representation is not breached where the union fails to process a meritless grievance, engages in mere negligent conduct, or fails to process a grievance due to error in evaluating the merits of the grievance.

**Counsel:** [**1] Appearing for Appellant: K. FELICIA DAVIS, Syracuse, NY.

Appearing for Appellees: JOHN T. McCANN, (James P. Youngs, on the brief), Hancock & Estabrook, LLP, Syracuse, NY, KENNETH L. WAGNER, Blitman & King LLP, Syracuse, NY.

**Judges:** HON. RICHARD C. WESLEY, HON. DEBRA ANN LIVINGSTON, Circuit Judges, HON. JANE A.

RESTANI, * Judge.

# Opinion

[*455] SUMMARY ORDER

**UPON DUE CONSIDERATION, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED** that the judgment of the United States District Court for the Northern District of New York be **AFFIRMED.**

Reba Carter appeals the order of the United States District Court for the Northern District of New York (Mordue, *J.*) granting summary judgment in favor of defendants-appellees. Carter had brought suit in the district court under Title VII of the Civil Rights Act of 1964, *42 U.S.C. § 2000e to 2000e-17* (collectively "Title VII"); id. *§§ 1981*, *1981a* (collectively [*456] " *§ 1981*"); id. §§ 158,185, alleging that her employer, New Venture Gear, Inc. and Daimler Chrysler Corp. (collectively "NVG"), committed racial discrimination, disparate treatment, and created a hostile work environment [**2] through racial and sexual harassment, and that her union, the United Automobile, Aerospace and Agricultural Implement Workers of America Local 624, and its international affiliate, United Automobile, Aerospace and Agricultural Implement Workers of America (collectively the "Union") breached the duty of fair representation. Carter appeals the dismissal of all claims. [1] We assume familiarity by the parties as to the facts, the procedural context, and the specification of appellate issues.

*HN2*[⬆] This Court reviews de novo the district court's grant of summary judgment, construing presented evidence and

---

* The Honorable Jane A. Restani, Chief Judge of the United States Court of International Trade, sitting by designation.

[1] Carter also brought claims against NVG and the Union under New York State law for assault and battery, intentional infliction of emotional distress, negligent infliction of emotion distress, and breach of contract. *Carter v. New Venture Gear, Inc., No. 5:00-CV-1744, 2007 U.S. Dist. LEXIS 71695, 2007 WL 2847217, at *10-*11 (N.D.N.Y. Sept. 26, 2007).* The district court dismissed these claims, however, because Carter failed to respond to the defendants' motions for summary judgment insofar as they sought dismissal of these claims. Id. Carter attempts to appeal the dismissal of her claims for negligent infliction of emotional distress and intentional infliction of emotional distress by addressing them in her reply brief. However, *HN1*[⬆] this [**3] Court generally does not consider issues raised for the first time in a reply brief. *In re Harris, 464 F.3d 263, 268 n.3 (2d Cir. 2006).* We decline to do so here. *See, e.g., Thomas v. Roach, 165 F.3d 137, 146 (2d Cir. 1999).*

resolving ambiguities in a light most favorable to the nonmoving party. *Doro v. Sheet Metal Workers' Int'l Ass'n, 498 F.3d 152, 155 (2d Cir. 2007).* Summary judgment is only warranted upon a showing by the movant "that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." *Fed. R. Civ. P. 56(c).* A dispute about a genuine issue of material fact exists if the evidence is such that "a reasonable [factfinder] could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).*

I. Claims Against NVG

A. Dismissal of Title VII Claims

*HN3*[⬆] To make out a prima facie case under Title VII, a plaintiff must show: (1) she is a member of a protected class; (2) she is qualified to perform the job in question; (3) there was an adverse employment action; and (4) circumstances supporting [**4] an inference of discrimination. *Swierkiewicz v. Sorema N.A., 534 U.S. 506, 510, 122 S. Ct. 992, 152 L. Ed. 2d 1 (2002)* (citing, inter alia, *McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973)).* Once a plaintiff establishes a prima facie Title VII case, the burden shifts to the employer to provide a legitimate, nondiscriminatory reason for the employment decision at issue. *See Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 142, 120 S. Ct. 2097, 147 L. Ed. 2d 105 (2000).* If the employer satisfies this requirement, the burden shifts back to the plaintiff to prove by a preponderance of the evidence that the employer was acting with pretext. *See St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 530, 113 S. Ct. 2742, 125 L. Ed. 2d 407 (1993).*

1. Racial Discrimination

Applying the *McDonnell Douglas* analysis to the case at bar, it is undisputed that the plaintiff, as an African American, is a member of a protected class, and the district court found that she had made the minimal showing needed to satisfy the second element of the test. [*457] *Slattery v. Swiss Reinsurance Am. Corp., 248 F.3d 87, 91-92 (2d Cir. 2001).* However, Carter failed to present evidence sufficient to establish that the third or fourth elements of the *McDonnell Douglas* test were satisfied with respect to NVG's job assignment [**5] to Carter. Carter failed to raise any genuine issue that NVG's measures constituted an adverse employment action against her. Carter did not meet her burden of raising a genuine issue of material fact that her assignment to an admittedly equally paying and comparable job was "materially less prestigious, materially less suited to [her] skills and expertise, or materially less conducive to career advancement." *Galabya v. New York City Bd. of Educ.,*

*202 F.3d 636, 641 (2d Cir. 2000)*. Nor do the circumstances surrounding Carter's allegations give rise to an inference of race discrimination. No assertions made by the plaintiff support the notion that NVG contemplated race in her assignment. Furthermore, even assuming that plaintiff had made out a prima facie case, NVG has met its burden of articulating a legitimate, nondiscriminatory reason for its actions, namely, Carter's perceived lack of productivity and extended absences, and Carter has failed to demonstrate that the reason given was pretext. Thus, Carter has not met her ultimate burden of showing that she has been the victim of racial discrimination.

2. Disparate Treatment

*HN4*[↑] A plaintiff alleging discrimination based on disparate disciplinary [**6] treatment must demonstrate, in applying the *McDonnell Douglas* test, that she was subject to an adverse employment action "and that a similarly situated employee not in the relevant protected group received better treatment." *McGuinness v. Lincoln Hall, 263 F.3d 49, 53 (2d Cir. 2001)*. Specifically, a plaintiff must show that she engaged in an act of "comparable seriousness," but was punished more severely than similarly situated coworkers based on an application of disciplinary rules or a code of conduct. *Graham v. Long Island R.R., 230 F.3d 34, 40 (2d Cir. 2000)*.

As the district court pointed out, Carter has provided no evidence that similarly situated black workers were punished differently than white coworkers for actual, comparable incidents. Carter states she reported to an apparently indifferent management that a white coworker was smoking marijuana on the job, though she does not provide analogous occurrences involving black employees smoking marijuana that would support disparate treatment based on race. Furthermore, no reasonable factfinder would infer disparate treatment from NVG promptly calling police when an employee threatened to shoot coworkers, but "only" holding a departmental [**7] meeting when plaintiff had a brownie thrown at her. Thus, Carter failed to present any genuine issue of material fact supporting disparate treatment by NVG.

B. Dismissal of Racial Harrassment Claim

*HN5*[↑] To survive a motion for summary judgment on a racial harassment claim relating to a hostile work environment, a plaintiff must demonstrate: "(1) that the workplace was permeated with discriminatory intimidation that was sufficiently severe or pervasive to alter the conditions of his or her work environment, and (2) that a specific basis exists for imputing the conduct that created the hostile environment to the employer." *Mack v. Otis Elevator Co., 326 F.3d 116, 122 (2d Cir. 2003)* (internal quotation

marks and brackets omitted).

The first element of a hostile work environment claim has both an objective and subjective component: "the misconduct must be severe or pervasive enough to create an objectively hostile or abusive [*458] work environment, and the victim must also subjectively perceive that environment to be abusive." *Terry v. Ashcroft, 336 F.3d 128, 148 (2d Cir. 2003)* (internal quotation marks omitted). A hostile work environment claim may be based on one incident, but "we require that the [**8] incident constitute an 'intolerable alteration' of the plaintiff's working conditions, so as to substantially interfere with or impair his ability to do his job." *Mathirampuzha v. Potter, 548 F.3d 70, 79 (2d Cir. 2008)* (citation omitted).

A review of the actual evidence on which plaintiff relies to support her allegations reveals a lack of objective proof of racially-related incidents beyond conclusory statements. Carter's testimony corroborates her daily notebook entry at the time of the alleged incidents in that it shows she either did not believe some incidents were racially related or that her belief that some incidents were racially related is based solely on speculation. For example, Carter testified that on October 13, 1999, she found a note written by coworkers, which included a racial epithet. However, the note itself was produced, reading only: "get out we do not want you here." There is nothing in the record to support Carter's speculation that the note was racially-motivated. Even if accepted as true by the Court, the conduct Carter claims to have been subjected to either directly or indirectly was too isolated, infrequent, and did not demonstrate unreasonable interference [**9] in her ability to work, nor is there any reason to believe such conduct was necessarily due to her race. Thus, Carter has failed to satisfy her burden of showing an objectively hostile work environment.

C. Dismissal of Sexual Harassment Claim

Plaintiff argues that the sexual harassment claims are sufficiently related to the race-related allegations in the charge so that it would be unfair to bar the sexual harassment claims because they were explicitly unexhausted in her EEOC Charge Discrimination filing on December 9, 1999. *See Butts v. City of New York Dep't of Hous. Pres. & Dev't, 990 F.2d 1397, 1402 (2d Cir. 1993)*, superceded by statute on other grounds, Civ. Rights Act of 1991, *Pub. L. No. 102-166, 105 Stat. 1071*. The "sufficiently related" theory applies in three situations: (1) where the conduct complained of would fall within the scope of the EEOC investigation which can reasonably be expected to grow out of the charge of discrimination; (2) "where the claim alleges an employer's retaliation for filing an EEOC charge; and (3) where a plaintiff alleges further incidents of discrimination carried out

in the same manner alleged in precisely the EEOC charge." *Id. at 1402-03* (internal **[**10]** quotation marks and citation omitted).

None of the three theories are applicable. Carter's charge to the EEOC made no reference whatsoever to gender bias at NVG, and such claims are not reasonably related to her race-based charge. The EEOC was thus not "on notice" of Carter's gender-based complaints. Even if the Court reaches the merits of Carter's sexual harassment claims, moreover, the allegations were too infrequent, isolated, and unknown to NVG and, thus, do not amount to a showing that the workplace was permeated with discriminatory sexual intimidation that was sufficiently pervasive to alter the work environment and subsequently impute responsibility to NVG. *See Terry, 336 F.3d at 148.* Accordingly, plaintiff cannot raise a genuine issue of material fact to render dismissal of the sexual harassment claim improper.

**[*459]** II. Claims Against the Union

*HN6*[⬆] A union has a duty to "serve the interests of all [its] members without hostility or discrimination toward any, to exercise its discretion with complete good faith and honesty, and to avoid arbitrary conduct." *Vaca v. Sipes, 386 U.S. 171, 177, 87 S. Ct. 903, 17 L. Ed. 2d 842 (1967).* "[B]reach [of this duty] occurs only when a union's conduct toward a member . . . is arbitrary, **[**11]** discriminatory, or in bad faith," *United Steelworkers of Am., AFL-CIO-CLC v. Rawson, 495 U.S. 362, 372, 110 S. Ct. 1904, 109 L. Ed. 2d 362 (1990)* (internal quotation marks omitted), or "when [the union] causes an employer to discriminate against employees on arbitrary, hostile, or bad faith grounds." *Ramey v. Dist. 141, Int'l. Ass'n of Machinists & Aerospace Workers, 378 F.3d 269, 277 (2d Cir. 2004).* "[T]he duty of fair representation is not breached where the union fails to process a meritless grievance, engages in mere negligent conduct, or fails to process a grievance due to error in evaluating the merits of the grievance." *Cruz v. Local Union No. 3 of Intn'l. Bhd. of Elec. Workers, 34 F.3d 1148, 1153-54 (2d Cir. 1994).*

Evidence provided by Carter does not adequately support the assertion of racial discrimination by the union and, quite the contrary, lends credence to the affidavits of Carter's union stewards John J. Courcy and Gilbert A. Odjick, the latter of which particularly points out a lack of racial animus or sexual harassment directed against any employee. Thus, Carter has not provided any evidence that would suggest a breach of the union's duty of fair representation is a contested fact, and summary judgment **[**12]** against plaintiff with regard to a breach of the duty of fair representation was appropriate.

Accordingly, for the reasons set forth above, the judgment of the district court is AFFIRMED.

---

**End of Document**

 Positive
As of: October 23, 2023 2:00 PM Z

## *Diggs v. Niagara Mohawk Power Corp.*

United States District Court for the Northern District of New York

April 14, 2016, Decided; April 14, 2016, Filed

1:14-cv-244 (GLS/CFH)

### Reporter

2016 U.S. Dist. LEXIS 50035 *; 2016 WL 1465402

MICHAEL J. DIGGS, Plaintiff, v. NIAGARA MOHAWK
POWER CORPORATION, Defendant.

**Subsequent History:** Affirmed by *Diggs v. Niagara Mohawk
Power Corp., 2017 U.S. App. LEXIS 9496 (2d Cir. N.Y., May
31, 2017)*

## Core Terms

employees, termination, similarly situated, arbitrator,
backhoe, prima facie case, summary judgment motion,
misconduct, discrimination claim, reasons, arbitral decision,
give rise, title vii, circumstances, discipline, material respect,
investigatory, argues, employment discrimination,
discriminatory intent, employment action, meetings, policies,
parties

**Counsel: [*1]** FOR THE PLAINTIFF: JAMES D. HARTT,
ESQ., OF COUNSEL, Office of James D. Hartt, Rochester,
NY.

FOR THE DEFENDANT: ROBERT A. LABERGE, ESQ.,
KSENIYA PREMO, ESQ., OF COUNSEL, Bond, Schoeneck
Law Firm, Syracuse, NY.

**Judges:** Gary L. Sharpe, Senior United States District Judge.

**Opinion by:** Gary L. Sharpe

## Opinion

### MEMORANDUM-DECISION AND ORDER

### I. Introduction

Plaintiff Michael J. Diggs commenced this action against
defendant Niagara Mohawk Power Corporation, alleging
employment discrimination on the basis of race under Title

VII of the Civil Rights Act of 1964,[1] and age discrimination
under the Age Discrimination in Employment Act (ADEA).[2]
(Compl., Dkt. No. 1.) Pending before the court is Niagara
Mohawk's motion for summary judgment. (Dkt. No. 21.) For
the reasons that follow, the motion is granted.

### II. Background[3]

Diggs, an African-American male over the age of forty, was
employed by Niagara Mohawk as a gas mechanic, prior to his
discharge in January 2013. (Def.'s Statement of Material Facts
(SMF) ¶¶ 1, 18, Dkt. No. 21, Attach. 14; Pl.'s SMF ¶ 22, Dkt.
No. 26 at 4-7.) On December 20, 2012, Diggs was working at
a jobsite in Albany, New York, when he left in a
Niagara **[*2]** Mohawk backhoe and drove to his personal
garage located on Third Street in Albany. (Def.'s SMF ¶ 7;
Pl.'s SMF ¶ 7; Dkt. No. 21, Attach. 13 at 21-22, 27.) While at
his garage, Diggs used the backhoe to try to break up a tree
stump in his yard. (Def.'s SMF ¶ 7; Dkt. No. 21, Attach. 13 at
27-28.) Diggs then drove the backhoe to his home on
Pennsylvania Avenue in Albany, ate lunch, and, finally,
returned the backhoe to a Niagara Mohawk facility in
Glenmont, New York, where his personal vehicle was parked.
(Dkt. No. 21 at 21-22, 28.) That day, Niagara Mohawk
received a customer complaint, advising that Diggs was at his
personal property with a Niagara Mohawk backhoe during the
workday. (Def.'s SMF ¶ 8.)

As a result of the complaint, Scott Ackermann, a Niagara
Mohawk Gas Operations manager, convened an investigatory
meeting attended by Diggs and Diggs' union representative.
(*Id.* ¶ 9; Dkt. No. 21, Attach. 11 ¶¶ 1, 5.) When questioned,
Diggs stated that he used the backhoe as transportation to and
from his home, but failed to "elaborate on the fact that [he]
used the backhoe at his garage," and denied that he used the

---

[1] *See 42 U.S.C. §§ 2000e-2000e-17.*

[2] *See 29 U.S.C. §§ 621-634.*

[3] Unless otherwise noted, the facts are not in dispute.

equipment for "personal gain." (Def.'s SMF ¶ 10; Pl.'s SMF ¶ 10, Dkt. No. [*3] 21, Attach. 13 at 31-32.) Subsequently, the complaining customer submitted photographs of Diggs operating the backhoe in the yard of his garage. (Def.'s SMF ¶ 11; Dkt. No. 21, Attach. 5.) Thereafter, a second investigatory meeting was conducted on January 8, 2013. (Def.'s SMF ¶ 12.) This meeting was attended by Diggs and his union representative, Ackermann, Labor Relations Manager Frank DeMauro, and Gas Operations Director Bryan Buck. (Dkt. No. 21, Attach. 1 ¶ 16.) Initially, Diggs repeated his claims that he had used the backhoe for transportation purposes only. (Def.'s SMF ¶ 13.) However, once confronted with the complaining customer's photographs, Diggs acknowledged using the backhoe in his yard to try to remove a tree stump. (Id. ¶ 14.)

Niagara Mohawk "maintains a uniform set of Standards of Ethical Business Conduct, entitled 'Doing the Right Thing.'" (Id. ¶ 2.) These standards of conduct prohibit employees from using Niagara Mohawk equipment for personal reasons, require employees to cooperate fully with internal investigations, and provide that employees who refuse to cooperate in good faith or obstruct such investigations will be subject to disciplinary actions, up to and including [*4] dismissal. (Id. ¶ 3; Dkt. No. 22 at 9; Dkt. No. 23 at 9.) Further, the Gas Operations Maintenance and Construction Department of Niagara Mohawk maintains a set of policies to which employees, such as Diggs, must adhere. (Def.'s SMF ¶ 5.) These policies provide, among other things, that Niagara Mohawk vehicles should be used only for company business and for transporting company employees or contractors, and Niagara Mohawk tools should be used only for company purposes. (Id.; Dkt. No. 21, Attach. 3 at 9, 11.) These policies also specify that failure to follow the "Doing the Right Thing" standards of conduct may result in disciplinary action, up to and including termination. (Def.'s SMF ¶ 5; Dkt. No. 21, Attach. 3 at 13.) Diggs received a copy of both of these sets of company guidelines and was trained on them. (Def.'s SMF ¶¶ 4, 6; Dkt. No. 21, Attach. 13 at 34-36, 43.) Nevertheless, Diggs contends that, although he attended a class where the prohibition on the use of company equipment for "personal gain" was discussed, it was "not fully explained." (Pl.'s SMF ¶¶ 4, 6; Dkt. No. 26, Attach. 5 at 3.) On January 8, 2013, after Diggs admitted using the backhoe in his yard, DeMauro informed [*5] Diggs that he was terminated for violating the "Doing the Right Thing" standards of conduct and Gas Operations policies on December 20, 2012, and for lying about his misconduct during the subsequent investigatory meetings. (Def.'s SMF ¶ 16.) The explanation for his termination was also memorialized in a January 16, 2013 memorandum, written by Buck. (Id. ¶ 17; Dkt. No. 21, Attach. 10.)

Diggs thereafter challenged his termination through a grievance and a two-day hearing before a neutral arbitrator appointed by the American Arbitration Association, pursuant to the parties collective bargaining agreement (CBA). (Def's SMF ¶ 23; Dkt. No. 21, Attach. 8 at 2.) At the arbitration hearing, Diggs was represented by counsel, testified, and was permitted to examine and cross-examine other witnesses, and submit documentary evidence and a post hearing brief. (Def's SMF ¶ 23.) The issue Diggs raised before the arbitrator was "whether or not the penalty (termination) imposed upon [him] was for just cause." (Dkt. No. 21, Attach. 8 at 8.) Diggs claimed that he was treated more severely than several other Niagara Mohawk employees who committed similar, or even more egregious conduct. (Id. at 7-8.) Specifically, [*6] Diggs contended that Robert Bain, Mark Walker, Roger Contento, and Curtis Bailey were not discharged after violating Niagara Mohawk's policy prohibiting the utilization of company equipment and vehicles for personal reasons. (Id.; Dkt. No. 21, Attach. 1 ¶ 27.) Ultimately, the arbitrator upheld Diggs' termination, finding that Diggs was terminated for violating Niagara Mohawk policies, including those prohibiting personal use of Niagara Mohawk property and by failing to be truthful in the investigatory meetings. (Def's SMF ¶ 23; Dkt. No. 21, Attach. 8.) The arbitrator concluded that Diggs' "dishonesty and evasive attitude at investigatory meetings with management distinguished his case from those of Bain, Walker, Contento, or Bailey." (Dkt. No. 21, Attach. 8 at 17.) Subsequently, Diggs commenced this action with the filing of a complaint on March 6, 2014. (Compl.) Following joinder of issue, (Dkt. No. 4), and the close of discovery, Niagara Mohawk filed the now-pending motion for summary judgment, (Dkt. No. 21).

### III. Standard of Review

The standard of review pursuant to *Fed. R. Civ. P. 56* is well established and will not be repeated here. For a full discussion of the standard, the court refers the parties [*7] to its decision in *Wagner v. Swarts, 827 F. Supp. 2d 85, 92 (N.D.N.Y. 2011)*, aff'd sub nom. *Wagner v. Sprague, 489 F. App'x 500 (2d Cir. 2012)*.

### IV. Discussion

#### A. Race Discrimination

Turning to the merits of Diggs' race discrimination claim, Niagara Mohawk argues that Diggs was terminated for a legitimate, non-discriminatory reason — namely, his violation of the company's standards of conduct — and that he cannot

establish a prima facie case of employment discrimination nor demonstrate that the stated reasons for his dismissal are a pretext for discrimination. (Dkt. No. 21, Attach. 15 at 15-25.) In response, Diggs states that the disparate treatment of similarly situated Caucasian employees is "direct evidence" that could lead a jury to conclude that his violation of company policy was not the sole reason for his termination, and that he was, in fact, terminated for discriminatory reasons. (Dkt. No. 26 at 9.) The court agrees with Niagara Mohawk.

Under Title VII, it is "an unlawful employment practice for an employer . . . to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." *42 U.S.C. § 2000e-2(a)(1)*. Discrimination claims are analyzed [*8] under the *McDonnell Douglas* burden-shifting rules, which place upon the plaintiff the initial burden of making out a prima facie case of discrimination. *See McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973)*. To satisfy this initial burden, the plaintiff "'must show: (1) he belonged to a protected class; (2) he was qualified for the position he held; (3) he suffered an adverse employment action; and (4) that the adverse employment action occurred under circumstances giving rise to an inference of discriminatory intent.'" *Brown v. City of Syracuse, 673 F.3d 141, 150 (2d Cir. 2012)* (quoting *Holcomb v. Iona Coll., 521 F.3d 130, 138 (2d Cir. 2008))*. Generally, a plaintiff's burden of establishing a prima facie case of employment discrimination is minimal. *See Collins v. N.Y.C. Trans. Auth., 305 F.3d 113, 118 (2d Cir. 2002)*.

"A plaintiff's establishment of a *prima facie* case gives rise to a presumption of unlawful discrimination that shifts the burden of production to the defendant, who must proffer a legitimate, nondiscriminatory reason for the challenged employment action." *Woodman v. WWOR-TV, Inc., 411 F.3d 69, 76 (2d Cir. 2005)* (internal quotation marks and citations omitted). If the defendant comes forward with a legitimate, nondiscriminatory reason for the challenged employment action, the presumption of discrimination drops out of the analysis, and the defendant "will be entitled to summary judgment . . . unless the plaintiff can point to evidence that reasonably [*9] supports a finding of prohibited discrimination." *James v. New York Racing Ass'n, 233 F.3d 149, 154 (2d Cir. 2000)*.

Ultimately, once the burden shifts back to the plaintiff, he must show, "without the benefit of the presumption, that the employer's determination was in fact the result of racial discrimination." *Holcomb, 521 F.3d at 138*. The plaintiff must demonstrate "by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." *Tex. Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 253, 101 S. Ct. 1089, 67 L. Ed. 2d 207 (1981)*. As further explained by the Supreme Court, to demonstrate pretext, a plaintiff must show "*both* that the [employer's proffered] reason was false, *and* that discrimination was the real reason." *St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 515, 113 S. Ct. 2742, 125 L. Ed. 2d 407 (1993); see Fisher v. Vassar Coll., 70 F.3d 1420, 1433 (2d Cir. 1995), reheard en banc on other grounds, 114 F.3d 1332 (2d Cir.1997), abrogated on other grounds by Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 120 S. Ct. 2097, 147 L. Ed. 2d 105 (2000)*. However, conclusory allegations of discrimination are insufficient to defeat a motion for summary judgment. *See Holcomb, 521 F.3d at 137; Schwapp v. Town of Avon, 118 F.3d 106, 110 (2d Cir. 1997)*.

With respect to Diggs' burden to establish a prima facie case, it is undisputed that, "as an African-American, [he] is a member of a protected class, and because he was terminated, he was subjected to an adverse employment action." *Simpson v. N.Y.S. Dep't of Civil Serv., No. 02-CV-1216, 2005 U.S. Dist. LEXIS 3399, 2005 WL 545349, at *10 (N.D.N.Y. Mar. 1, 2005)* (internal citations omitted), *aff'd,166 F. App'x 499 (2d Cir. 2006)*. Nor do the parties dispute that Diggs was qualified for the position he held. (*See generally* Dkt. No. 21, Attach. [*10] 15.) Thus, the question that remains is whether Diggs can show that the circumstances surrounding his termination give rise to an inference of discrimination. *See Collins, 305 F.3d at 118*. "'An inference of discrimination may arise if a plaintiff can show that [][he was treated differently than similarly situated employees of a different race[.]'" *Simpson, 2005 U.S. Dist. LEXIS 3399, 2005 WL 545349, at *11* (quoting *Jackson v. Norwalk Bd. of Educ., No. Civ.3:02CV1777, 2004 U.S. Dist. LEXIS 22106, 2004 WL 2472223, at *5 (D. Conn. Sept. 9, 2004)); see Humphreys v. Cablevision Sys. Corp., 553 F. App'x 13, 14-15 (2d Cir. 2014)* ("[A] showing that the employer treated plaintiff less favorably than a similarly situated employee outside his protected group . . . is a recognized method of raising an inference of discrimination for purposes of making out a *prima facie* case." (internal quotation marks and citation omitted)). When considering whether a plaintiff has raised an inference of discrimination by showing that he was subjected to disparate treatment, the plaintiff must show that he was "'similarly situated in all material respects'" to the individuals with whom he seeks to compare himself. *Graham v. Long Island R.R., 230 F.3d 34, 39 (2d Cir. 2000)* (quoting *Shumway v. United Parcel Serv., Inc., 118 F.3d 60, 64 (2d Cir. 1997))*.

In his complaint, Diggs alleges that three "younger white

employees were given far less discipline than [Diggs] for similar conduct." (Compl. ¶¶ 18-21), and, indeed, he has presented some evidence that three other employees [*11] — Bain, Walker, and Contento — were not discharged from their employment for their personal use of Niagara Mohawk equipment, (Dkt. No. 26, Attachs. 1-3; Dkt. No. 21, Attach. 1 ¶ 27).[4] Despite this evidence, Niagara Mohawk argues that Diggs cannot establish a prima facie case of employment discrimination, because he has not shown that the arbitrator's decision that his termination was for just cause was wrong as a matter of fact, or that the impartiality of the arbitration proceeding was somehow compromised. (Dkt. No. 21, Attach 15 at 13-15.) In making this argument, Niagara Mohawk relies on the Second Circuit's decision in *Collins, 305 F.3d 113*. In that case, the plaintiff filed a grievance against his employer, pursuant to a CBA, claiming that he was discriminatorily discharged. *See 305 F.3d at 117*. An arbitration was held in which the plaintiff was represented by his union. *See id.* The arbitration board conducted three days of hearings, and subsequently "issued a reasoned fourteen-page opinion," concluding that the plaintiff should be discharged for his conduct. *Id. at 119*. The plaintiff then filed a Title VII claim. *See id. at 117*. The Second Circuit, in affirming the grant of summary judgment in favor of the employer, held that the arbitrator's [*12] decision was "highly probative of the absence of discriminatory intent in [the] termination." *Id. at 119*. Therefore, the Court concluded, when the decision of an arbitrator who has the final power to discipline or discharge an employee "follows an evidentiary hearing and is based on substantial evidence, the Title VII plaintiff, to survive a motion for summary judgment, must present strong evidence that the decision was wrong as a matter of fact . . . or that the impartiality of the proceeding was somehow compromised." *Id. at 119*.

Diggs correctly points out that a negative arbitration decision rendered under a CBA does not preclude a Title VII action by a discharged employee. (Dkt. No. 26 at 11); *see Collins, 305 F.3d at 119*. However, he fails to present any evidence "that the decision [of the arbitrator] was wrong as a matter of fact—e.g. new evidence not before the tribunal—or that the impartiality of the proceeding was somehow compromised." *Collins, 305 F.3d at 119*. He simply argues that, because [*13] the arbitration did not focus upon the discriminatory intent of Niagara Mohawk, and, instead, focused upon whether Diggs engaged in the alleged misconduct, "the notion that the issues are somehow precluded or that [his] burden is higher . . . is inaccurate."

(Dkt. No. 26 at 13.) Contrary to Diggs' argument, however, courts in this Circuit have held that whether discrimination claims were made before the arbitrator is irrelevant, because "'[t]here is no suggestion in *Collins* that the plaintiff had presented his evidence of discriminatory . . . intent to the arbitrator.'" *Brenner v. City of N.Y. Dep't of Educ., No. 14 Civ. 3559, 132 F. Supp. 3d 407, 2015 U.S. Dist. LEXIS 124509, 2015 WL 5475628, at *6 (E.D.N.Y. Sept. 17, 2015)* (quoting *Gallimore-Wright v. Long Island R. Co., 354 F. Supp. 2d 478, 491-92 (S.D.N.Y. 2005))*; *see Simpson, 2005 U.S. Dist. LEXIS 3399, 2005 WL 545349, at *16* ("Under *Collins* and its progeny, failure to address the discrimination issue in an arbitration does not diminish the impact of that arbitration on a subsequent discrimination action." (citations omitted)).

Here, the arbitrator's decision was based on evidence provided by both parties during a two-day hearing, at which Diggs was represented by counsel, and rendered in a thorough eighteen-page opinion. (Def's SMF ¶ 23; Dkt. No. 21, Attach. 8.) Diggs has not offered any new evidence that was not before the arbitrator, nor has he offered any evidence or argument that would impugn the impartiality of the arbitrator. [*14] The absence of such evidence "effectively undermines [Diggs'] ability to make out a *prima facie* case of discrimination." *See Higgs v. Columbia Univ., No. 05 Civ. 2642, 2009 U.S. Dist. LEXIS 3579, 2009 WL 77880, at *14 (S.D.N.Y. Jan. 6, 2009)*. Diggs' argument that his proffer of evidence of "three other similarly situated Caucasian employees who engaged in similar, arguably more serious misconduct" than Diggs, but who were not terminated by Niagara Mohawk, is sufficient to overcome any higher burden of proof he faces as a result of the arbitrator's decision is also unavailing. (Dkt. No. 26 at 13.) First, this evidence was before the arbitrator. (Dkt. No. 21, Attach. 8 at 12-13.) Moreover, the court agrees with Niagara Mohawk that the employees Diggs compares himself to are not similarly situated to him in all material respects. (Dkt. No. 21, Attach. 15 at 20-22.)

To determine whether two employees are similarly situated, the court must consider "(1) whether the plaintiff and those he maintains were similarly situated were subject to the same workplace standards and (2) whether the conduct for which the employer imposed discipline was of comparable seriousness." *Graham, 230 F.3d at 40*. Niagara Mohawk first argues that the three employees Diggs compares himself to were not similarly situated because they were not disciplined [*15] by Buck, DeMauro, or Ackerman, the decision makers in Diggs' firing. (Dkt. No. 21, Attach. 15 at 21-22.) It has supported this assertion with affidavits from Buck, DeMauro, and Ackerman who indicate that the three comparator employees did not work in the areas in which they had responsibilities at the time the employees were disciplined, and, therefore, DeMauro, Buck, and Ackerman

---

[4] While Niagara Mohawk appears to agree that these three employees are Caucasian, they contend, and Diggs does not dispute, that such employees are actually older than, or approximately the same age as Diggs. (Def.'s SMF ¶¶ 18, 20; Dkt No. 21, Attach. 15 at 19.)

"were not consulted or involved" in any decisions to discipline those employees. (Dkt. No. 21, Attach. 1 ¶ 28; Dkt. No. 21, Attach. 9 ¶ 11; Dkt. No. 21, Attach. 11 ¶ 15.) "In the Second Circuit, whether or not co-employees report to the same supervisor is an important factor in determining whether two employees are subject to the same workplace standards for purposes of finding them similarly situated." *Conway v. Microsoft Corp., 414 F. Supp. 2d 450, 465-66 (S.D.N.Y. 2006)* (collecting cases); *see Gannon v. United Parcel Serv., 529 F. App'x 102, 104 (2d Cir. 2013)* ("[W]e conclude the district court correctly found [the plaintiff] was not similarly situated as a matter of law to the three employees who worked in a different division and were disciplined by a different division manager."); *McDowell v. T-Mobile USA, Inc., No. CV-04-2909, 2007 U.S. Dist. LEXIS 71591, 2007 WL 2816194, at *9 (E.D.N.Y. Sept. 26, 2007)* (concluding that employees who reported to a different supervisor than plaintiff were not similarly situated, despite the fact that they were subject to the same [*16] workplace rules), *aff'd, 307 F. App'x 531 (2d Cir. 2009)*.

Further, Niagara Mohawk argues the proposed comparators are inapposite because Diggs cannot show that they lied during Niagara Mohawk's investigations into their alleged misconduct. (Dkt. No. 21, Attach. 15 at 21.) Again, Buck, DeMauro, and Ackerman indicate in their affidavits that the three comparators "did not lie about their conduct during . . . investigatory meetings and instead admitted to their misconduct and apologized for it." (Dkt. No. 21, Attach. 1 ¶ 27; Dkt. No. 21, Attach. 9 ¶ 10; Dkt. No. 21, Attach. 11 ¶ 14.) Courts have routinely held that an employee who lies about his misconduct is not similarly situated in all material respects to comparator employees who did not lie about their misconduct. *See, e.g., Anderson v. Nat'l Grid, PLC, 93 F. Supp. 3d 120, 143-44 (E.D.N.Y. 2015)* ("The fact that [a co-worker] cooperated fully with the investigation, whereas plaintiff did not, is reason enough to hold that plaintiff and [the co-worker] were not similarly situated in all material respects."); *Rodriguez v. Long Island Am. Water, Inc., No. 12-cv-2970, 2014 U.S. Dist. LEXIS 136388, 2014 WL 4805021, at *9 (E.D.N.Y. Sept. 26, 2014)* (collecting cases and noting that "courts have granted summary judgment for the employer in circumstances . . . where the comparator employee (unlike the plaintiff) did [*17] not lie about the misconduct when confronted"); *Roggenbach v. Touro Coll. of Osteopathic Med., 7 F. Supp. 3d 338, 345 (S.D.N.Y. 2014)* (holding that a student who did not cooperate with a college's disciplinary process and was accused of dishonesty was not similarly situated in all material respects to comparator students); *Schweit v. City of New York, No. 04-CV-5462, 2007 U.S. Dist. LEXIS 28392, 2007 WL 1133440, at *6 (E.D.N.Y. Apr. 17, 2007)* ("[W]ith respect to the unidentified officers, [the plaintiff] has not shown that any of them made false or

misleading statements in connection with the investigation; consequently, [the plaintiff] has not demonstrated that he and any other officers . . . were similarly situated in all material respects.").

Diggs offers almost no response to Niagara Mohawk's arguments regarding whether the comparator employees are similarly situated. He merely states that he "made clear in his deposition testimony that the three Caucasian employees . . . were []similarly situated employees." (Dkt. No. 26 at 14.) Further, he asserts that one of the comparator employees worked in the Gas Department of Niagara Mohawk, as did Diggs, while the other two comparator employees worked in the Electrical Department. (*Id.*) The fact that two of the three comparator employees worked in a different department than Diggs supports Niagara Mohawk's argument that these two employees were [*18] not similarly situated to Diggs in all material respects. *See Gannon, 529 F. App'x at 104*. Ultimately, because the arbitrator's decision that there was just cause for Diggs' termination is highly probative of Niagara Mohawk's non-discriminatory reason for terminating Diggs, *see Collins, 305 F.3d at 119*, and because Diggs has not offered sufficient evidence of disparate treatment, he has failed to establish an inference of discriminatory intent to satisfy the fourth prong of his prima facie case. *See Simpson, 2005 U.S. Dist. LEXIS 3399, 2005 WL 545349, at *17* ("Plaintiff's lack of disparate treatment proof, in combination with the Hearing Officer's adverse decision, convinces the court that plaintiff has not shown, as he must, that his termination arose under circumstances giving rise to an inference of race discrimination."). Accordingly, Niagara Mohawk's motion for summary judgment on Diggs' race discrimination claim is granted.

## B. Age Discrimination

Claims of employment discrimination brought under the ADEA are subject to a largely identical analytical framework as those brought under title VII. *See Leibowitz v. Cornell Univ., 584 F.3d 487, 498 (2d Cir. 2009)* (describing the framework for age discrimination claims under the ADEA, and gender discrimination claims under Title VII), *superseded by statute on other grounds*, Local Civil Rights Restoration [*19] Act of 2005, N.Y.C. Local L. No. 85, as recognized in *Mihalik v. Credit Agricole Cheuvreux N. Am., Inc., 715 F.3d 102, 109 (2d Cir. 2013)*.[5] Again, with respect

---

[5] However, the court notes that "a claimant bringing suit under the ADEA must demonstrate that age was not just a motivating factor behind the adverse action, but rather the 'but-for' cause of it. Title VII, on the other hand, . . . authorize[s] a 'mixed motive'

to Diggs' burden to establish a prima facie case, it is undisputed that Diggs meets the first three elements of a discrimination claim.[6] *See id.* With respect to the forth element — whether the circumstances surrounding his termination give rise to an inference of discrimination — Diggs argues that his "discharge occurred under circumstances giving rise to an inference of age discrimination insofar as [Diggs] was an aged employee who was terminated under a pretext of misconduct and when no other viable reason existed to terminate his employment." (Dkt. No. 26 at 11.) Further, he contends that Niagara Mohawk "had obtained the best and most productive years out of [him], and that given his increasing age, [Niagara Mohawk] sought to dishonestly justify its termination of [him]." (*Id.*) The only evidence Diggs cites in support of this contention is an undated, unsigned, and unsworn statement which sets forth his belief that Niagara Mohawk "feels that because of [his] age they have gotten the best years out of [him]. The company may also feel [he is] a liability because of [his] health, and if they can push [him] out [*20] now they would save money on [his] retirement package." (Dkt. No. 26, Attach 4. at 2.)

As Niagara Mohawk points out, this document is inadmissible. (Dkt. No. 27 at 1 n.1); *see Riehl v. Martin, No. 9:13-cv-439, 2013 U.S. Dist. LEXIS 186610, 2014 WL 1289601, at *6 (N.D.N.Y. Mar. 31, 2014)* ("[U]nsworn statements are generally inadmissible in opposition to a motion for summary judgment."). Moreover, these allegations are conclusory and without evidentiary support. *See Brenner, 2015 U.S. Dist. LEXIS 124509, 2015 WL 5475628, at *5* ("'[C]onclusory statements, conjecture, and inadmissible evidence are insufficient to defeat summary judgment.'" (quoting *ITC Ltd. v. Punchgini, Inc., 482 F.3d 135, 151 (2d Cir. 2007)))*; *see also Holcomb, 521 F.3d at 137* ("Even in the discrimination context . . . a plaintiff must provide more than conclusory allegations to resist a motion for summary judgment."). Notably, [*21] the rationale of *Collins* applies to Diggs' age discrimination claims as well. *See Brenner, 2015 U.S. Dist. LEXIS 124509, 2015 WL 5475628, at *6* (applying *Collins* to ADEA claims). Thus, the arbitrator's decision is highly probative of the absence of discriminatory intent in Diggs' termination. *See Collins, 305 F.3d at 119.* Furthermore, Buck, Ackerman, and DeMauro are all

approximately the same age as Diggs. (Def.'s SMF ¶¶ 18-19); *see Chan v. Donahoe, 63 F. Supp. 3d 271, 294, 298 (E.D.N.Y. 2014)* ("An inference against discrimination exists where the person who participated in the allegedly adverse decision is also a member of the same protected class." (internal quotation marks and citation omitted)); *Marlow v. Office of Court Admin., 820 F. Supp. 753, 757 (S.D.N.Y. 1993)* ("[I]f [the] decisionmaker is in [the] same protected class as plaintiff, claims of discrimination become less plausible." (citation omitted)), *aff'd, 22 F.3d 1091 (2d Cir. 1994), aff'd, 513 U.S. 897, 115 S. Ct. 252, 130 L. Ed. 2d 173 (1994).*

Based on the foregoing, Diggs has not linked his termination to circumstances giving rise to an inference of age discrimination. Niagara Mohawk's motion for summary judgment regarding Diggs' age discrimination claim is therefore also granted.

## V. Conclusion

**WHEREFORE**, for the foregoing reasons, it is hereby

**ORDERED** that Niagara Mohawk's motion for summary judgment (Dkt. No. 21) is **GRANTED**; and it is further **ORDERED** that the complaint (Dkt. No. 1) is **DISMISSED**; and it is further; [*22]

**ORDERED** that the Clerk close this case; and it is further

**ORDERED** that the Clerk provide a copy of this Memorandum-Decision and Order to the parties.

**IT IS SO ORDERED**.

April 14, 2016

Albany, New York

/s/ Gary L. Sharpe

Gary L. Sharpe

U.S. District Judge

---

discrimination claim." *Leibowitz, 584 F.3d at 498 n.2* (citations omitted); *see Vega v. Hempstead Union Free Sch. Dist., 801 F.3d 72, 86 (2d Cir. 2015).*

[6] With respect to the first element, membership in a protected class, Diggs was fifty-one years old at the time of his discharge, (Def.'s SMF ¶ 18), and the protections of the ADEA are available "to individuals who are at least [forty] years of age." *29 U.S.C. § 631(a).*

Wayne Gradl

 Cited
As of: October 23, 2023 2:03 PM Z

## *Draper v. New York State Office of Parks & Historic Preservation*

United States District Court for the Western District of New York

August 29, 2013, Decided; August 29, 2013, Filed

10-CV-6414

**Reporter**

2013 U.S. Dist. LEXIS 123822 *; 2013 WL 4647631

JUDITH G. DRAPER, Plaintiff, v. NEW YORK STATE OFFICE OF PARKS, RECREATION, AND HISTORIC PRESERVATION, Defendant.

## Core Terms

hostile work environment, summary judgment, alleges, park police, discriminatory, subjected, discrimination claim, defense motion, employees, severe

**Counsel:** [*1] For Judith G. Draper, Plaintiff: Christina A. Agola, LEAD ATTORNEY, Brighton, NY; Ryan Charles Woodworth, Christina Agola PLLC, Brighton, NY.

For New York State Office of Parks, Recreation, and Historic Preservation, Defendant: J. Richard Benitez, LEAD ATTORNEY, NYS Attorney General's Office, Department of Law, Rochester, NY.

**Judges:** Michael A. Telesca, United States District Judge.

**Opinion by:** Michael A. Telesca

## Opinion

**DECISION and ORDER**

INTRODUCTION

Plaintiff Judith G. Draper, ("Draper") a former employee of the defendant New York State Office of Parks, Recreation, and Historic Preservation ("the Parks Department"), who retired in 2009, brings this action pursuant to Title VII of the Civil Rights Act of 1964 (codified at *42 U.S.C. § 2000e, et seq.*) claiming that she was discriminated against on the basis of her gender and subjected to a hostile work environment. Specifically, plaintiff claims that from 1986 to 2002, she was subjected to disparate treatment from her supervisors, and that after 2002, she was subjected to a hostile work environment

based on her gender.

Defendant moves for summary judgment against the plaintiff on grounds that plaintiff has failed to state a cause of action for a hostile work environment, [*2] and that her claims of disparate treatment are barred by the statute of limitations. For the reasons set forth below, 1 grant defendant's motion for summary judgment, and dismiss plaintiff's complaint with prejudice.

BACKGROUND

Plaintiff Judith G. Draper was hired in 1978 by the defendant New York State Office of Parks, Recreation, and Historic Preservation as a park-police dispatcher at Letchworth State Park ("the park"), located in the Counties of Livingston and Wyoming, New York. In 1981, plaintiff was promoted to the position of "Park Worker III," a job which included groundskeeping and serving park visitors with checking in to campsites. Plaintiff also supervised youth employees of that park.

In 1986, plaintiff became employed as a Park Police Officer. During her employment as a Park Police Officer, plaintiff was supervised by Majors David Page ("Page") and Scott Ritchie ("Ritchie"). According to the plaintiff, Page and Ritchie discriminated against her on the basis of her gender by treating her differently than other police officers, all of whom were male. In 2001, after 15 years of employment as a police officer, plaintiff filed a complaint of discrimination against the Parks Department [*3] with the New York State Division of Human Rights claiming that she had been discriminated against on the basis of her gender and a disability. In 2002, plaintiff settled her discrimination claim with the State, and withdrew her administrative complaint. As part of the settlement, Draper agreed to return to civilian employment at the park, where she would no longer be under the supervision of Majors Page or Ritchie.[1] Although plaintiff alleges that she

---

[1] Although plaintiff alleges in her Complaint and in an Affidavit that

was "pressured" into settling the dispute, she acknowledges that she did agree to withdraw the complaint and accept a position as a civilian employee at the park. Plaintiff further claims that although she was supposed to be payed "comparably" as a civilian employee, she was placed into a position that paid significantly less money than she received as a park police officer.

From 2002 to 2009, plaintiff remained employed as a civilian "Park Worker III" employee at Letchworth State Park. In 2009, after serving more than 30 years as a state employee, plaintiff accepted a "buyout" of $20,000, and retired from her position with a full pension. Plaintiff now claims, however, that she did not retire, but was constructively discharged as a result of a hostile work environment created by Page. In support of her claims of a hostile work environment, plaintiff contends that Page treated her with contempt while she was a park police officer, a position she held from 1986 through 2002. With respect to alleged actions Page took after 2002, when he was no longer Draper's supervisor, plaintiff alleges that on one occasion, in July 2009, Page referred to her by her last name **[*5]** only when referencing her over the police dispatch system. Plaintiff further alleges that in August, 2009, Page walked past her in an office without making eye contact with her, and proceeded to talk to two other female park employees. Similarly, in 2008, at an Arts and Crafts show, Page allegedly walked right by Draper without acknowledging her. Deposition Testimony of Judith Draper at p. 36. In her deposition testimony, plaintiff alleged that sometime in either 2008 or 2009, Page "completely ignored" her at an office party. Deposition Testimony of Judith Draper at p. 30. On other occasions, approximately six times per year, Draper claims that if Page passed her while the two were driving separate vehicles, Page "would not wave to me unless I had a passenger with me." Deposition Testimony of Judith Draper at p. 36. According to the plaintiff, these incidents made working at the Parks department so intolerable that she was forced to retire in September, 2009. Thereafter, plaintiff filed an administrative complaint of employment discrimination with the EEOC, and subsequently filed the instant action in this court.

---

"at all times relevant" her immediate supervisors were Page and Ritchie, there is absolutely no factual support in the record for this allegation. Rather, plaintiff acknowledged in her deposition that part of the reason she accepted the settlement of her discrimination claim and agreed to return **[*4]** to civilian employment at the park was to "get away" from supervision by Page and Ritchie. Deposition of Judith Draper at p. 26, lines 17-20. Plaintiff further stated that once she returned to civilian employment at the park she was supervised by Roland Beck and Kenneth Rorick, both of whom served as Park Managers, and who remained as her supervisors until the end of her employment in 2009. Id. p. 27.

## DISCUSSION

### I. Defendant's Motion for Summary Judgment

*Rule 56(c) of the Federal Rules of Civil Procedure* **[*6]** provides that summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." When considering a motion for summary judgment, all genuinely disputed facts must be resolved in favor of the party against whom summary judgment is sought. *Scott v. Harris, 550 U.S. 372, 380, 127 S. Ct. 1769, 167 L. Ed. 2d 686 (2007).* If, after considering the evidence in the light most favorable to the nonmoving party, the court finds that no rational jury could find in favor of that party, a grant of summary judgment is appropriate. *Scott, 550 U.S. at 380* (citing *Matsushita Elec. Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 586-587, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986)).*

### II. Plaintiff's Discrimination Claims are Without Merit

#### A. Hostile Work Environment

Draper claims that she was subjected to a hostile work environment, and that as a result, she was forced to resign from her employment. To state a claim of discrimination based on a hostile work environment, a plaintiff must establish the existence of a workplace that is "permeated with discriminatory intimidation, ridicule and insult, **[*7]** that is sufficiently severe or pervasive to alter the conditions of the victim's employment." *Torres v. Pisano, 116 F.3d 625, 630-631 (2d. Cir.1997)* (quoting *Harris v. Forklift Sys., Inc., 510 U.S. 17, 21, 114 S. Ct. 367, 126 L. Ed. 2d 295 (1993)).* "Conduct that is merely offensive and not severe or pervasive enough to create an objectively hostile or abusive work environment" will not establish a Title VII discrimination claim. *Torres, 116 F.3d at 631 (2d Cir.)* (internal quotes omitted); *Gallagher v. Delaney, 139 F.3d 338, 346 (2d Cir.1998)* ("A reasonable person would have to find the environment hostile or abusive, and the victim must have subjectively so perceived it."). To establish the existence of a hostile work environment, "[T]here must be a steady barrage of opprobrious [discriminatory] comments." *Snell v. Suffolk County, 782 F.2d 1094, 1103 (2d Cir.1986).* The conduct alleged, however, does not need to be so severe as to cause severe emotional or physical distress. *Harris, 510 U.S. at 21.* Rather, conduct that "detract[s] from employees' job performance, discourage[s] employees from remaining on the job, or keep[s] them from advancing in their careers" may be actionable under Title VII. *Harris, 510 U.S. at 21.*

Wayne Gradl

"Evaluating **[*8]** a hostile environment [claim] involves reviewing the totality of the circumstances, including 'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" *Miller v. McHugh, 814 F. Supp. 2d 299, 2011 WL 4091466, *8 (S.D.N.Y., September 14, 2011)*(quoting *Harris, 510 U.S. at 23*).

In the instant case, there is a total lack of evidence that plaintiff was subjected to a hostile work environment. Initially, the court notes that the administrative complaint in this case was filed on May 28, 2010. Pursuant to the 300 day statute of limitations applicable to discrimination claims, any claims of discriminatory acts that occurred prior to July 31, 2009 are time barred absent proof of a continuous and concerted pattern of discrimination directed at the plaintiff. In this case, there is no proof of a pattern of discrimination against the plaintiff, and accordingly, any alleged discriminatory acts occurring prior to July 31, 2009 are time barred. Moreover, any allegations regarding plaintiff's employment as a park-police officer are barred not **[*9]** only by the statute of limitations, but by her voluntary settlement of those claims in 2002, and her voluntary withdrawal of her discrimination complaint made with the New York State Division of Human Rights. Accordingly, any claims regarding her employment as a park police officer are not cognizable in this case.

With respect to allegedly discriminatory acts that took place after July 31, 2009, plaintiff alleges only that Page, on one occasion, walked past her without making eye contact with her and engaged in conversation with two other female employees. Such conduct, quite obviously, does not constitute the creation of a hostile work environment, and the court is unable to conceive of any scenario in which counsel for the plaintiff could, in good faith, allege that this conduct created a hostile work environment. Even considering the allegations which fall just outside the limitations period: that Page routinely failed to wave at her when driving past her on the road, that he ignored her at an office party and at a festival, and that he referred to her, on one occasion, by her last name only over a police dispatch system, there is simply no evidence whatsoever suggesting a claim **[*10]** for a hostile work environment.

Because plaintiff has failed to allege any acts which could be construed as creating a hostile work environment, I grant defendant's motion for summary judgment.

B. Disparate Treatment

Plaintiff alleges that she was treated differently than male employees during her employment as a park police officer from 1986 to 2002. Specifically, she alleges that Page told her that the park police department was "no place for a woman," and that he subjected her to significantly greater scrutiny than given to male police officers. She claims that her assigned vehicle was taken away from her while a park-police officer.

As stated above, all of these claims are time barred, as all of the alleged acts took place prior to 2002. The actions are well outside of the statute of limitations, and the claims were resolved in a 2002 voluntary settlement with the Parks Department which occurred under the auspices of the New York State Division of Human Rights. Because Title VII permits recovery only for discriminatory conduct that occurred within 300 days of the plaintiff's filing of a charge of discrimination with the EEOC, the conduct complained of here, which occurred more than **[*11]** 8 years prior to the filing of plaintiff's administrative complaint, is time barred, and thus fails to state a claim for discrimination. Accordingly, defendant's motion for summary judgment with respect to these claims granted.

CONCLUSION

For the reasons set forth above, I grant defendant's motion for summary judgment, and dismiss plaintiffs' Complaint with prejudice.

ALL OF THE ABOVE IS SO ORDERED.

/s/ Michael A. Telesca

Michael A. Telesca

United States District Judge

DATED: Rochester, New York

August 29, 2013

---

**End of Document**

| STATE OF NEW YORK | ) | | **AFFIDAVIT OF SERVICE** |
|---|---|---|---|
| | ) | ss.: | **BY OVERNIGHT EXPRESS** |
| COUNTY OF NEW YORK | ) | | **MAIL** |

I, Tyrone Heath, 2179 Washington Avenue, Apt. 19, Bronx, New York 10457, being duly sworn, depose and say that deponent is not a party to the action, is over 18 years of age and resides at the address shown above or at

**On November 9, 2023**

deponent served the within: **Brief for Defendants-Appellees**

**upon:**

Ruthetta L. Alford
*Plaintiff-Appellant Pro Se*
12 Olcott Place
Buffalo, New York 14225
(716) 816-5881

the address(es) designated by said attorney(s) for that purpose by depositing **1** true copy(ies) of same, enclosed in a postpaid properly addressed wrapper in a Post Office Official Overnight Express Mail Depository, under the exclusive custody and care of the United States Postal Service, within the State of New York.

**Sworn to before me on November 9, 2023**

**MARIANA BRAYLOVSKIY**
Notary Public State of New York
No. 01BR6004935
Qualified in Richmond County
Commission Expires March 30, 2026

**Job# 512753**